UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Case No. 06-43993

TRANS-INDUSTRIES, INC., *et al.*,               Chapter 7
                                                (Jointly Administered)[1]
            Debtors.                            Judge Thomas J. Tucker
_____/

CHARLES J. TAUNT, TRUSTEE,

            Plaintiff,

v.                                              Adv. Pro. No. 07-6790

JOAN PARKER COENEN,
in her capacity as representative of the
estate of Dale S. Coenen, deceased, *et al.*,

            Defendants.
_____/

**OPINION REGARDING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

**I.  Introduction**

        Among other things, this adversary proceeding raises a number of  statute of limitation

issues, which arose after a Chapter 7 bankruptcy trustee sued former pension plan fiduciaries for

breach of fiduciary duty under Employee Retirement Income Security Act of 1974 ("ERISA").

This opinion discusses such issues, and the interplay and interpretation of Bankruptcy Code

§ 108(a) (11 U.S.C. § 108(a)), and ERISA's statute of limitations, 29 U.S.C. § 1113.

        In this adversary proceeding, the Chapter 7 Trustee has asserted multi-million dollar

_____

        [1]  This case (*In re Trans-Industries, Inc.*, Case No. 06-43993) is being jointly administered with
the following cases: *In re Transign, Inc.*, Case No. 06-43995; *In re Transmatic, Inc.*, Case No. 06-43997,
and *In re Vultron, Inc.*, Case No. 06-43998. ("Order Pursuant to Fed. R. Bankr. P. 1015 Directing Joint
Administration of This Chapter 11 Case with Three Affiliated Cases" (Docket # 35)).

breach of fiduciary duty claims against Dale S. Coenen ("Coenen") and Kai R. Kosanke

("Kosanke"), two alleged fiduciaries of the Debtor Trans-Industries, Inc.'s pension plan - the

"Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan & Trust" (the "Plan").[2]  The

Trustee brings these claims under ERISA, in his capacity as successor to the Debtor, in its

capacity as plan administrator of the ERISA Plan, based on 11 U.S.C. § 704(a)(11).  The breach

of fiduciary duty claims are based on (1) the Plan's purchase of 19,000 shares of Series A

Preferred Stock of Trans-Industries, Inc. on June 5, 2001 (the "June 5, 2001 Transaction") (the

"Acquisition Claim"); (2) the Plan's retention of that preferred stock for a period of several years

thereafter, and the Plan's retention of the Debtor's common stock allegedly in amounts too great

and for too long (the "Retention Claims"); and (3) a series of transactions between the Plan,

Debtor, Coenen, and Fields in 2005, which resulted in Coenen and Fields receiving lump sum

cash distributions of the entire amount of their vested interests in the Plan, and which left the

Plan unable to satisfy its obligations to all of the other Plan participants (the "Distribution

Claim").

This adversary proceeding is before the Court on (1) the Trustee's motion for summary

judgment against both Defendants, Coenen and Kosanke (Docket # 286), and (2) Defendant

Coenen's motion for summary judgment (Docket # 278).  The summary judgment motions raise

statute of limitations issues, and other issues.  And by previous order, the Court allowed

Defendant Kosanke to "join" Coenen's summary judgment motion, but only with respect to

---

[2]  The Trustee originally sued two additional defendants, Richard A. Solon ("Solon") and Delmar
F. Fields ("Fields"), but later settled all claims against those defendants.

2

Coenen's arguments about the statute of limitations.[3]  So the Court deems Kosanke to have moved for summary judgment on that basis.  In referring to Coenen's motion, this opinion should be deemed also to refer to Kosanke's joinder of that motion, with respect to the statute of limitations issues.

After the Court held a hearing on the summary judgment motions, the original Chapter 7 Trustee and Plaintiff, David S. Allard, died.  After Charles J. Taunt was appointed the successor Chapter 7 Trustee, the Court ordered that he be substituted as Plaintiff in this adversary proceeding.[4]

Also after the hearing on the motions, Defendant Dale S. Coenen died.  On motion of the Trustee, the Court ordered that Coenen's widow, Joan Parker Coenen, be substituted as Defendant in place of Dale S. Coenen, but "only in her capacity as representative of the estate of Dale S. Coenen, and not in her personal capacity."[5]  References in this opinion to "Coenen" are to the late Dale S. Coenen, unless otherwise noted.

For the reasons stated in this opinion, the Court will grant Coenen's motion for summary judgment on the Acquisition Claim, and on any Retention Claims that are based on actions or inactions that occurred before December 14, 2001, based on the statute of limitations.  This

---

[3]  After the hearing on the summary judgment motions, in which counsel for Defendant Kosanke participated, Kosanke filed a "Motion to Join," seeking to join the summary judgment motion filed by Defendant Coenen, but only with respect to Coenen's arguments regarding the statute of limitations. (Docket # 405).  After considering the Trustee's and Coenen's written responses to that joinder motion, the Court granted the motion.  (*See* Opinion and Order, etc. (Docket # 422)).

[4]  Order Substituting Successor Chapter 7 Trustee as Plaintiff in this Adversary Proceeding, etc. (Docket # 444).

[5]  Order Granting Plaintiff-Trustee's Motion to Substitute Joan Coenen for Deceased Defendant Dale S. Coenen (Docket # 458).

3

ruling also will apply to the Trustee's claims against Kosanke.  The Court also will grant summary judgment for Coenen, on any claims based on actions or inactions that occurred on or after November 16, 2005, when Coenen ceased being a Plan fiduciary.  (This part of the Court's ruling does not apply to Kosanke).  In all other respects, the Court will deny Coenen's motion.

The Court will deny the Trustee's motion for summary judgment in its entirety.  A trial will be required on the Trustee's Retention Claims, to the extent they are not barred by the statute of limitations, and on the Trustee's Distribution Claim.

## II. Facts

### A. Background

Unless otherwise noted, the facts stated in this opinion are not in dispute.  Trans-Industries, Inc. was "formed . . . sometime in the late [19]60s for the sole purpose of acquiring Transign[, Inc.]."[6]  From its inception, until he was forced to resign in March 2005, Coenen was Chief Executive Officer ("CEO"), a Director, and Chairman of the Board of Directors of Trans-Industries, Inc. (the "Board").[7]  Although Coenen was forced to resign as CEO and Chairman of the Board in March 2005, he remained a Director until November 2005.[8]  Kosanke was Chief Financial Officer ("CFO"), Vice President, and Treasurer of Trans-Industries, Inc. from 1989 until he left the company in April 2006.[9]  Fields worked in several positions for Transign, Inc.

---

[6] Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 15.

[7] Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 16-18; Final Pre-Trial Or. (Docket # 371) at 6 ¶ 4 (Stipulation of Facts and Law).

[8] Final Pre-Trial Or. (Docket # 371) at 6 ¶ 4 (Stipulation of Facts and Law).

[9] *Id.* at 6 ¶ 4 (Stipulation of Facts and Law)*;* Tr. of Kosanke Dep. (Ex. 2 of Pl.'s Response in
(continued...)

both prior to and after its acquisition by Trans-Industries, Inc. He was the President of Transign, Inc. at the time he was fired in August 2004.[10]

## B. The Trans-Industries, Inc. Plan

In 1989, Trans-Industries, Inc. created the "Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan and Trust."[11]

### 1. The Plan's purchase of Trans-Industries, Inc. Series A Preferred Stock (the June 5, 2001 Transaction)

On June 5, 2001, when Trans-Industries, Inc. was experiencing operating losses and the possibility of not being able to continue operations, and needed to raise capital, the Board unanimously approved a consent agreement authorizing Trans-Industries, Inc. to issue 19,000 shares of Series A Preferred Stock to the Plan at a cost of $100 per share, for a total of $1.9 million.[12] The Series A Preferred Stock was not publicly traded; had "[a] cumulative dividend rate of $8.25 per share (or 8.25% per annum) . . . payable on the last day of May and November each year;" had a higher priority than the common stock in the payment of dividends or in a liquidation; and was "redeemable at the discretion of the Board of Directors . . . [for] $100 per

---

[9](...continued)
Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 10-11, 87.

[10] Tr. of Fields's Dep. (Ex. 30 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 15.

[11] Final Pre-Trial Or. (Docket # 371) at 6 ¶ 4 (Stipulation of Facts and Law); Ex. 24 of Pl.'s Response in Opp. To Def. Coenen's Mot. For Summ. J. (Docket # 307).

[12] Final Pre-Trial Or. (Docket # 371) at 7; *see also* Ex. 9 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at pdf. p. 2; Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 58-59; Tr. of Robert Paul Anderson Dep. (Ex. 14 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 40-41.

5

share plus all accumulated dividends."[13]

Before the Plan paid Trans-Industries, Inc. the $1.9 million to purchase the Series A Preferred Stock, no valuation study of the stock was performed. It was not until more than two years later, on October 16, 2003, that such a valuation study was completed by Amherst Capital Partners, L.L.C. ("Amherst"). Amherst valued the Series A Preferred Stock at $1,964,879 as of December 31, 2002, and at $1,906,671 as of June 30, 2003.[14] The valuation relied on financial information that Trans-Industries, Inc. provided to Amherst, including "the book values [of assets] contained in the audited statements of [Trans-Industries, Inc.]," and the fact that "management ha[d] indicated a desire to complete redemption of the preferred shares over the 2004-2005 time frame."[15] Amherst's valuation study noted that Trans-Industries, Inc. had not been paying dividends on the Series A Preferred Stock. Based on that fact, Amherst compared the Series A Preferred Stock to publicly-traded preferred stocks not paying dividends. Amherst's valuation study stated, in relevant part:

> The quantity of comparable, publicly traded preferred stocks that are not paying dividends is quite limited. Of the 75 preferred stocks listed in Attachment F that have suspended dividend payment, the majority of the firms are in bankruptcy (e.g., Enron, Worldcom) and have minimal chance of paying significant amounts out to the preferred shareholders. These stocks trade at distressed values that are a fraction of the total book value of the liquidation preference and accrued dividends.

_____

[13] Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Ex. 10 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at pdf. pp. 8, 12.

[14] *Id.* at pdf. pp. 6, 18.

[15] *Id.* at pdf. pp. 5, 13, 18.

6

Only a small number of shares have maintained value after suspension of dividends. These shares belong to companies where financial difficulties are being encountered, but the market believes substantial payment of the amount due will be made at some undetermined future date.[16]

## 2. The Plan after it was amended in 2004

On January 11, 2004, the Plan was amended, with an effective date of January 1, 2003.[17] Kosanke and Coenen executed various documents that amended the Plan, including the "Adoption Agreement for The Benefit Advantage, Inc. Non-Standardized 401(k) Profit Sharing Plan and Trust" (the "Adoption Agreement").[18] Kosanke had the opportunity to review the Adoption Agreement before he signed it.[19] The Adoption Agreement, states that "Kai Kosanke" and "Dale S. Coenen" would "serve as discretionary Trustee(s) over assets not subject to control by a corporate Trustee."[20]

The Summary Plan Description, which all of the participants of the Plan received, also

---

[16] *Id.* at pdf. p. 16. Amherst updated the original stock valuation on December 21, 2004, opining that as of December 31, 2003, the stock was worth $2,035,614 and as of September 30, 2004, the stock was worth $2,087,843. (*See* Ex. 22 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300).) Amherst later performed a third valuation, finding that as of September 30, 2005, the stock was worth $997,349. (*See* Ex. 18 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300).)

[17] Final Pre-Trial Or. (Docket # 371) at 6 ¶ 4 (Stipulation of Facts and Law); Ex. 20 of Pl.'s Response in Opp'n to Def. Solon's Mot. for Summ. J. (Docket # 299) at pdf. pp. 80, 103, 110, 116.

[18] *See, e.g.,* Ex. 20 of Pl.'s Response in Opp'n to Def. Solon's Mot. for Summ. J. (Docket # 299) at pdf. pp. 103, 110, 116. Under the Adoption Agreement, Trans-Industries, Inc. "adopt[ed] The Benefit Advantage, Inc. Prototype Non-Standardized 401(k) Profit Sharing Plan and Trust" and elected various other provisions. *Id.* at 79.

[19] Tr. of Kosanke Dep. (Ex. 2 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 192-93.

[20] Ex. 20 of Pl.'s Response in Opp'n to Def. Solon's Mot. for Summ. J. (Docket # 299) at pdf. 80; Tr. of Kosanke Dep. (Ex. 2 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 191 (emphasis added).

listed Coenen and Kosanke as Trustees of the Plan, under the heading "Trustee Information."[21]

The Plan names the "Employer" (Trans-Industries, Inc.) as the Plan Administrator.[22]

Paragraph 7.2(a) of the Plan provides, in relevant part, that

> if the Employer in the Adoption Agreement . . . designates the Trustee to administer all or a portion of the trust as a discretionary Trustee . . . then the Trustee has the discretion and authority to invest, manage, and control those Plan assets except . . . those assets which are subject to the investment direction of a Participant . . . or an Investment Manager, the Administrator, or other agent appointed by the Employer."[23]

Paragraph 7.9 of the Plan is entitled "Annual Report of the Trustee" and requires "the Trustee or its agent" to prepare an annual

> written statement of account with respect to the Plan Year . . . setting forth:
>
> (1)      the net income, or loss, of the Trust Fund;
>
> (2)      the gains, or losses realized by the Trust Fund upon sales or other disposition of the assets;
>
> (3)       the increase, or decrease, in the value of the Trust Fund;
>
> (4)      all payments and distributions made from the Trust Fund; and

---

[21] Tr. of Kosanke Dep. (Ex. 2 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 185-88. A document entitled "Trans-Industries, Inc. Employee Profit Sharing Plan Issues" also lists Coenen and Kosanke as Trustees of the Plan. (Ex. 23 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 3 ¶ IV.A. A document entitled "Fiduciary Responsibility Under ERISA" prepared by Charles Kelly, an attorney hired to advise Trans-Industries, Inc. on ERISA issues also states that "[t]he Individual Trustees who serve as discretionary Trustees over the assets of the [P]lan are Kai Kosanke and Dale Coenen. " (Ex. 3 of Docket # 300 at pdf. p. 9.) Kosanke also signed at least one letter as the Trustee for the Plan. (Tr. of oral argument on Summ. J. Mots. (Docket # 395) at 51.)

[22] Ex. 20 of Pl.'s Response in Opp'n to Def. Solon's Mot. for Summ. J. (Docket # 299) at pdf. p. 81.

[23] *Id.* at pdf. p. 49.

(5)     such further information as the Trustee and/or Administrator deems appropriate.[24]

Paragraph 10.12 of the Plan provides that "[t]he 'named Fiduciaries' of this Plan are (1) the Employer, (2) the Administrator, (3) the Trustee (if the Trustee has discretionary authority as elected in the Adoption Agreement or as otherwise agreed upon by the Employer and the Trustee)[.]"[25]

Paragraph 6.4(a) of the Plan provides that "[i]f a Participant's employment with the Employer is terminated for any reason other than death, Total and Permanent Disability, or retirement, then . . . the Administrator shall direct that the entire Vested portion of the Terminated Participant's Combined Account be payable to such Terminated Participant provided the conditions, if any, set forth in the Adoption Agreement have been satisfied."[26]

Paragraph 10.15 of the Plan provides that "[a]ll provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner."[27]

Until Debtors filed bankruptcy, Trans-Industries, Inc. had liability coverage for the fiduciaries of the Plan. In procuring the fiduciary liability coverage, "the intent was to cover anybody that worked with the [P]lan, whether they were a fiduciary or not[;]" namely the assistant treasurer, (which was either Keith LeComb or Paul Clemo depending on the time frame

---

[24] *Id.* at pdf. p. 54.

[25] *Id.* at pdf. p. 60.

[26] *Id.* at pdf. p. 37.

[27] *Id.* at pdf. p. 61.

9

involved); Coenen and Kosanke.[28]   Kosanke performed administrative responsibilities for the

Plan, including: retaining records; administrative reporting; accounting; the creation of monthly

balance sheets of the Plan's assets; distribution of quarterly reports to Plan participants;

distribution of annual reports required by Paragraph 7.9 of the Plan to Plan participants;

determining the eligibility of Plan participants; communicating with Plan participants; and

determining or calculating the distributions that Plan participants were entitled to.[29]   Coenen

determined what investments the nonparticipant-directed profit-sharing portion of Plan made and

retained.[30]

### 3.  The liquidity problems with the Plan

In March 2004, Richard Solon ("Solon"), became the President, Chief Operating Officer

("COO"), and a member of the Board.[31]   In August 2004, Solon fired Fields from his position as

President of Transign, Inc.[32]   On August 28, 2004, after Solon fired him, Fields wrote a letter

addressed to Kosanke as CFO of Trans-Industries, Inc. with copies to Solon and to Coenen,

---

[28] Tr. of Kosanke Dep. (Ex. 2 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 139, 146-48.

[29] *Id.* at 12, 16, 26-27, 30-31, 33, 122, 130-34, 188-89, 199-200; *see also* Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 24-25, 31-32, 37, 45-52, 116-17, 124-29; *see also* Tr. of Solon Dep. (Ex. 13 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 145-46.

[30] Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 21, 34.

[31] Tr. of Solon Dep. (Ex. 13 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 22-23.

[32] Tr. of Fields Dep. (Ex. 30 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 15, 21.

10

requesting payment of his entire vested interest in the Plan.[33] Fields's vested interest was about

36% of the Plan's assets, which had an estimated total value of approximately $3.9 million as of

August 31, 2004.[34] Trans-Industries, Inc. reported to Fields "that he ha[d] a profit sharing

balance of approximately $1.4 million as of August 31, 2004."[35] But as of that date, 70% of the

Plan's assets consisted of preferred and common stock of Trans-Industries, Inc.[36] Fields's

request created a liquidity crisis for the Plan, because even if Trans-Industries, Inc. liquidated all

of the Plan's investments other than the stock it held in Trans-Industries, Inc., there would be a

shortfall of more than $300,000.00 in cash needed to pay Fields his vested interest in full.[37]

In response to the liquidity crisis created by Fields's distribution request, Trans-Industries

Inc. hired Relational Advisors, later known as RA Capital Advisors, LLC, a merchant banking

company, to advise it.[38] In addition, upon the advice of Robert Paul Anderson ("Anderson"),

outside legal counsel for Trans-Industries, Inc, and Secretary to the Board, Coenen, Kosanke, and

Anderson met with Charles Kelly ("Kelly"), an attorney who, according to Anderson, was more

experienced in ERISA issues than he was, to discuss the Plan's liquidity problems caused by

---

[33] Ex. 12 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at 3.

[34] Ex. 3 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at 2.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 156; Tr. of Solon Dep. (Ex. 13 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 48-49.

Fields's distribution request.[39]

On September 17, 2004, the Board held a meeting to discuss the June 5, 2001 Transaction, by which the Plan had paid Trans-Industries, Inc. $1.9 million for the Series A Preferred Stock.[40] By decision of the Board, "[o]n the advice of counsel and on its own initiative, [Trans-Industries, Inc.] . . . decided to unwind the [June 5, 2001 Transaction]" and "to appoint two of its Directors who were not involved in the [June 5, 2001 Transaction; namely James O'Brien ("O'Brien") and Solon,)] to make a recommendation of a method and formula for unwinding the transaction."[41]

After the Board's September 17, 2004 meeting, attorney Kelly prepared a memorandum dated October 6, 2004. The Kelly memorandum raised serious concerns about possible breaches of fiduciary duty under ERISA based on the June 5, 2001 Transaction, and the continued retention of the Series A Preferred Stock in the Plan, and warned that "ERISA and IRS provide for substantial penalties and personal liability of fiduciaries," and that "'an ERISA Event' would place [Trans-Industries, Inc.] in violation of its [current credit arrangement] covenants."[42] The

---

[39] Tr. of Anderson Dep. (Ex. 14 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 6-9, 11-19, 34-42.

[40] Memorandum prepared by Anderson dated November 22, 2004 (Ex. 29 of Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at pdf. p. 2.

[41] *Id.*; *see also* Tr. of Anderson Dep. (Ex. 14 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 76-77.

[42] Ex. 3 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at pdf. pp. 2-3. The Kelly memorandum included the following:

      II.  Initial Concerns

      A.      Did the original acquisition of the preferred stock breach
              the fiduciary standards established by ERISA?

(continued...)

memorandum had an attachment entitled "Fiduciary Responsibility Under ERISA," which contained a detailed explanation of relevant ERISA law and included the following topic headings: "Basic Duty of Fiduciary;" "The Exclusive Benefit Rule;" "The Prudent Man Rule;" The Diversification Requirement;" "Compliance With Plan Documents;" "Co-Fiduciary Liability;" "Remedial Action Requirement;" "ERISA's Prohibited Transaction Rules;" and "Covenants, Representations and Warranties in Credit and Security Agreement Between Trans-Industries, Inc. and Affiliated Companies and The Huntington National Bank."[43]   The

---

[42](...continued)

      B.    Does continuing to hold the preferred stock in the portfolio [of the Plan] violate ERISA requirements?

          i.    Exclusive Benefit Rule - Investments must be made for the exclusive benefit of the Plan participants and beneficiaries.

          ii.    Prudent Investor Rule: diversification, liquidity and rate of return.

      C.    Compliance with Plan documents

          i.    Was the Preferred stock invested "exclusively" for the benefit of the participants and beneficiaries as required by ERISA (see memorandum attached as Exhibit "C")?

          ii.    Does the current Plan document require divestment of the preferred stock.

      D.    ERISA and IRS provide for substantial penalties and personal liability of fiduciaries.

      E.    Under [Trans-Industries, Inc.'s] current credit arrangement, an "ERISA Event" would place [Trans-Industries, Inc.] in violation of its [current credit arrangement] covenants.

[43] *Id.* at pdf. pp. 9-17.

13

memorandum stated that "[i]f the action called for by the plan provision is inconsistent with ERISA, the fiduciary is obligated to ignore the plan provision."[44]   The memorandum also explained that "[i]f a fiduciary becomes aware of a breach of duty by a co-fiduciary, the fiduciary must try to remedy the breach."[45]   In this regard, the memorandum stated:

> A plan fiduciary, plan sponsor, party in interest, or other person in a position to correct a breach may avoid assessment of civil penalties under ERISA Section 502(1) for possible breaches of fiduciary duties by correcting such breaches, and reporting them to [the Department of Labor's] Pension and Welfare Benefits Administration ("PWBA") pursuant to PWBA's Voluntary Fiduciary Correction Program (VFC Program).  To participate in the VFC Program, the plan official must:
>
>     1.  Identify the violation;
>
>     2.  Correct the specific violations identified;
>
>     3.  Restore any plan losses and profits with interest;
>
>     4.  Notify participants and beneficiaries; and
>
>     5.  File an application including documents evidencing corrected financial transactions with the appropriate PWBA regional office.[46]

After Kelly prepared the memorandum, he met with Coenen, Kosanke, and Anderson to discuss it.[47]   At that meeting, Kelly expressed his concern that the June 5, 2001 Transaction may have run afoul of ERISA, and advised Coenen, Kosanke, and Anderson that the Plan's purchase

---

[44] *Id.* at pdf. p. 11.

[45] *Id.* at pdf. p. 12.

[46] *Id.*

[47] Tr. of Anderson Dep. (Ex. 14 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 36-37.

of the Series A Preferred Stock should be unwound.[48]   Kelly also advised Coenen, Kosanke, and

Anderson that Trans-Industries, Inc. should consult with "a full fledged ERISA firm."[49]

According to Anderson, the meeting ended with a lot of open issues, and the understanding that

Coenen and Kosanke were going to have to come up with some plans to address those issues.[50]

On November 10, 2004, Anderson, Kosanke, Coenen, and Dan Nemes ("Nemes"), a

Certified Public Accountant, had a meeting to discuss how to redeem the Series A Preferred

Stock from the Plan.[51]   That meeting was described in a memorandum prepared by Anderson,

dated November 12, 2004.[52]   The memorandum stated that the Series A Preferred Stock was

valued on the books of Trans-Industries, Inc. at $2,176,000; that Coenen held a 22% vested

interest in the Plan worth approximately $950,000; and that Coenen was "willing to take an in-

kind distribution/rollover vested percentage in 100% of the [P]lan's preferred stock."[53]   It also

stated that "[t]he Plan would either be terminated or Mr. Coenen would resign as an employee

and enter into a consulting agreement with [Trans-Industries, Inc.], so that he could roll his

preferred stock into his own separate IRA."[54]

On November 18, 2004, O'Brien, Solon and Anderson had a telephone conference to

further discuss how to unwind the June 5, 2001 Transaction.  Among other things, they discussed

---

[48] *Id.* at 36, 44.

[49] *Id.* at 42.

[50] *Id.* at 53.

[51] *Id.* at 69-70.

[52] Ex. 4 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300).

[53] *Id.* at pdf. p. 2.

[54] *Id.* at pdf. p. 3.

the possibility of Coenen taking a distribution of his vested interest in the Plan in kind, and the Plan being amended to allow for a distribution in kind.[55]

Sometime in late 2004, a document entitled "Trans-Industries, Inc. Employee Profit Sharing Plan Issues" was prepared, outlining "a course of action designed to resolve issues relating to the . . . Plan" (the "Plan Issues Document").[56] The Plan Issues Document stated that Fields's interest in the Plan was 35.6%, valued at $1,451,052.60 as of June 30, 2004.[57] In the Plan Issues Document, there was an assumption that the Plan would be terminated and all participants of the Plan would receive distributions of their vested interest in the Plan.[58] The document also stated that Coenen and Kosanke, as Plan Trustees, would be asked to voluntarily take an in-kind distribution of Series C Preferred Stock in full satisfaction of their vested interests in the Plan;[59] and that some identified Plan participants, including Fields, would be asked to voluntarily "take some Series C Preferred Stock in satisfaction of their interests in the [Plan]";[60] and that "[s]ince some [P]lan participants will be given a choice as to whether to receive a [P]lan distribution in cash or Series C Preferred Stock, all [P]lan participants must be given the same right to elect to receive their [P]lan distributions in either cash or Series C

---

[55] Memorandum prepared by Anderson dated November 22, 2004 (Ex. 29 of Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at pdf. p. 2.

[56] Ex. 23 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300); Tr. of Solon Dep. (Ex. 13 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 53-54.

[57] Ex. 23 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at 4 ¶ V.A.

[58] *Id.* at 1 ¶ I.B.1, 6 ¶¶ VII.D-VII.E.

[59] *Id.* at 3-4 ¶¶ IV.A-IV.E.

[60] *Id.* at 4 ¶ V.A.

16

Preferred Stock."[61] The Plan Issues Document "assumed that all participants but the participants named in th[e] outline [as being asked to receive Series C Preferred Stock] w[ould] elect cash."[62]

On November 17, 2004, the Board conducted a regular meeting at which it discussed the Plan. Present at the meeting were Coenen, O'Brien, Robert J. Ruben, and Solon. At the meeting the Board unanimously approved a motion to amend the Plan "to allow for a distribution or roll over in kind."[63]

The Plan's liquidity crisis deepened on March 16, 2005, when Coenen was forced to resign and became entitled to receive his 22.4% vested interest in the Plan's assets, valued at $913,191.04 as of June 30, 2004.[64]

### 4. The Plan Distributions to Fields and Coenen

Although one option repeatedly discussed for dealing with the Plan's liquidity crisis was to terminate the Plan and make distributions to all of the Plan participants based on their vested interests in the Plan, that approach was not followed. Rather than terminating the Plan, Trans-Industries, Inc. entered into various agreements with Coenen and Fields, under which Coenen and Fields would receive cash distributions from the Plan, on the condition that they would use a portion of the cash received to purchase restricted common stock of Trans-Industries, Inc. Trans-Industries, Inc. would then use the money received from such common stock purchases to

---

[61] *Id.* at 5 ¶ VI.A.

[62] *Id.*

[63] Ex. 15 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at pdf. p. 9.

[64] *See* Ex. 17 of Pl.'s Mot. for Summ. J. (Docket # 286) ("Agreement for Management Succession, Resignation and Severance of CEO, and Other Miscellaneous Matters") at ¶ 1.1 (noting that Coenen's resignation was effective March 16, 2005); Ex. 23 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at 3 ¶ IV.B.1 (valuing Coenen's interest in the Plan).

redeem Series A Preferred Stock from the Plan.[65]

### a. Trans-Industries, Inc.'s agreements with Coenen

On March 16, 2005, the Board; namely Coenen, Harry E. Figgie ("Figgie"), Solon, O'Brien, Robert J. Ruben, and H. Sean Mathis; signed a special resolution, which provided for the resignation of Coenen as CEO of Trans-Industries, Inc., the appointment of Solon in Coenen's place; and entering into various agreements with Coenen. Those agreements with Coenen were: (i) the "Agreement for Management Succession, Resignation and Severance of CEO and Other Miscellaneous Matters;" (ii) the "Severance Agreement and Release of Claims;" (iii) the "Stock Purchase Agreement;" (iv) Amendment No. 3 to the Right of First Refusal Agreement; and (v) the "Stock Restriction Agreement" (collectively, the "Coenen Transaction Agreements").[66]

Trans-Industries, Inc. and Coenen actually executed the Coenen Transaction Agreements, which were drafted by Anderson, on May 23, 2005, with an effective date of March 16, 2005. Under the "Agreement for Management Succession, Resignation and Severance of CEO and Other Miscellaneous Matters," Coenen resigned as CEO, effective March 16, 2005, but was to "remain a member of the Board of Directors until his earlier resignation or removal in

---

[65] Anderson described the approach taken as follows:

> In a nutshell, . . . cash distributions were going to be made out to [Coenen and Fields] and they were going to immediately turn around and purchase corporate Trans-Industries[, Inc.] stock. And Trans-Industries[, Inc.] would immediately take the cash and put it into the profit sharing plan and redeem[] the [Series A Preferred Stock].

Tr. of Anderson Dep. (Ex. 14 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 85.

[66] Ex. 17 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at pdf. pp. 2-38.

accordance of with the bylaws of [Trans-Industries, Inc.], or otherwise."[67]  Coenen also was to "continue to act as Trustee of the . . . Plan until the earlier of November 16, 2005 or the termination of the . . . Plan."[68]  The Agreement also provided for distribution of Coenen's vested interest in the Plan, and its rollover into Coenen's IRA, conditioned on Coenen using the distributed amount less $59,000 to purchase common stock from Trans-Industries, Inc.[69]  The "Severance Agreement and Release of Claims," provided for a severance payment of $120,000.00 to Coenen; health care coverage until November 16, 2005 "at the current employee cost" to be deducted from the severance payment; and payment for a company vehicle until November 1, 2005.[70]

### b.  Trans-Industries, Inc.'s stock purchase agreement with Fields

Fields also entered into an agreement with Trans-Industries, Inc. that required him to purchase common stock from Trans-Industries, Inc., after receiving a distribution of his vested interest in the Plan.  Under his "Stock Purchase Agreement" with the company, Fields agreed to purchase $400,000 worth of common stock of Trans-Industries, Inc., on the date that he received a distribution of his vested interest in the Plan.[71]

### c.  The impact on the Plan of Trans-Industries, Inc.'s transactions with Coenen and Fields

As a result of the agreements between Trans-Industries, Inc., Coenen and Fields, and the

---

[67] *Id.* at pdf. p. 5 ¶¶ 1.1-1.2.

[68] *Id.* at pdf. p. 6 ¶ 1.3.

[69] *Id.* at pdf. p. 6 ¶¶ 3.1-3.2.

[70] *Id.* at pdf. p. 12-13 ¶¶ 1-2, 4, 6.

[71] Ex. 26 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at pdf. pp. 2-3  ¶¶ 2.1,  3.1, and 4.1.

related transactions under those agreements, only Coenen and Fields and a few other employees received cash distributions from the Plan in June 2005. On June 17, 2005, the Plan had a cash balance of $985,068.00. After a series of transactions with, and distributions to, Coenen and Fields based on their vested interests in the Plan, only $3,719.24 *of cash* remained in the Plan for the rest of the approximately 175 Plan participants. The cash distributions from the Plan are detailed in a document entitled "Trans Industries, Inc. Profit Sharing Plan Cash Transaction 'Checklist' June 17, 2005."[72] It shows the following:

| | Date | Activity | Balance |
|---|---|---|---|
| Cash Balance | 6/17/05 | 985,068.00 | 985,068.00 |
| Coenen Distribution | 6/21/05 | (59,000.00) | 926,068.00 |
| Coenen IRA Outgoing Wire | 6/21/05 | (910,763.65) | 15,304.35 |
| Misc. Employee Distributions | 6/21/05 | (2,247.11) | 13,057.24 |
| Loan from TI | 6/21/05 | 15,000.00 | 28,057.24 |
| Coenen IRA Incoming Wire to TI | 6/23/05 | 0.00 | 28,057.24 |
| TI Wire (Coenen) | 6/23/05 | 910,763.65 | 938,820.89 |
| Figgie Wire to TI | 6/22/05 | 0.00 | 938,820.89 |
| Figgie Wire (From TI) | 6/24/05 | 250,000.00 | 1,188,820.89 |
| Fields IRA Outgoing Wire | 6/29/05 | (410,000.00) | 778,820.89 |
| Fields IRA Incoming Wire to TI | 6/30/05 | 0.00 | 778,820.89 |
| Fields Wire From TI | 6/30/05 | 400,000.00 | 1,178,820.89 |
| Fields Distribution | 6/30/05 | (1,175,101.65) | 3,719.24 |

After the June 2005 cash distributions, the only other assets remaining in the Plan, other than the $3,719.24 in cash, were Series A Preferred Stock and common stock of Trans-Industries, Inc.

At no time after Fields's and Coenen's distribution requests were the other plan participants informed about the liquidity crisis, the options that were being discussed for handling the crisis, or the planned distributions to Coenen and Fields.[73]

---

[72] Ex. 16 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300).

[73] Tr. of Solon Dep. (Ex. 13 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J.

(continued...)

20

At the time of the June 5 cash distributions listed in the document quoted above, Coenen and Kosanke were still the named "discretionary Trustees" of the Plan.

## C.  The bankruptcy cases

Less than a year after the June 5 Plan distributions to Coenen and Fields, on April 3, 2006, Trans-Industries, Inc. and four of its wholly-owned subsidiaries filed voluntary petitions for relief under Chapter 11.  The bankruptcy cases are being jointly administered under the Trans-Industries, Inc. case number, 06-43993.  On October 17, 2006, the cases were converted to Chapter 7.  On October 20, 2006, David W. Allard was appointed the Chapter 7 Trustee.  On December 14, 2007, the Trustee filed this adversary proceeding.

## III.  Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  As discussed at length in a prior opinion in this case, the Court has "related to" subject matter jurisdiction over this adversary proceeding, and this is a non-core proceeding.  *See Allard v. Coenen* (*In re Trans-Industries, Inc.*), 419 B.R. 21, 24-25 (Bankr. E.D. Mich. 2009).  All the remaining parties in this adversary proceeding (*i.e.*, the Plaintiff-Trustee and Defendants Dale S. Coenen and Kai R. Kosanke) expressly consented to the bankruptcy court conducting any trial in this adversary proceeding and entering a final judgment, under 28 U.S.C. § 157(c)(2).[74]  For this reason, this bankruptcy court has both statutory and constitutional authority to enter a final judgment on the

_____

[73](...continued)
(Docket # 300)) at 59-60; Tr. of Coenen Dep. (Ex. 1 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300)) at 127-29.

[74]  *See* Final Pretrial Or. (Docket # 371) at 1.

Plaintiff-Trustee's claims.  *See* 11 U.S.C. § 157(c)(2); Fed.R.Bankr.P. 7012(b); *see generally*

*Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).

## IV. Summary judgment standards

As this Court has stated previously, in *McCallum v. Pixley* (*In re Pixley*), 456 B.R. 770,

774-75 (Bankr. E.D. Mich. 2011):

> Fed.R.Civ.P. 56(a), applicable to bankruptcy adversary
> proceedings under Fed.R.Bankr.P. 7056, provides that a motion for
> summary judgment "shall" be granted "if the movant shows that
> there is no genuine dispute as to any material fact and the movant
> is entitled to judgment as a matter of law."  In *Cox v. Kentucky
> Dep't of Transp.*, 53 F.3d 146, 149-50 (6th Cir. 1995), the court
> elaborated:
>
>> The moving party has the initial burden of proving
>> that no genuine issue of material fact exists and that
>> the moving party is entitled to judgment as a matter
>> of law.  To meet this burden, the moving party may
>> rely on any of the evidentiary sources listed in Rule
>> 56(c) or may merely rely upon the failure of the
>> nonmoving party to produce any evidence which
>> would create a genuine dispute for the [trier of fact].
>> Essentially, a motion for summary judgment is a
>> means by which to challenge the opposing party to
>> 'put up or shut up' on a critical issue.
>> If the moving party satisfies its burden, then the
>> burden of going forward shifts to the nonmoving
>> party to produce evidence that results in a conflict
>> of material fact to be resolved by [the trier of fact].
>> In arriving at a resolution, the court must afford all
>> reasonable inferences, and construe the evidence in
>> the light most favorable to the nonmoving party.
>> However, if the evidence is insufficient to
>> reasonably support a . . . verdict in favor of the
>> nonmoving party, the motion for summary judgment
>> will be granted.  Thus, the mere existence of a
>> scintilla of evidence in support of the plaintiff's
>> position will be insufficient; there must be evidence
>> on which the [trier of fact] could reasonably find for
>> the plaintiff.

22

. . .

> Finally, the Sixth Circuit has concluded that, in the
> "new era" of summary judgments that has evolved
> from the teachings of the Supreme Court in
> *Anderson* [*v. Liberty Lobby, Inc.,* 477 U.S. 242
> (1986)], *Celotex* [*Corp. v. Catrett*, 477 U.S. 317
> (1986)] and *Matsushita* [*Electric Indus. Co., Ltd. v.
> Zenith Radio Corp.,* 475 U.S. 574 (1986)], trial
> courts have been afforded considerably more
> discretion in evaluating the weight of the
> nonmoving party's evidence. The nonmoving party
> must do more than simply show that there is some
> metaphysical doubt as to the material facts. If the
> record taken in its entirety could not convince a
> rational trier of fact to return a verdict in favor of
> the nonmoving party, the motion should be granted.

> *Id.* (internal quotation marks and citations omitted). In
> determining whether the moving party has met its burden, a court
> must "believe the evidence of the nonmovant, and draw all
> justifiable inferences in favor of the nonmovant." *Ingram v. City
> of Columbus*, 185 F.3d 579, 586 (6th Cir.1999)(relying on *Russo v.
> City of Cincinnati*, 953 F.2d 1036, 1041-42 (6th Cir.1992)).

## V. Discussion of the motions

### A. The statute of limitations arguments

One of the issues raised by the summary judgment motions is whether and to what extent

the Trustee's claims are barred by ERISA's statute of limitations, 29 U.S.C. § 1113.

Defendant Coenen argues, among other things, that "the evidence demonstrates that any

claim against [him] was time-barred before Trans-Industries[, Inc.] filed a bankruptcy petition."[75]

If, however, the Court does not dismiss all of the claims against Coenen based on the applicable

statute of limitations, Coenen argues, "the Court should at the least rule that [he] can only be

---

[75] Def. Dale S. Coenen's Supplemental Br. Regarding the Statute of Limitations (Docket # 401)
at 2.

07-06790-tjt    Doc 483    Filed 09/25/15    Entered 09/25/15 14:17:09    Page 23 of 71

liable for alleged actions or inactions taken between December 18, 2001[76] [(6 years before the date the Trustee filed this adversary proceeding)] and November 2005 [(the time after which Coenen was no longer a trustee of the Plan)]."[77] Coenen argues that because the June 5, 2001 Transaction occurred before December 18, 2001, any claim based on, or related to, the June 5, 2001 Transaction (the Acquisition Claim) is time-barred by ERISA's 6-year statute of limitations.

In response to Coenen's statute of limitations argument, the Trustee conceded during oral argument that any breach of fiduciary duty claim based solely on the June 5, 2001 Transaction (the Acquisition Claim) was barred by ERISA's 6-year statute of limitations. For example, during oral argument, the Trustee's counsel stated the following in response to the Court's questioning:

> THE COURT: So is the answer to my question then, that -- that the trustee does concede that any breach of fiduciary duty claim based solely on the acquisition of the preferred stock in 2001, is time barred.
>
> MR. ETZEL: If you take the strict six year statute of limitations or statute – you know, of repose under ERISA, yes, it would be because we filed our lawsuit in December of '07. The transaction was in June of '01.
>
> THE COURT: Okay. So the – the fiduciary duty breach claims are all then based on the post December, whatever the day it was, 18, 2001, from that date forward the dates after that date, December of '01.

---

[76] Coenen's brief in support of his motion for summary judgment assumes that December 18, 2007 is the date that the Trustee filed this adversary proceeding. However, the Trustee filed this adversary proceeding on December 14, 2007.

[77] Br. in Supp. of Def. Coenen's Mot. for Summ. J. (Docket # 278) at 12.

MR. ETZEL: That's correct.[78]

However, the Trustee argued in his motion for summary judgment that the basis of his breach of fiduciary duty claim was *not* the June 5, 2001 Transaction itself. Rather, the Trustee argued, among other things, that Coenen breached his fiduciary duties under ERISA by failing to cause the Plan to divest itself of the preferred stock in the several years after the June 5, 2001 Transaction (part of the Retention Claim), and that this Retention Claim is separate and distinct from the June 5, 2001 Transaction itself, and is not barred by the 6-year statute of limitations. Specifically, the Trustee argued that "although the Plan's acquisition of Preferred Stock in June of 2001 ostensibly falls outside the six-year limitations period, the Plan's continued *retention* of Preferred Stock – at Coenen's discretion – constitutes a continued violation of fiduciary duty that occurred even after Coenen received his distribution in June of 2005."[79] In addition, the Trustee argues that he would still have timely claims based on other breaches of fiduciary duty that occurred after December 14, 2001, including Coenen's "negotiation of his own Plan distribution in June of 2005, which was the final transaction in the causal chain resulting in the Plan's collapse."[80]

In reply to these arguments, Coenen argues that even under the Trustee's continuing-duty theory, the 6-year statute of limitations began to run on June 5, 2001, when the Plan first acquired the preferred stock.[81] Because of this, Coenen argues, all of the Trustee's claims relating to the

---

[78]  Tr. of oral argument on Summ. J. Mots. (Docket # 395) at 11.

[79]  Trustee's Resp. in Opp'n to Def. Dale S. Coenen's Mot. for Summ. J. (Docket # 307) at 9.

[80]  *Id.* at 10-11, 14-17.

[81]  *See* Reply Br. in Supp. of Def. Coenen's Mot. for Summ. J. (Docket # 317) at 5-7; Tr. of oral
(continued...)

07-06790-tjt    Doc 483    Filed 09/25/15    Entered 09/25/15 14:17:09    Page 25 of 71

Plan's June 5, 2001 acquisition of the preferred stock, *and* the Plan's post-2001 retention of that stock, are time-barred. Coenen does not argue that the 6-year statute of limitations bars claims relating to transactions in 2005 which culminated in distributions to Coenen and Fields of Plan assets (the Distribution Claim).

Arguably, the parties could be viewed as having agreed, in their initial summary judgment arguments, that 29 U.S.C. § 1113's 6-year limitation period bars any breach of fiduciary duty claim, with respect to the June 5, 2001 Transaction itself — *i.e.*, the Acquisition Claim. By this, the parties may have tacitly agreed that 11 U.S.C. § 108(a), which has the effect of extending the statute of limitations period in certain circumstances specified by the statute, has no impact on the Acquisition Claim, at least. However, because neither the Trustee nor Coenen directly discussed the possible impact of 11 U.S.C. § 108(a), or even cited that section, in their written briefs or during oral argument,[82] and because the Court does not intend to ignore § 108(a), the

_____

[81](...continued)
argument on Summ. J. Mots. (Docket # 395) at 57-61.

[82] The Court notes however, that Coenen indirectly alluded to § 108(a) in his brief in support of his motion for summary judgment, in arguing that "[t]he automatic stay does not to[l]l the statute of limitations for a bankruptcy trustee's adversary proceedings." (Br. in Supp. of Def. Coenen's Mot. for Summ. J. (Docket # 278) at 12). One of the two cases Coenen cited in support of that argument, *United States v. Neary* (*In re Armstrong*), 206 F.3d 465 (5th Cir. 2000), stated, in relevant part:

> We note that the Bankruptcy Code provides a reprieve from the statute of limitations clock for both debtor and trustee once bankruptcy has been filed. 11 U.S.C. § 108 extends the time in which a trustee or debtor may commence an action or file a pleading, etc. for the later of the expiration of the statute of limitations or two years after filing for bankruptcy for commencing an action under § 108(a) and for sixty days after filing for the actions indicated by § 108(b).

*Id.* at 470 n.2.

Court permitted the Trustee and Coenen to file supplemental briefs addressing § 108(a),[83] which they did.[84]

## B. Discussion of statute of limitations issues

Even if the parties can be viewed as initially agreeing that ERISA's statute of limitations barred the Trustee's breach of fiduciary duty claims in part, the Court is not bound by the parties' stipulations of law. Rather, the Court should apply the correct law to the facts of each case. *See, e.g.*, *T I Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995); *Koch v. U.S. Dep't of Interior*, 47 F.3d 1015, 1018 (10th Cir. 1995); *FirstSouth, F.A. v. Lawson Square, Inc.* (*In re Lawson Square, Inc.*), 816 F.2d 1236, 1240 (8th Cir. 1987); *Thompson v. Roland* (*In re Roland*), 294 B.R. 244, 250 (Bankr. S.D.N.Y. 2003).

### 1. The impact of 11 U.S.C. § 108(a) on the statute of limitations applicable to the Trustee's breach of fiduciary duty claims

The Court must decide whether 11 U.S.C. § 108(a) applies, and if so, what its impact is on the limitations period applicable to the Trustee's breach of fiduciary duty claims.

Section 108(a) of the Bankruptcy Code provides:

> (a) If applicable nonbankruptcy law . . . fixes a period within which **the debtor may commence an action**, and such period has not expired before the date of the filing of the petition, **the trustee may commence such action** only before **the later of**--
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or

---

[83] *See* "Order Permitting Plaintiff David W. Allard, Trustee, and Defendant Dale S. Coenen Each to File a Supplemental Brief in Support of Their Motions for Summary Judgment, Regarding Statute of Limitations Issues" (Docket # 398).

[84] Docket ## 401 ("Defendant Dale S. Coenen's Supplemental Brief Regarding the Statute of Limitations"), 402 ("Plaintiff-Trustee's Supplemental Brief in Support of His Motion for Summary Judgment, Regarding Statute of Limitations Issues").

(2) **two years after the order for relief**.

11 U.S.C. § 108(a)(emphasis added).

The ERISA statute of limitations at issue, 29 U.S.C. § 1113, is, in the words of

Bankruptcy Code § 108(a), the "applicable nonbankruptcy law" which "fixes a period within

which the [D]ebtor may commence an action" for breach of fiduciary duty.  Section 1113

provides:

> No action may be commenced under this subchapter with respect
> to a fiduciary's breach of any responsibility, duty, or obligation
> under this part, or with respect to a violation of this part, after the
> **earlier of**–
>
> (1) **six years** after (A) the date of the last action which constituted
> a part of the breach or violation, or (B) in the case of an omission
> the latest date on which the fiduciary could have cured the breach
> or violation, or
>
> (2) **three years** after the earliest date on which **the plaintiff** had
> actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be
> commenced not later than **six years** after the date of discovery of
> such breach or violation.

29 U.S.C. § 1113 (emphasis added).

> Under this section, three possible limitations periods may apply:
> (1) six years from the last date of breach [or in the case of an
> omission, six years after the latest date the breach could have been
> cured]; (2) three years from the date of actual knowledge of the
> plaintiff that a breach has occurred; and (3) six years from the date
> of discovery of the breach if there was fraud or concealment
> preventing the plaintiff from discovering earlier the breach or
> violation.

*District 65 Retirement Trust for Members of Bureau of Wholesale Sales Representatives v.*

*Prudential Sec., Inc.*, 925 F. Supp. 1551, 1558 (N.D. Ga. 1996).  The fraud/concealment

exception under § 1113 is not at issue in this case.[85]  Therefore, only two possible limitations

periods could apply to a breach of fiduciary claim brought against Coenen and Kosanke by the

Debtor (in Debtor's pre-bankruptcy capacity as plan administrator of the Trans-Industries, Inc.

Plan) –  the 6-year limitations period of § 1113(1) or the 3-year limitations period of § 1113(2).

### a. The parties' arguments in their supplemental briefs regarding the application of § 108(a)

In discussing the application of § 108(a) to the statute of limitations issues in their

supplemental briefs, the Trustee shifted his position on whether ERISA's statute of limitations

bars the Acquisition Claim.

### i. The Trustee's position

The Trustee now argues that ERISA's 6-year statute of limitations in 11 U.S.C. § 1113(1)

does *not* bar *any* of the Trustee's breach of fiduciary duty claims, including a claim based solely

on the June 5, 2001 Transaction, because 11 U.S.C. § 108(a) applies and extends the 6-year

limitations period until two years after the petition date.[86]  The Trustee reasons as follows.  The

bankruptcy petition was filed on April 3, 2006, less than 6 years after the June 5, 2001

Transaction.  Therefore, ERISA's 6-year limitations period had not expired before Debtor filed

its bankruptcy petition.  This is turn meant that § 108(a) applied and extended the statute of

---

[85] Under 29 U.S.C. § 1113, if a defendant has engaged in fraud or concealment, the statute of limitations is tolled until "six years after the date of discovery of such breach or violation."  Coenen argues that "Plaintiff[-Trustee] could not establish fraudulent concealment, both because it has not been pled and no evidence would support it" and because "[t]he Trustee has never challenged that fraudulent concealment was not plead and is not at issue here."  ("Defendant Dale S. Coenen's Supplemental Brief Regarding the Statute of Limitations" (Docket # 401) at 7.)  The Trustee does not dispute this in his supplemental brief or elsewhere, and the Court concludes that the "fraud or concealment" tolling provision of 29 U.S.C. § 1113 is not at issue and does not apply in this case.

[86] Trustee's Supplemental Br. in Supp. of Mot. for Summ. J. Regarding Statute of Limitations Issues (Docket # 402) at 2-4.

limitations for the Trustee to file a breach of fiduciary duty claim based on the June 5, 2001

Transaction, until April 3, 2008 (two years after the bankruptcy petition date).[87]   Because the

Trustee filed his adversary complaint on December 14, 2007, even his claim based solely on the

June 5, 2001 Transaction (the Acquisition Claim) is timely under § 1113(1).

The Trustee argues further that ERISA's *3-year* limitation period does not bar his claims

because the *Trustee*, who is the Plaintiff in this adversary proceeding, did not have actual

knowledge of the June 5, 2001 Transaction when it occurred.[88]   The earliest the Trustee could

have had actual knowledge of the June 5, 2001 Transaction was October 20, 2006, the day he

was appointed as the Chapter 7 Trustee, and the first day he was required under 11 U.S.C.

§ 704(a)(11) to perform the duties of an ERISA Plan administrator.   Three years from that date is

October 20, 2009.   So, the Trustee argues, his filing of this adversary proceeding on December

14, 2007 was nearly 2 years before the 3-year statute of limitations under  § 1113(2) expired.[89]

### ii.  Coenen's position

Coenen argues that § 108(a) does not apply because "any [breach of fiduciary duty] claim

[that *Debtor* could have brought] against Coenen was time-barred before [Debtor] filed a

bankruptcy petition."[90]   Coenen now argues that ERISA's 3-year limitations period in § 1113(2)

---

[87] *Id.* at 3-4.

[88] *Id.* at 4-5.

[89] *See* Trustee's Supplemental Br. in Supp. of Mot. for Summ. J. Regarding Statute of Limitations Issues (Docket # 402) at 4-5; Trustee's Resp. in Opp'n to Def. Dale S. Coenen's Mot. for Summ. J. (Docket # 307) at 8-9.

[90] Def. Dale Coenen's Supplemental Br. in Supp. of Summ. J. Regarding Statute of Limitations (Docket # 401) at 2.

30

bars all of the Trustee's breach of fiduciary duty claims.[91]  Coenen argues that "the 'actual

knowledge' requirement of § 1113(2) was met in 2001, so the limitations period expired three

years from 2001 [(in 2004)]."[92]  According to Coenen, several facts "highlight that **the company**

[(Debtor)] had 'actual knowledge' of the alleged ERISA violation by 2001, and thus the statute

of limitations expired three years later (in the year 2004) [which was some], two years before the

bankruptcy petition was filed in April of 2006."[93]  Therefore, § 108(a) did not extend the

limitations period for the Trustee.  Coenen argues, in the alternative, that even if the longer 6-

year limitation period applies, it still expired before the *adversary proceeding* was filed.[94]

> **b.  The Court's conclusion: § 108(a) has no practical impact on ERISA's statute of limitations for the Trustee's breach of fiduciary duty claims.**

The Court concludes that § 108(a) has no practical impact on ERISA's statute of

limitations for any of the Trustee's breach of fiduciary duty claims.  "Under 29 U.S.C. § 1113(2),

a plaintiff with actual knowledge of a non-fraudulent breach of ERISA fiduciary duties must file

suit within three years."  *Tassinare v. Am. Nat'l Ins. Co.*, 32 F.3d 220, 223 (6th Cir.

1994)(footnote omitted).  Because it is undisputed that the Debtor, through its agents, had "actual

knowledge" of the alleged breaches of fiduciary duty, including the June 5, 2001 Transaction, at

the time they occurred, ERISA's 3-year limitations period applied to any breach of fiduciary duty

---

[91] *Id.* at 2, 4.  Coenen did not argue in his motion for summary judgment that ERISA's 3-year limitation period applied.  Both the Trustee's and Coenen's arguments in their summary judgment motions only addressed the application of ERISA's 6-year limitation period to the Trustee's breach of fiduciary duty claims.

[92] *Id.* at 6.

[93] *Id.* (emphasis added).

[94] *Id.* at 3-4.

claims that the Debtor could have filed. *See Gold v. Deloitte & Touche, LLP* (*In re NM Holdings Co., LLC*), 405 B.R. 830, 858 (Bankr. E.D. Mich. 2008) (citations omitted) ("Under Michigan agency law, the general rule is that the knowledge of corporate officers, employees, and agents, acting within the scope of their authority or employment, is imputed to the corporation.").

Section 108(a) only applies to extend the statute of limitations if the limitation period for "**the debtor** [to] commence an action" (emphasis added) has not expired as of the petition date. Three years after the June 5, 2001 Transaction (the first breach of fiduciary duty alleged by the Trustee) was June 5, 2004. Therefore, the period within which *Debtor* could have commenced an action for breach of fiduciary duty, based solely on the June 5, 2001 Transaction, expired nearly two years *before* Debtor and its affiliates filed their voluntary Chapter 11 petitions on April 3, 2006. Because of this, § 108(a) did not extend the limitations period for *the Trustee* to file a claim for breach of fiduciary duty under ERISA based on the June 5, 2001 Transaction.

Nor did § 108(a) extend the limitations period with respect to any breach of fiduciary duty that occurred more than 3 years before the April 3, 2006 bankruptcy petition date; namely any breaches that occurred before April 3, 2003. This is because as of the petition date, the 3-year limitations period of § 1113(2) barred *the Debtor* from suing for any breaches that occurred before April 3, 2003.

From this, it would appear that § 108(a) extended, until at least April 3, 2008 (two years after the petition date), the ERISA limitations period for any breaches of fiduciary duty that occurred on or after April 3, 2003. But this has no practical effect in this case. That is because, as explained below, even without the benefit of § 108(a), the Trustee's suit is timely with respect to breaches of fiduciary duty that occurred on or after December 14, 2001 (6 years before the

32

adversary proceeding was filed on December 14, 2007).

## 2. Application of 29 U.S.C. § 1113 to Trustee's breach of fiduciary duty claims

### a. Coenen's position that all of the Trustee's breach of fiduciary claims were barred under 29 U.S.C. § 1113 before the bankruptcy petition was filed

Coenen argues that "[a]s the bankruptcy estate Trustee, Plaintiff . . . had the right to bring any claim that was not time-barred and otherwise belonged to the estate at the time of the petition filing."[95] According to Coenen, because "the 'actual knowledge' requirement triggering a three year limitations period was, under the facts, met in 2001 . . . by the time the bankruptcy petition was filed in 2006, the Plaintiff Trustee's claim was already time-barred [under 29 U.S.C. § 1113.]"[96]

### b. The Chapter 7 Trustee's authority under § 704(a)(11) of the Bankruptcy Code to bring a breach of fiduciary duty claim under ERISA

Coenen's reasoning is flawed. First, Coenen wrongly assumes that the Trustee can only bring claims that the Debtor could bring as of the date of filing the petition. Accordingly to Coenen, because the Debtor was barred from filing a breach of fiduciary duty claim before the bankruptcy petition was filed, the Trustee likewise is barred from bringing such a claim. However, a Chapter 7 trustee's standing to file suit against third parties is not limited to claims that the debtor could bring as of the commencement of the bankruptcy case, although it does include such claims.

> A trustee's standing to pursue litigation against third parties springs from several sources. First, a trustee may stand in the shoes of the debtor by bringing a cause of action belonging to the

---

[95] Def. Dale S. Coenen's Supplemental Br. Regarding the Statute of Limitations (Docket # 401) at 4.

[96] *Id.* at 4, 6.

33

> bankruptcy estate. Section 541(a)(1) creates a bankruptcy estate
> that encompasses "all legal or equitable interests of the debtor in
> property as of the commencement of the case" including causes of
> action that a debtor could assert. 11 U.S.C. § 541(a)(1); *Honigman
> v. Comerica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947
> (6th Cir.1997). When a trustee pursues a cause of action under
> § 541(a), the trustee brings the action as successor to the debtor's
> interest in property and, as such, the trustee is subject to all
> defenses, including *in pari delicto*, that would have been available
> to the defendant against the debtor.

*State Bank & Trust Co. v. Spaeth* (*In re Motorwerks, Inc.*), 371 B.R. 281, 288 (Bankr. S.D. Ohio 2007)(footnote omitted)(citations omitted). A Chapter 7 trustee acting under § 541(a) can only bring claims that the debtor could bring as of the date of filing a bankruptcy petition. Therefore, under § 541(a), if a debtor is barred from bringing a claim by the applicable statute of limitations, the Chapter 7 trustee would also be barred from bringing the claim, because the trustee's rights are derivative of the debtor's rights.

But "[a]nother source of a trustee's standing springs directly from the Bankruptcy Code itself. The Bankruptcy Code grants the trustee direct powers such as the ability to avoid certain types of transfers pursuant to 11 U.S.C. §§ 547, 548 and 549." *Motorwerks*, 371 B.R. at 288 n.3 (citation omitted). Section 704(a)(11), a provision added to the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, also gives a Chapter 7 trustee the authority to pursue litigation against third parties that an administrator of an ERISA employee benefit plan would have authority to pursue. Section 704(a)(11) provides:

> (a) The trustee shall - -
>
> . . .
>
> (11) if, at the time of the commencement of the case, the debtor (or
> any entity designated by the debtor) served as the administrator (as
> defined in section 3 of the Employee Retirement Income Security

> Act of 1974) of an employee benefit plan, continue to perform the
> obligations required of the administrator[.]

This section applies in this case because the Debtor Trans-Industries, Inc. was the administrator

of the Plan before filing its bankruptcy case.

> "Section 704(a)(11) is unique in that it imposes upon the Chapter 7 trustee additional

fiduciary obligations regarding assets which are not property of the debtor's bankruptcy estate[.]"

*In re Robert Plan Corp.*, 439 B.R. 29, 40 (Bankr. E.D.N.Y. 2010), *rev'd on other grounds*, *U.S.*

*Dept. of Labor v. Kirchenbaum*, 508 B.R. 257 (E.D.N.Y. 2014).

> [Section 704(a)(11)] is not adjunct to, or supplemental of, any
> substantive right created by the Bankruptcy Code. Section
> 704(a)(11) stands alone in putting the trustee in the shoes of the
> ERISA plan administrator. The plan administrator's rights and
> obligations are found in ERISA. The Bankruptcy Code does not
> alter those rights and obligations.

*In re Mid-States Express, Inc.*, 433 B.R. 688, 695-96 (Bankr. N.D. Ill. 2010).

The language in § 704(a)(11) can be construed in two different ways. First, it could mean

that the Chapter 7 Trustee does not actually become the administrator of the plan, but only must

perform the duties of the former plan administrator. Under this interpretation, the trustee would

stand in the shoes of the former plan administrator. Under this interpretation, if the debtor was

the pre-bankruptcy plan administrator, a trustee's § 704(a)(11) authority to sue would be purely

derivative of the debtor's right. Under this view, if the debtor was barred from filing a particular

claim, the Chapter 7 trustee likewise would be barred. Coenen has not argued that § 704(a)(11)

should be interpreted in this manner, and even if he had made this argument, the Court would

reject it in favor of the second interpretation.

The second possible interpretation of § 704(a)(11) is that the Chapter 7 trustee becomes a

successor plan administrator, with all the rights that go with that position. The sparse legislative history of this provision indicates that this is what Congress intended in enacting § 704(a)(11). As stated by the court in *In re NSCO, Inc.*, 427 B.R. 165, 174 (Bankr. D. Mass. 2010)(citing H.R. REP. 109–31(I) (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 105):

> The meager legislative history [of § 704(a)(11)] addresses the new provision in one sentence.
>
> > In addition, the bill **streamlines the appointment of an ERISA administrator** for an employee benefit plan, under certain circumstances, to minimize the disruption that results when an employer files for bankruptcy relief.

(Emphasis added). This legislative history indicates that Congress intended the Chapter 7 trustee to become the new plan administrator.

Because a Chapter 7 trustee acting under § 704(a)(11) is a successor ERISA plan administrator, whether the trustee can bring a claim does not depend on whether the debtor could have brought the claim as of the petition date. The fact that the debtor was time-barred as of the petition date does not necesarily mean that the trustee is time barred. *Cf. McLemore v. Regions Bank*, 682 F.3d 414, 420-21 (6th Cir. 2012) (refusing to impute the bankruptcy debtor's wrongful, criminal conduct to the bankruptcy trustee; refusing to bar the trustee's action for breach of fiduciary duty under ERISA; and rejecting the defenses of unclean hands and *in pari delicto*).

As the successor plan administrator, the trustee has standing, as a "fiduciary," to sue other fiduciaries for breach of fiduciary duty. *See* 29 U.S.C. § 1132(a)(2) ("A civil action may be brought . . . by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title [("[l]iability for breach of fiduciary duty").]"). As plan

36

administrator, the trustee is a "fiduciary" because he is required to exercise discretionary authority and discretionary control regarding the management of the plan and the management and disposition of its assets. He thereby is at least a functional fiduciary of the plan with the right to file suit for breach of fiduciary duty. *See Michigan Affiliated Healthcare Sys., Inc. v. CC Sys. Corp. of Michigan*, 139 F.3d 546, 549 (6th Cir. 1998) (citation omitted) (explaining that a person is a plan fiduciary "to the extent that '(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.' 29 U.S.C. § 1002(21)(A)" and that "[t]he term 'fiduciary' not only includes persons specifically named as fiduciaries by a benefit plan, 'but also anyone else who exercises discretionary control or authority over the plan's management, administration, or assets.'")

### c. ERISA's 6-year limitations period applies to the Trustee's breach of fiduciary duty claims and bars the Trustee's Acquisition Claim.

Coenen's position, that ERISA's 3-year limitations period expired *as to the Trustee* before the petition was filed, is erroneous. With regard to the Trustee, the earliest possible bar date under ERISA's 3-year limitations period was October 20, 2009, long after the Trustee filed this adversary proceeding.

The Trustee was appointed on October 20, 2006. No one contends, and there is no evidence, that the Trustee had "actual knowledge" of any of the alleged breaches of fiduciary duty prior to his appointment. Therefore, the earliest the Trustee could have had actual knowledge of the alleged breaches was October 20, 2006. Three years after that date was October 20, 2009. Because this adversary proceeding was filed well before that date, none of the

Trustee's claims are barred by § 1113's 3-year statute of limitations.

But applying § 1113's 6-year limitations period does bar some of the Trustee's claims. Six years before December 14, 2007 (the date the Trustee filed the adversary complaint) was December 14, 2001. Therefore, § 1113(1) bars any breach of fiduciary duty claim that accrued before December 14, 2001. The Acquisition Claim, which is based on the June 5, 2001 Transaction, therefore is barred by ERISA's 6-year limitation period.

In arguing that ERISA's 3-year limitations period expired before the bankruptcy petition was filed, and that "the 'actual knowledge' requirement of § 1113(2) was met in 2001," Coenen seeks to impute to the Chapter 7 Trustee the knowledge of the Debtor Trans-Industries, Inc., including the knowledge of the members of the Board and certain employees of Trans-Industries, Inc. But the Debtor's knowledge cannot be imputed to the Chapter 7 Trustee in this context.

Coenen relies on *New Orleans Employers Int'l Longshoremen's Ass'n, AFL-CIO Pension Fund v. Mercer Inv. Consultants,* 635 F. Supp. 2d 1351 (N.D. Ga. 2009); *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216 (7th Cir. 1990); and *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133 (1st Cir. 2005).[97]

In *Mercer Inv. Consultants*, the plaintiffs filed suit in November 2006 on behalf of the ERISA-qualified Longshoremen's Pension Fund (the "Fund"), based on alleged breaches of fiduciary duty to the Fund committed from 2001-2002. 635 F.2d at 1353, 1378. Although the action was "well within the six-year statute of limitations" under § 1113(1), the defendants argued that the 3-year statute of limitations in § 1113(2) barred the claims. *Id.* at 1378-79. This was so, the defendants argued, because "[t]hree current [t]rustees [of the Fund] who testified at

---

[97] *Id.* at 7.

trial, . . . were [t]rustees at the time of the alleged breaches of fiduciary duty by [d]efendants" and "had knowledge of the alleged breaches" in 2001 and 2002 when they occurred. *Id.* at 1379.

Those trustees were not, however, the named plaintiffs in the case before the court. Rather, one of the plaintiffs was also a current trustee of the Fund, but had not been appointed as a trustee until March 2006, and had "filed suit within three years of learning of [d]efendants' alleged breaches of fiduciary duty." *Id.* The other plaintiff joined the lawsuit as a Fund participant and was not appointed as a trustee of the Fund until May 2008. *Id.* The plaintiffs argued that "because the statute of limitations refers to the plaintiff's actual knowledge" and they personally did not have actual knowledge of the breaches of fiduciary duty in 2001-2002, ERISA's 3-year statute of limitations did not bar their claims. *Id.* The plaintiffs argued further that the knowledge of the other trustees, who were not named plaintiffs in the lawsuit, was irrelevant for purposes of § 1113(2). *Id.*

The court first noted that "[t]he few district courts that have confronted similar situations have, with one exception, declined to find that the statute of limitations was applicable." *Id.* The court also noted that "[c]ourts have construed the 'actual knowledge' requirement [of 29 U.S.C. § 1113(2)] strictly; constructive knowledge is inadequate, rather, the plaintiff must have knowledge of the facts or transaction that constituted the breach in order to trigger the statute of limitations." *Id.* at 1378 (citation omitted). The court acknowledged that although employee benefit plans are the real parties in interest in breach of fiduciary duty cases, "some courts have focused on the actual knowledge of the named representative plaintiffs when determining if the statute of limitations bars the action." *Id.* at 1380 (citing *Landwehr v. DuPree*, 72 F.3d 726, 732-33 (9th Cir.1995); *Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F. Supp.

39

869, 882-83 (S.D.N.Y. 1997); *Useden v. Acker*, 734 F. Supp. 978, 980 (S.D.Fla.1989), *aff'd*, 947 F.2d 1563 (11th Cir. 1991)).

However, the *Mercer Inv. Consultants* court did not follow the approach of those cases that looked to the "actual knowledge" of the named plaintiffs in applying § 1113(2). The court reasoned that it was the Fund that was the "real party in interest in the case," and not the named plaintiffs, and "[t]hrough the [t]rustees, the Fund had contemporaneous knowledge of the alleged breaches of fiduciary duty [in 2001-2002]." *Id.* at 1380. Although the named plaintiffs in the case did not have "actual knowledge" of the alleged breaches until at least 2006 and 2008, respectively, and had filed the lawsuit within 3 years of 2006, the court nevertheless held that ERISA's 3-year statute of limitations barred the claims. *Id.* at 1381.

The court relied primarily on a principle it had gleaned from the "sparse" case law dealing with similar situations; namely that "manipulation of the statute of limitations should not be tolerated." *Id.* at 1379-80 (citations omitted). The court concluded that the plaintiffs had impermissibly manipulated and attempted to avoid the 3-year "actual knowledge" limitation period of ERISA "through careful selection of the named plaintiffs." *Id.* at 1380. Under the circumstances of the case before it, where 9 of the 10 trustees of the Fund in 2001 had knowledge of all of the breaches as they occurred, the court found that "allowing the statute of limitations period to be controlled by the knowledge of the named [p]laintiffs . . . [was] an artifice." *Id.* at 1381. The *Mercer Inv. Consultants* court, in essence, imputed the knowledge of some current and some former trustees, who were not the plaintiffs in the lawsuit, to the named plaintiffs in the case, to render applicable ERISA's 3-year statute of limitations.

Thus, the *Mercer Inv. Consultants* case largely supports Coenen's position. The two

other cases cited by Coenen, however, do not support his position. Neither case involves a court imputing knowledge to a named plaintiff in a breach of fiduciary duty lawsuit to satisfy the "actual knowledge" requirement of § 1132(2).

In *Radiology Ctr.*, the Seventh Circuit Court of Appeals held that the district court improperly interpreted the "actual knowledge" requirement of § 1113(2) to include both the plaintiff's actual and constructive knowledge of the breach of fiduciary duty. 919 F.2d at 1222. The Seventh Circuit held that "actual knowledge" does not include constructive knowledge. *Id.*

In his brief, Coenen relies on and quotes the *Radiology Ctr.* court's statement that "'[w]hile it is not uncommon for parties to cast the same set of facts in such a way that they amount to a claim that is not time-barred rather than one that is, we are reluctant to read § 1113 as encouraging this practice.'"[98] This statement had nothing to do with the "actual knowledge" requirement of 29 U.S.C. § 1113(2). Rather, the court was referring to the plaintiffs' attempt to characterize their breach of fiduciary claim as a fraud claim, in order to fall within the fraud exception of 29 U.S.C. § 1113, with its 6-year-after-discovery limitation period.

In *Edes*, the third case cited by Coenen, the First Circuit Court of Appeals described the "actual knowledge" requirement of 29 U.S.C. § 1113(2) as follows:

> The amendment to ERISA § 413 [29 U.S.C. § 1113] means that knowledge of *facts* cannot be attributed to plaintiffs who have no actual knowledge of them. . . . [T]here cannot be actual knowledge of a violation for purposes of the limitation period unless a plaintiff knows "the essential facts of the transaction or conduct constituting the violation." And, . . . we recognize that determining the meaning of complex transactions may take some time; mere knowledge of facts indicating that " 'something was awry' " does not always mean there is actual knowledge of a violation. On the

---

[98] *Id.* at 7 (quoting *Radiology Ctr.*, 919 F.2d at 1221).

> other hand, we do not think Congress intended the actual
> knowledge requirement to excuse willful blindness by a plaintiff.

417 F.3d at 142 (citations omitted)(italics in original).  Applying these concepts, the *Edes* court

determined that the ERISA "actual knowledge" 3-year limitation period applied and barred the

plaintiffs' claims.  *Id.*  However, this determination was based on the court's finding that the

named plaintiffs themselves had personal knowledge of the alleged breach more than 3 years

before they filed their lawsuit alleging breach of fiduciary duties; it was not based on any

imputation of anyone else's knowledge to the plaintiffs.  *See id.*

The Trustee argues that imputation of knowledge to him is not permissible under the

language of the statute or case law.  First, the Trustee argues that the "knowledge of the former

ERISA trustees cannot be imputed to Trustee" to start the statute of limitations clock ticking

earlier than when the Trustee was appointed, because there was no relationship between the

Trustee and the former trustees of the Plan, that would make imputation reasonable.[99]  Second,

the Trustee argues that:

> any knowledge of Sue Hornung or any other Plan participant about
> potential ERISA violations or the date of Board approval of the
> [June 5, 2001] Transaction is irrelevant, as the three year
> limitations period only began to run on the date that *the person
> bringing suit* (Plaintiff-Trustee) learned of the breach or violation,
> which was no earlier than October 20, 2006.[100]

The Trustee relies on *Landwehr v. DuPree,* 72 F.3d 726 (9th Cir. 1995); *Crimi v. PAS

Indus., Inc.*, No. 93 Civ. 6394, 1995 WL 272580 (S.D.N.Y. May 9, 1995); and *District 65 Ret.

Trust for Members of Bureau of Wholesale Sales Representatives v. Prudential Sec., Inc.*, 925 F.

---

[99] *See* Trustee's Supplemental Br. in Supp. of Mot. for Summ. J. Regarding Statute of
Limitations Issues (Docket # 402) at 5.

[100] *Id.*

42

Supp. 1551 (N.D. Ga. 1996). All of these cases support the Trustee's position.

In *Landwehr*, it was undisputed that the plaintiffs alleging breach of fiduciary duty, on behalf of an ERISA plan, had filed their lawsuit well within three years of when they personally had "actual knowledge" of the breaches, and therefore "well within the three-year period [of 29 U.S.C. § 1113(2)]." 72 F.3d at 731-32. Despite this, one of the defendants argued "that the real 'plaintiff' in th[e] case [was] the Plan" and therefore, "the statute of limitations [under 29 U.S.C. § 1113(2)] should start to run on the first date that any agent of the Plan had 'actual knowledge' of the breach or violation." *Id.* at 732.

The court rejected this argument. The *Landwehr* court explained that although breach of fiduciary duty actions are brought on behalf of the ERISA plan, rather than in an individual capacity, "[t]he plaintiff in such actions, however, is not the plan itself but the fiduciary, beneficiary, or participant, bringing suit." *Id.* (citations omitted). The court held that "the statute of limitations started to run on the first date that either [of the two plaintiffs] had actual knowledge of the alleged violation, regardless of whether any [p]lan fiduciary or service provider knew of the violation before that date." *Id.*

In *Crimi v. PAS Indus., Inc.*, No. 93 Civ. 6394, 1995 WL 272580, at *3 (S.D.N.Y. May 9, 1995), the court, relying on *Useden v. Acker*, 734 F. Supp. 978, 980 (S.D. Fla. 1989), *aff'd*, 947 F.2d 1563 (11th Cir. 1991),[101] rejected the argument that the "knowledge of one trustee alone may be considered actual knowledge by all trustees, and set the clock running [under 29 U.S.C.

---

[101] In *Useden v. Acker*, 734 F. Supp. 978, 980 (S.D. Fla. 1989), *aff'd*, 947 F.2d 1563 (11th Cir. 1991), the court refused to impute the knowledge of a trustee to any of his successor trustees, who were the plaintiffs in that case, for purposes of the "actual knowledge" requirement of 29 U.S.C. § 1113(2). The *Useden* court held that "[t]he knowledge of the actual plaintiff . . . will determine whether to apply the three-year or the six-year limitation period." *Id.*

§ 1113(2)] for all trustees." The *Crimi* court reasoned:

> Most consonant with the language of the statute and the purposes of ERISA is the interpretation that any trustee who sues as plaintiff and does not have actual knowledge of the relevant facts sufficient to make an ERISA claim may avail himself of the six year limitations period. In the context of what constitutes actual knowledge, courts have construed the "actual knowledge" provision narrowly. *See Gluck v. Unisys Corp.*, 960 F.2d 1168, 1176 (3d Cir. 1992). In light of Congress's clear purpose to protect plan assets, a narrow construction of limitations of actions brought by plan trustees is preferable. Especially, as here, where the union and employer representatives constitute the pension plan trustees and often face a conflict between their own interests and the plan interests, where one or more trustees have failed to pursue an ERISA claim (whether or not such failure amounts to a fiduciary violation), another trustee who has no actual knowledge of the underlying facts -- even a successor -- should not be unduly restricted from pursuing claims to protect the integrity of plan assets. Indeed, section 413(b) itself addresses a "plaintiff" with actual knowledge. Since each trustee has an obligation to protect the plan assets, each has an obligation to seek enforcement and to be such a plaintiff where necessary. Because the enforcement statute allows any fiduciary to sue, it would be inconsistent to provide a shorter limitations period for a plaintiff trustee due to the actual knowledge of another trustee, whether or not a co-plaintiff.

*Id.* at *3.

In *District 65 Ret. Trust,* 925 F. Supp. at 1559 & n.8 (citation omitted)*,* the court also refused to impute the actual knowledge of former trustees to the successor trustee plaintiffs, where "there [was] no evidence of a relationship between the former trustees and the successor trustees, particularly the one appointed by a federal court, which would make imputation of knowledge a viable alternative."  The court stated that "[t]he imputation of knowledge presupposes a relationship between the former and successor trustees so as to make the imputation of knowledge reasonable."  *Id.* at n.8.  The court explained further why it refused to allow the imputation of knowledge to the plaintiff trustees, as follows:

44

When construing statutory language, the Court begins with the plain language of the statute. The plain language of the statute controls unless literal application of the statute produces a result which is irreconcilable with the purpose of the statute. If Congress's intent is clear, then the Court may not use its policy concerns to circumvent that purpose. The ERISA statute of limitations plainly states that it is the *plaintiff's* actual knowledge that triggers the three-year time bar. Had Congress wished to impute the knowledge of former fiduciaries to successor trustees, Congress certainly could have done so. There is no language or policy of the ERISA breach of fiduciary duty provisions which indicates that Congress intended other than to look to the actual knowledge of the plaintiff in this case.

*Id.* at 1558-59 (footnote omitted) (internal quotation marks and citations omitted).

This Court agrees with the holdings of, and reasoning in, the cases cited by the Trustee, and other cases reviewed by the Court, which refuse to impute the knowledge of another person or entity to the plaintiff bringing a breach of fiduciary suit under ERISA. *See, e.g., Mason Tenders District Council Pension Fund v. Messera*, 958 Fed. Supp. 869, 882 (S.D.N.Y 1997) ("Actual knowledge is measured from the standpoint of the trustees who commenced the lawsuit and cannot be attributed to them by the knowledge of prior trustees or other current trustees."). ERISA's 3-year statute of limitations, 29 U.S.C. § 1113(2), is unambiguous, and requires that "the plaintiff" have "actual knowledge" of the breach or violation that is the basis for a lawsuit alleging breach of fiduciary duty. And "the plaintiff" means "the person bringing the suit on behalf of the plan." *Landwehr v. DuPree,* 72 F.3d 726, 732 (9th Cir. 1995).

The Court also agrees with the Trustee that, based on the holdings and reasoning in *Landwehr*, *Crimi*, and *District 65 Ret. Trust*, it is not appropriate, particularly under the facts of this case, to impute the knowledge of any other person or entity to the Trustee to satisfy the "actual knowledge" requirement of 29 U.S.C. § 1113(2). The Court notes that the *District 65*

*Ret. Trust* case could be read as possibly permitting the imputation of knowledge from one plan trustee to a successor trustee, where there was a relationship between the former and successor trustee. But the Court does not need to decide if such imputation would be permissible under the language of § 1113(2), because in this case there was no relationship between the post-bankruptcy administrator (the Chapter 7 Trustee) and the former administrator (the Debtor).

The Court also notes that in this case, where the Trustee was required to perform the duties of plan administrator of the Plan due to 11 U.S.C. § 704(a)(11), no one contends that he was selected as a plaintiff to avoid ERISA's 3-year limitation period, or that his appointment was an attempt to manipulate the ERISA statute of limitation periods. For these reasons, the concern about unfair manipulation of the statute of limitations, which was relied on by the *Mercer Inv. Consultants* case cited by Coenen, does not arise in this case.

In *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003), the Sixth Circuit described the type of knowledge a plaintiff must have to trigger ERISA's 3-year limitation period: "[T]o trigger the running of the statute of limitations under Section 413(2) of ERISA, 29 U.S.C. § 1113(2), it is only the plaintiff's actual knowledge of the underlying conduct giving rise to the alleged violation that is required, rather than the knowledge that the underlying conduct violates ERISA." Or in other words,

> the relevant knowledge required to trigger the statute of limitations under 29 U.S.C. § 1113(2) is knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute.

*Id.* at 330.

It is undisputed that the earliest the Chapter 7 Trustee (David Allard) could have

46

personally known about the June 5, 2001 Transaction was October 20, 2006 – the date he was appointed the Chapter 7 Trustee. That was also the earliest date when the Trustee possibly could have had standing to file a breach of fiduciary duty claim against Coenen and Kosanke. The Chapter 7 Trustee only had the authority to file a breach of fiduciary duty claim based on § 704(a)(11). It was not until his appointment as Chapter 7 Trustee, that the Trustee had the duty "to perform the obligations required of the [Plan] administrator" based on 11 U.S.C. § 704(a)(11), which would include filing claims against third parties on behalf of the Plan. Three years after October 20, 2006 (the date of the Trustee's appointment) was October 20, 2009. The Trustee filed this adversary proceeding on December 14, 2007. Thus, the Court agrees with the Trustee that none of the Trustee's claims are barred by ERISA's 3-year statute of limitations.

### d. ERISA's 6-year limitations period bars some, but not all, of the Trustee's Retention Claims.

Although the Trustee's Acquisition Claim is time-barred, not all of the Trustee's Retention Claims are barred by ERISA's 6-year limitations period.[102] The Retention Claims implicate "the continuing violation doctrine." In *L.I. Head Start Child Dev. Servs., Inc. v. Econ.*

---

[102] Coenen argues that to the extent the Retention Claim is based on the continued retention of The Series A Preferred Stock, such claim is deemed to accrue on the June 5, 2001 date of acquisition. Coenen relies on two unpublished cases in support of his position: *Ternes v. Tern-Fam, Inc.*, No. 89-1648, 904 F.2d 708 (6th Cir. 1990) (unpublished table decision)*; and *Shirk v. Fifth Third Bancorp*, No. 05-cv-049, 2009 WL 3150303 (S.D. Ohio Sept. 30, 2009). Neither case is on point. Both cases concerned the actual knowledge prong of 29 U.S.C. 1113, and neither case involved a claim based on the continued retention of an imprudent investment. In *Ternes*, the alleged breach was based on a failure to pay benefits, and in *Shirk*, the alleged breach was based on the payment of excessive fees. The Court notes that courts have specifically held that a breach of fiduciary duty claim based on a failure to pay benefits does not give rise to continuing violations. *See, e.g.*, *Wiesner v. Romo Paper Prods. Corp. Emps.' Ret. Plan*, 514 F. Supp. 289, 292 (E.D.N.Y. 1981)(citations omitted)(stating that "courts have rejected the argument that a failure to pay benefits occurring after ERISA's effective date might constitute a renewed or continuing violation, holding that a cause of action arising from an alleged wrongful deprivation of benefits accrued when plaintiff first became entitled to receive them" and contrasting such cause of action to an action based on a fiduciary's breach of his continuing duty "to ensure that the trust's funds are currently invested prudently" which does give to a continuing violation).

*Opportunity Comm'n of Nassau Cnty., Inc.*, 558 F. Supp. 2d 378, 400 (E.D.N.Y. 2008), *aff'd* 710

F.3d 57 (2d Cir. 2013) (relying, in part, on *Buccino v. Cont'l Assurance Co.*, 578 F. Supp. 1518,

1521-22 (S.D.N.Y. 1983)), the court explained how "the continuing violation doctrine" impacts

that statute of limitations in ERISA cases:

> In the ERISA context, the continuing violation doctrine is used for
> statute of limitations purposes to analyze when a cause of action
> accrues. In certain instances, a new cause of action accrues for each
> violation where separate violations of the same type, or character,
> are repeated over time. These cases are marked by repeated
> decision-making, of the same character, by the fiduciaries.

Under the continuing violation doctrine, fiduciaries of an ERISA plan are under a

continuing duty to review the investments in the plans to assure that they are prudent, and

repeated failures to divest the plan of imprudent investments give rise to breaches of fiduciary

duty separate and distinct from any breach that occurred with an initial acquisition of a stock or

other investment.  Both § 1113(1) and case law distinguish between breaches of fiduciary duty

that result from the *actions* of an ERISA fiduciary as opposed to those that result from *omissions*.

While the limitations period for breaches resulting from "actions" is 6 years after "the date of the

last action which constituted a part of the breach or violation," "in the case of an omission, [the

limitations period is 6 years after] the **latest date** on which the fiduciary could have cured the

breach or violation[.]"  29 U.S.C. § 1113(1)(A) and (B) (emphasis added).

Under the case law, breach of fiduciary duty claims based on a fiduciary's failure to

divest an ERISA plan of imprudent investments are considered breaches by omission, and are

viewed as giving rise to separate and distinct claims from a claim based on the initial purchase of

stock, which is considered an "action."  *See, e.g.:*

- *Koch v. Dwyer*, No. 98 CIV. 5519(RPP), 1999 WL 528181, at *5-6 (S.D.N.Y. July 22,

1999)(characterizing the allegation in the complaint "that it was imprudent to retain JWP stock in the Plan at least as of May 1, 1991" as "an allegation of breach-by-omission" and holding that the plaintiff could "pursue a claim for breach of fiduciary duty based on continued retention of an imprudent investment for a period beginning [six years before the complaint was filed]"), *opinion clarified on denial of reconsideration by* No. 98 Civ. 5519 RPP, 2000 WL 174945, at *1 (S.D.N.Y. Feb.15, 2000)(clarifying that "breaches of fiduciary duty by defendants of which plaintiff had 'actual knowledge' more than three years prior to the filing of this lawsuit . . . are time-barred");

- *Reich v. Johnson*, 891 F. Supp. 208, 209 (D.N.J. 1995)(finding that the plaintiff's alleged breach of fiduciary duty claims based on a failure to divest the ERISA plans of imprudent stock holdings were breaches by omission that were not barred by ERISA's 6-year limitations period even though the purchases of the stock occurred beyond 6 years before the complaint was filed, because the action was filed "within six years of the time in which defendants could have cured the alleged breaches");

- *Reich v. Glasser*, No. 95 CIV. 8288 (JFK), 1996 WL 243243, at *2 (S.D.N.Y. May 10, 1996) (characterizing the fiduciaries' causing the Fund to make below-market-rate loans as breaches by omissions, and holding that "the failure to adjust the interest due on loan repayments to a 'reasonable rate'" as a "'continuing' breach of [the d]efendants' fiduciary duties under ERISA which began the running of the statute of limitations anew with respect to each loan repayment carrying the below-market interest rate);

- *Starr v. JCI Data Processing, Inc.*, 767 F. Supp. 633, 638 (D.N.J. 1991)(finding, where the plaintiff had alleged "multiple and successive violations of [ERISA] occurring over a thirteen-year period, some of which [fell] outside the limitations period" and the fiduciary's breach was its "failure to act in compliance with the statute each time it made annual contributions to the plan[,]" that [the] plaintiff [was] entitled to assert all of his fiduciary-related ERISA claims . . . which occurred in each of the six years preceding the filing of his complaint").

*Buccino v. Continental Assurance Co.*, 578 F. Supp. 1518, 1520 (S.D.N.Y. 1983), a case

cited by the Trustee, also supports the Trustee's position that his Retention Claims are distinct

from his Acquisition Claim. In *Buccino*, the alleged breaches of fiduciary duty were (1)

"inducing [the Fund] to buy . . . individual, permanent, whole life insurance policies, rather than

a single group policy" when the "individual policies, costing more than a group policy without

providing superior benefits, were inappropriate for the Fund;" and (2) the retention of those

policies beginning in 1971 and continuing until the middle of 1980. The *Buccino* court

49

explained that

> as Fund fiduciaries [the defendants] were under a continuing
> obligation to advise the Fund to divest itself of unlawful or
> imprudent investments. Their failure to do so gave rise to a new
> cause of action each time the Fund was injured by its continued
> possession of individual policies, that is, each time it made a
> premium payment.

*Id.* at 521 (relying on *Morrissey v. Curran*, 567 F.2d 546 (2d Cir.1977)). The court viewed the

claim for breach of fiduciary duty based on the acquisition of the insurance policies as separate

from the claims based on the retention of those policies, for purposes of the accrual of the statute

of limitations. The court held that:

> although the statute of limitations may protect defendants from
> liability for the initial purchase decision and for subsequent failures
> to take corrective action prior to [six years before the action was
> filed], it does not bar suit for defendants' continued failure to take
> steps to terminate the Funds insurance arrangement after that date.

*Id.* at 1521.

In *Morrissey v. Curran*, 567 F.2d 546 (2d Cir.1977), the case relied on by the court in

*Buccino*, the Second Circuit Court of Appeals recognized that the continued retention of a bad

investment in an ERISA plan was a separate breach from making the initial imprudent

investment. In *Morrisey*, one of the breaches of fiduciary duty complained of was

"improvidently investing over $1 million in a Panama venture." The district court held that it

lacked jurisdiction over the plaintiffs' claims because the investment had occurred before January

1, 1975, the effective date of ERISA, and ERISA was not retroactive. *Id.* at 547. On appeal of

that decision, the plaintiffs argued that

> whatever else the trustees may have done before 1975, they also
> breached their trust after that date. . . [because] when the trustees
> became ERISA fiduciaries on January 1, 1975, they inherited an

50

> imprudent and unproductive investment in Panama, which they
> were bound to review and liquidate. As ERISA trustees, defendants
> cannot be excused from this obligation merely because the unwise
> investment was made before ERISA took effect.

*Id.* at 548.  The Second Circuit noted that the plaintiffs' complaint had alleged "continuing

wrongdoing" by the fiduciaries of the plan, and stated: "We have no doubt that under the

'prudent man' rule, which is codified in ERISA, the trustees here had a duty within a reasonable

time after ERISA took effect to dispose of any part of the trust estate which would be improper to

keep."  *Id.* at 547-49.  The Second Circuit remanded the case to district court to determine

whether "the trustees improperly retained the Panama investment after January 1, 1975."  *Id.* at

549.

A recent decision of the United States Supreme Court supports the Trustee's position.  In

*Tibble v. Edison Int'l*, 135 S. Ct. 1823 (2015), the Supreme Court drew a distinction between an

ERISA fiduciary's duty of prudence in the initial selection of a plan investment, on the one hand,

and that fiduciary's continuing duty of prudence in retaining that investment thereafter, on the

other hand.  And the Court held that ERISA's six-year statute of limitations for a claim that the

Trustee breached the latter duty runs from the time the Trustee breached that duty, not from the

time the fiduciary initially selected the investment.  The Court quotes the Supreme Court's

decision at length, because it explains the ERISA fiduciary's continuing duty to monitor its

retention of investments, and how the statute of limitations applies to a claimed breach of such

duty:

> Under the Employee Retirement Income Security Act of 1974
> (ERISA), 88 Stat. 829 *et seq.,* as amended, a breach of fiduciary
> duty complaint is timely if filed no more than six years after "the
> date of the last action which constituted a part of the breach or
> violation" or "in the case of an omission the latest date on which

the fiduciary could have cured the breach or violation." 29 U.S.C. § 1113. The question before us concerns application of this provision to the timeliness of a fiduciary duty complaint. It requires us to consider whether a fiduciary's allegedly imprudent retention of an investment is an "action" or "omission" that triggers the running of the 6-year limitations period.

. . .

As relevant here, petitioners argued that respondents violated their fiduciary duties with respect to three mutual funds added to the Plan in 1999 and three mutual funds added to the Plan in 2002. Petitioners argued that respondents acted imprudently by offering six higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available (the lower price reflects lower administrative costs).

. . .

As to the three funds added to the Plan in 1999, . . . the District Court held that petitioners' claims were untimely because, unlike the other contested mutual funds, these mutual funds were included in the Plan more than six years before the complaint was filed in 2007. 639 F.Supp.2d 1074, 1119–1120 (C.D.Cal.2009). As a result, the 6-year statutory period had run.

. . .

The Ninth Circuit affirmed the District Court as to the six mutual funds. 729 F.3d 1110 (2013). With respect to the three mutual funds added in 1999, the Ninth Circuit held that petitioners' claims were untimely because petitioners had not established a change in circumstances that might trigger an obligation to review and to change investments within the 6-year statutory period.

. . .

We believe the Ninth Circuit erred by applying a statutory bar to a claim of a "breach or violation" of a fiduciary duty without considering the nature of the fiduciary duty. The Ninth Circuit did not recognize that **under trust law a fiduciary is required to conduct a regular review of its investment with the nature and timing of the review contingent on the circumstances.**

. . .

An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting

in a like capacity and familiar with such matters" would use. §
1104(a)(1); see also *Fifth Third Bancorp v. Dudenhoeffer,* 573 U.S.
——, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014). We have often
noted that an ERISA fiduciary's duty is "derived from the common
law of trusts."

. . .

**Under trust law, a trustee has a continuing duty to monitor
trust investments and remove imprudent ones. This continuing
duty exists separate and apart from the trustee's duty to
exercise prudence in selecting investments at the outset.** The
Bogert treatise states that "[t]he trustee cannot assume that if
investments are legal and proper for retention at the beginning of
the trust, or when purchased, they will remain so indefinitely." A.
Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684,
pp. 145–146 (3d ed. 2009) (Bogert 3d). Rather, the trustee must
"systematic[ally] conside[r] all the investments of the trust at
regular intervals" to ensure that they are appropriate. Bogert 3d §
684, at 147–148; see also *In re Stark's Estate,* 15 N.Y.S. 729, 731
(Surr.Ct.1891) (stating that a trustee must "exercis[e] a reasonable
degree of diligence in looking after the security after the
investment had been made"); *Johns v. Herbert,* 2 App.D.C. 485,
499 (1894) (holding trustee liable for failure to discharge his "duty
to watch the investment with reasonable care and diligence"). The
Restatement (Third) of Trusts states the following:

> "[A] trustee's duties apply not only in making
> investments but also in monitoring and reviewing
> investments, which is to be done in a manner that is
> reasonable and appropriate to the particular
> investments, courses of action, and strategies
> involved." § 90, Comment *b,* p. 295 (2007).

The Uniform Prudent Investor Act confirms that "[m]anaging
embraces monitoring" and that a trustee has "continuing
responsibility for oversight of the suitability of the investments
already made." § 2, Comment, 7B U.L.A. 21 (1995) (internal
quotation marks omitted). Scott on Trusts implies as much by
stating that, **"[w]hen the trust estate includes assets that are
inappropriate as trust investments, the trustee is ordinarily
under a duty to dispose of them within a reasonable time."** 4 A.
Scott, W. Fratcher, & M. Ascher, Scott and Ascher on Trusts §
19.3.1, p. 1439 (5th ed. 2007). Bogert says the same. Bogert 3d §
685, at 156–157 (**explaining that if an investment is determined**

to be imprudent, the trustee **"must dispose of it within a reasonable time"**); see, *e.g., State Street Trust Co. v. De Kalb,* 259 Mass. 578, 583, 157 N.E. 334, 336 (1927) (trustee was required to take action to "protect the rights of the beneficiaries" when the value of trust assets declined).

**In short, under trust law, a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones. A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely.** The Ninth Circuit erred by applying a 6-year statutory bar based solely on the initial selection of the three funds without considering the contours of the alleged breach of fiduciary duty.

135 S.Ct. at 1826-29 (emphasis added).

The Court concludes that ERISA's 6-year statue of limitations bars not only the Trustee's Acquisition Claim, but also the Trustee's claims based on subsequent failures to cure that breach and divest the Plan of such stock that occurred more than six years before the adversary complaint was filed. That six-year look-back date was December 14, 2001. But ERISA's 6-year statute of limitations does not bar any of the Trustee's claims based on the failure(s) to cure and divest that occurred on or after the 6-year look-back date (*i.e.*, on or after December 14, 2001).[103]

The same is true with respect to the other aspect of the Trustee's Retention Claims — namely, the claim that the defendants imprudently caused the Plan to retain too much common stock of the Debtor for too long, while the value of that stock declined.

For these reasons, the Trustee's Retention Claims are time-barred to the extent they are based on any failure to cure or other omissions that occurred before December 14, 2001.

---

[103] On the record before the Court at this summary judgment stage, the Court cannot determine the latest date on which the Plan actually could have cured the acquisition of the Series A Preferred Stock and divested itself of such stock.

Otherwise, the Retention Claims are not time-barred.

### e. ERISA's 6-year statute of limitations does not bar the Trustee's Distribution Claim.

The Trustee's Distribution Claim is based on the distributions to Coenen and Fields of their vested interest in the plans, and the related transactions, all of which occurred in 2005, less than 3 years before the Trustee filed his adversary complaint on December 14, 2007. The Trustee's Distribution Claim therefore is not barred by ERISA's 6-year limitation period.

### f. Coenen is not liable for breaches that occurred after he was no longer a trustee.

Coenen argues that he cannot be held liable for any breach of fiduciary duty that occurred after he was no longer a Trustee of the Plan. The Court agrees. ERISA § 1109(b) provides that "[n]o fiduciary shall be liable with respect to a breach of fiduciary duty under this subchapter if such breach was committed before he became a fiduciary or after he ceased to be a fiduciary." 29 U.S.C. § 1109(b). Therefore, Coenen is entitled to summary judgment regarding any claims based on breaches that occurred after he was no longer a Trustee of the Plan. Coenen was no longer a Trustee of the Plan effective November 16, 2005.[104] Therefore, Coenen cannot be held liable for any breach of fiduciary duty that occurred after that date.

### C. Arguments made in the summary judgment motions other than those based on the statute of limitations

### 1. The Trustee's motion for summary judgment

The Court construes the Trustee's motion for summary judgment as seeking summary judgment against Coenen and Kosanke as to liability only, but not as to damages, on the

---

[104] *See* "Agreement for Management Succession, Resignation and Severance of CEO, and Other Miscellaneous Matters" at ¶ 1.3 ("Coenen shall continue to act as Trustee of the Company's Profit Sharing Plan until the earlier of November 16, 2005 or the termination of the Profit Sharing Plan."), attached to Trustee's Br. in Support of Mot. for Summ. J. (Docket # 286) as Exhibit 17 at pdf. p.6.

Trustee's Acquisition Claim; Retention Claims; and Distribution Claim. Because the Court has ruled that the Acquisition Claim is barred by the statute of limitations, only the Retention Claims and the Distribution Claim are still at issue.

Regarding the Retention Claims, the Trustee argues that in allowing the continuing retention of a large quantity of Trans-Industries, Inc.'s common and preferred stock in the Plan, Coenen and Kosanke breached their fiduciary duties under several ERISA provisions, including their duty of prudence, and their duty to diversify, and that such breaches caused the Plan to suffer losses in value of its assets.[105]

Regarding the Distribution Claim, the Trustee argues that Coenen and Kosanke were fiduciaries of the Plan; and that Coenen and Kosanke breached their fiduciary duty of loyalty, and their duty to deal with and represent all Plan participants and beneficiaries in a non-discriminatory manner, because Coenen and Kosanke engaged in negotiations and transactions which resulted in the lump sum distributions to Coenen and Fields of their entire vested interests in the Plan. The Trustee argues that such transactions and distributions damaged the Plan by leaving it with essentially no assets for the remaining participants.[106]

## 2. Coenen's motion for summary judgment

In addition to seeking summary judgment based on the ERISA statute of limitations, Coenen seeks summary judgment on any claims not time-barred. Coenen argues that the Trustee's claims "fail for lack of evidence establishing the elements of causation and

---

[105] Trustee's Br. in Supp. of Mot. for Summ. J. (Docket # 286) at Part III.C at 12-21.

[106] *Id.* at Part III.C.5 - Part III.D at 20-24.

damages."[107]

As to the causation element of all of the Trustee's claims, Coenen argues that he is not the

proximate cause of any claimed damages suffered by the Plan and the Plan participants, because

the Board of Trans-Industries, Inc. (of which Coenen was a member) ultimately directed,

approved, supervised, and controlled all actions taken regarding the Plan.[108]  Coenen argues that

"[w]hile he was a Trustee, [he] could make recommendations about the Plan but he was not in

control of the Plan."[109]  Rather, according to Coenen, "by the Plan terms, the ultimate supervision

and control of the Plan laid with the Board of Directors."[110]  Coenen argues further, that under

"[t]he Plan document, both as originally conceived and as amended . . . 'the Trustee is not

obligated to inquire . . . whether the manner of making any payment or distribution is proper' . . .

[and] the Plan specifically exempted Trustees from liability in all cases except gross negligence

or willful conduct."[111]  Put simply, Coenen's main causation argument is that any damages are

---

[107] Br. in Supp. of Def. Coenen's Mot. for Summ. J. (Docket # 278) at Part I at 2, Part III.C.2 at 14-17.

[108] *Id.* at Part II.B at 3-5.

[109] *Id.* at 3.

[110] *Id.*

[111] *Id.* at 4-5 (citing Ex. 5 (Jan. 11, 2004 Prototype Plan) at §§ 7.1(c), 7.13.

Section 7.1(c) of the Jan. 11, 2004 Prototype Plan provides in its entirety:

> (c)  The Trustee will credit and distribute the Trust Fund as directed by the Administrator.  The Trustee is not obligated to inquire as to whether any payee or distributee is entitled to any payment or whether the distribution is proper or within the terms of the Plan, or whether the manner of making any payment or distribution is proper.  The Trustee is accountable only to the Administrator for any payment or distribution made by it in good faith on the order or direction of the Administrator.

(continued...)

57

the Board's fault, not his.[112]

The Trustee disputes these arguments, citing, among other things, provisions of the Plan and other evidence regarding Coenen's control over the Plan's investments.[113]

Regarding the Trustee's Retention Claims, Coenen argues that he cannot be held liable for any damages caused by the Plan's retention of Trans-Industries, Inc.'s preferred and common stock, because he regularly consulted with outside auditing firms and financial advisors regarding the value and performance of the Plan's stock portfolio, "which determined that the value of the Plan assets was going up – not down" and also that "the Plan's investment in company stock was expected to generate dividends above what could be obtained on the open market."[114] Coenen argues that as a result, "there were no damages attributable to his recommendations."[115] Alternatively, Coenen argues that if there were any damages from retaining the preferred and common stock, they were the result of the "general economy;" the

_____

[111](...continued)
Section 7.13 of the Jan. 11, 2004 Prototype Plan provides in its entirety:

> The Employer agrees to indemnify and hold harmless the Trustee against any and all claims, losses, damages, expenses and liabilities the Trustee may incur in the exercise and performance of the Trustee's powers and duties hereunder, unless the same are determined to be due to gross negligence or willful misconduct.

[112] *Id.* at III.C.2 at 15-16. Coenen admits that he "was for years also one of the members of the Board of Directors." (Br. in Supp. of Def. Coenen's Mot. for Summ. J. (Docket # 278) at 3 n.1.) However, Coenen notes that "[t]here is no allegation in the Complaint that he controlled the Board or that the other Board members were not capable of exercising independent judgment and discretion." (*Id.; see also* Part III.C.2 at 15-16.)

[113] *See, e.g.*, Pl.'s Response in Opp. To Def. Coenen's Mot. For Summ. J. (Docket # 307) at 2, 11.

[114] Br. in Supp. of Def. Coenen's Mot. for Summ. J. (Docket # 278) at at Part II.D at 6-7.

[115] *Id.* at 7.

stock market crash; and the Board; other persons; or actions taken after he was no longer a Trustee of the Plan.[116]

Regarding the Trustee's Distribution Claim, Coenen, in essence, argues that the way his distribution was structured "ensured that the Plan had actually been *advantaged* – not hurt – by owning Trans-Industries [Inc.'s] stock."[117] Specifically, Coenen argues that (1) "[h]e was legally entitled to a pension distribution upon his termination[;]" (2) he took no more money than he was entitled to based on what he was told his vested interest was worth; (3) he "followed the directions of company counsel, and the Board, who were closely involved in structuring his distribution from the Plan in a fashion to minimize damage to both the Plan and the company[;]"[118] (4) the way the transactions leading to his nearly $1 million distribution were structured benefitted the Plan, because he used his entire distribution, except $59,000, to buy common stock of Trans-Industries, Inc., essentially agreeing to take stock in exchange for his cash distribution, and thereby infusing "over $1 million – more than the value of his interest – back into the company Plan."[119] Coenen argues that he did not "enjoy any gain that he can now be ordered to give back" because "he has already given all the money he had to the Plan."[120]

The Trustee disputes Coenen's argument that the Plan was not damaged by Coenen's distribution. Among other things, the Trustee argues:

---

[116] *Id.* at Part III.C.2 at 15.

[117] *Id.* at Part II.E at 9; Part III.C.2 at 16.

[118] *Id.* at Part II.E. at 7-8*; see also* Part III.C.2 at 16.

[119] *Id.* at Part II.E at 7-10. Coenen incorrectly states that he purchased common stock of Trans-Industries Inc. from the Plan. In fact, he purchased Trans-Industries, Inc.'s common stock from Trans-Industries, Inc., not from the Plan.

[120] *Id.* at Part II.E. at 10.

Despite his best efforts to spin the facts to make it appear as if he "took one for the team," the undisputed facts are that Coenen negotiated a distribution of his Plan benefits which provided him with a $969,763.65 cash payment, while just months later, the remaining 175 Plan participants learned they would receive nothing.

. . .

When negotiating and participating in his distribution, Coenen was on both sides of the transaction as the Plan Trustee on the one hand (obligated, by law, to serve the exclusive interests of all Plan participants), and as a highly compensated TI executive seeking his distribution. Indeed, the Plan – at Coenen's direction – liquidated all non-TI securities so that Coenen could receive his distribution. Coenen in fact received a cash distribution of $969,763.65 on June 21, 2005. The fact that he voluntarily used this cash payment to buy a large block of TI Common Stock does not change the fact that Coenen received 100 percent of his vested retirement account, while 175 remaining participants received nothing.[121]

### 3. Discussion of the law governing the Trustee's claims

### a. Elements, including causation and damages

29 U.S.C. § 1109(a) renders fiduciaries of an ERISA plan, who violate any of their duties, personally liable for any damages suffered by the Plan that are caused by the breach of fiduciary duty. Section 1109(a) provides, in relevant part:

> (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

---

[121] Pl.'s Response in Opp. To Def. Coenen's Mot. For Summ. J. (Docket # 307) at 14-15 (footnote and record citation omitted).

> "To state a claim under ERISA [§ 1109(a)] . . . for breach of [a]
> fiduciary duty, plaintiffs must allege that (1) defendants were
> fiduciaries of the plan who, (2) acting within their capacities as
> plan fiduciaries, (3) engaged in conduct constituting a breach of an
> ERISA fiduciary duty." *See In re Pfizer Inc. ERISA Litig.*, [No. 04
> Civ. 10071(LTS)(JFE),] 2009 WL 749545, at *6 (S.D.N.Y. Mar.
> 20, 2009) (citing 29 U.S.C. § 1109; *Pegram v. Herdrich*, 530 U.S.
> 211, 222–224, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)).

*Severstal Wheeling Inc. v. WPN Corp.*, 809 F. Supp. 2d 245, 254 (S.D.N.Y. 2011).

A claimant who seeks damages for a breach of fiduciary duty must also show that the Plan was harmed and that the breach of fiduciary duty was the cause of the harm. *See Miller v. Yazaki North America, Inc.*, 254 F. App'x 466, 468-69 (6th Cir. 2007)(affirming judgment for defendant on breach of fiduciary duty claim because the plaintiff did not prove that the breach of fiduciary duty was the proximate cause of the damages claimed); *Miller v. Yazaki North America, Inc.*, No. 06-10841, 2006 WL 3446246, at *4 (E.D. Mich. Nov. 27, 2006) (internal quotation marks and citations omitted)("Another element Plaintiff must establish to prevail on either theory of an ERISA breach of fiduciary duty [claim] is causation. In other words, there must be a showing of some causal link between the alleged breach ... and the loss plaintiff seeks to recover.").

### b. Who is a "fiduciary"

Under ERISA,

> A party is a fiduciary, and consequently owes duties to an ERISA
> plan, if he falls under one of two statutory categories. The first
> category of ERISA fiduciaries are "named" fiduciaries, which are
> parties explicitly listed as fiduciaries in a plan instrument. 29
> U.S.C. § 1102(a); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251,
> 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). ERISA requires every
> plan to have at least one "named" fiduciary. § 1102(a). The second
> category of ERISA fiduciaries is that of "unnamed" fiduciaries. A
> party will be considered an "unnamed" fiduciary if:

> (i) he exercises any discretionary authority or
> discretionary control respecting management of
> such plan or exercises any authority or control
> respecting management or disposition of its assets
> ... or (iii) he has any discretionary authority or
> discretionary responsibility in the administration of
> such plan.

§ 1002(21)(A).

*Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 828 (6th Cir. 2007). Because under 29 U.S.C.

§ 1102(a), "[n]amed fiduciaries" "shall have authority to control and manage the operation and

administration of the plan," ERISA defines both named and unnamed fiduciaries in functional

terms. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)) ("ERISA . . . defines 'fiduciary'

not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan,

see 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons subject to fiduciary

duties—and to damages—under § 409(a)."); *Walker v. Fed. Express Corp.*, No. 11-5201, 2012

WL 2855580, at *5 (6th Cir. July 11, 2012) (quoting *DeLuca v. Blue Cross Blue Shield of*

*Michigan*, 628 F.3d 743, 747 (6th Cir.2010))("'ERISA defines fiduciary ... in *functional* terms of

control and authority over [a] plan.'"). Therefore,

> [i]n every case charging breach of ERISA fiduciary duty, . . . the
> threshold question is not whether the actions of some person
> employed to provide services under a plan adversely affected a
> plan beneficiary's interest, but whether that person was acting as a
> fiduciary (that is, was performing a fiduciary function) when taking
> the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226 (2000).

Consistent with 29 U.S.C. § 1002(21)(A), and the case law interpreting that provision, the

Sixth Circuit uses a functional test to determine fiduciary status, which "examine[s] the conduct

at issue to determine whether it constitutes 'management' or 'administration' of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards." *Hamilton v. Carell,* 243 F.3d 992*,* 997 (6th Cir. 2001); *see also Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir. 2006)(citation omitted)("[S]everal courts have focused on the phrase 'to the extent' [in 29 U.S.C. § 1002(21)(A)] in holding that '[f]iduciary status . . . is not an all or nothing concept,' and that they must therefore 'ask whether a person is a fiduciary with respect to the particular activity in question.'"); *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999)(citations omitted)("[T]he definition of a fiduciary under ERISA is a functional one, is intended to be broader than the common law definition, and does not turn on formal designations such as who is the trustee.").  For example, conveying information to plan participants regarding the plan is "administration" of the plan within the meaning of ERISA § 1002(21)(A), and an individual is an administrator performing a fiduciary act when he does so. *See Variety v. Howe*, 516 U.S. 489, 502-03 (1996)(explaining that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose[,]" and would constitute "administration").

   **c.  Nature of the fiduciary duties**

   Section 404(a) of ERISA, 29 U.S.C. § 1104(a)(1), describes standards of care which apply to fiduciaries who administer plans governed by ERISA:

> (a) Prudent man standard of care
>
> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--

(A) for the exclusive purpose of:

> (i) providing benefits to participants
> and their beneficiaries; and

> (ii) defraying reasonable expenses of
> administering the plan;

(B) with the care, skill, prudence, and diligence
under the circumstances then prevailing that a
prudent man acting in a like capacity and familiar
with such matters would use in the conduct of an
enterprise of a like character and with like aims;

(C) by diversifying the investments of the plan so as
to minimize the risk of large losses, unless under the
circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and
instruments governing the plan insofar as such
documents and instruments are consistent with the
provisions of this subchapter and subchapter III of
this chapter.

29 U.S.C.A. § 1104(a)(1). The fiduciary duties encompassed within the § 1104(a) standard have

three components. *See Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th Cir. 1999)(citing

*Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1162 (6th Cir.1988)).

> The first is a "duty of loyalty" which requires that "all decisions regarding
> an ERISA plan 'must be made with an eye single to the interests of the
> participants and beneficiaries. Second, ERISA imposes a "prudent
> person" fiduciary obligation, which is codified in the requirement that a
> plan fiduciary exercise his duties "with the care, skill, prudence, and
> diligence under the circumstances then prevailing that a prudent man [sic]
> acting in a like capacity and familiar with such matters would use in the
> conduct of an enterprise of like character and with like aims." 29 U.S.C.
> § 1104(a)(1)(B)[.] The prudent person standard, in combination with the
> duty of loyalty, "imposes an unwavering duty on an ERISA trustee to
> make decisions with single-minded devotion to a plan's participants and
> beneficiaries and, in so doing, to act as a prudent person would act in a
> similar situation." Finally, ERISA requires that a fiduciary "act 'for the
> exclusive purpose' of providing benefits to plan beneficiaries."

64

*Id.* at 547 (citations omitted); *See also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)(citing, in part, 29 U.S.C. § 1104(a)(1))("The manner in which trustee powers may be exercised . . . is . . . defined in [ERISA] through the provision of strict standards of trustee conduct, also derived from the common law of trusts-most prominently, a standard of loyalty and a standard of care.")

The Supreme Court recently discussed the fiduciary's duty of prudence, in the *Tibble* case, quoted at length above. And the Supreme Court recently ruled, in the context of a plan fiduciary who had inside information, that:

> To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

*Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2472 (2014).

In *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987), the court expounded on the fiduciary's duty of loyalty that is codified in 11 U.S.C. § 1106(b):

> [T]he duty of loyalty [i]s codified in ERISA Section 406(b), which provides in pertinent part:

> > A fiduciary with respect to a plan shall not-(1) deal with the assets of the plan in his own interest or for his own account, [(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries,] or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b). This rule both assures protection to plan beneficiaries and provides notice to plan fiduciaries of their obligations. It protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing. It gives notice to fiduciaries that they must either avoid the transactions described in Section 406(b) or cease serving in their capacity as fiduciaries, no matter how sincerely they may believe that such transactions will benefit the plan. Such protection of beneficiaries and notice to fiduciaries requires that Section 406(b) be broadly construed, *see Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir.1984), and that liability be imposed even where there is "no taint of scandal, no hint of self-dealing, no trace of bad faith," *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir.1979)[.]

*Id.* The court stated that transactions prohibited under 29 U.S.C. § 1106(b) "deserve exacting scrutiny." *Id.* at 1215.

In *Gregg,* the court expounded on ERISA's "prudent person" fiduciary duty. It stated that "[c]ourts define 'prudent person' as that term is employed in the common law of trusts" and that "'[p]rudent person' is an objective standard." 343 F.3d at 840 n.3 (citations omitted). The court in *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir. 1984)(citations omitted), explained that the "prudent person" duty is "a duty to exercise such care and skill as a person of ordinary prudence would exercise in dealing with his own property and, bearing in mind the special nature and purpose of an employee profit sharing plan, to use care and skill to preserve the trust corpus." The *Morse* court further explained that this prudent person standard of conduct requires fiduciaries to act *in a nondiscriminatory manner for the benefit of all participants and the plan as the whole, rather than for the benefit of one group of participants*:

> [A] trustee has a duty to deal impartially with beneficiaries. In this case there are working Plan participants and retired beneficiaries and/or their families. The trustee must deal even-handedly among them, doing his best for the entire trust looked at as a whole. *See* II A. Scott, *The Law of Trusts*, § 183 at 1473; *Restatement (Second)*

66

of Trusts § 183; Note, *The Duties of Employee Benefit Plan Trustees Under ERISA in Hostile Tender Offers*, 82 Colum.L.Rev. 1692, 1706–07 (1982). That is to say, a trustee's duty is not to prefer the present interest of one group, *e.g.*, here the departing plan participants, but also not to unduly delay payment of benefits to such participants to their detriment. This is a salutary rule because at the slightest suggestion that any action taken was with other than the beneficiaries in mind, a trustee is subject to liability for resulting injury that the beneficiaries may suffer. *See* 29 U.S.C. § 1109(a) (1982); *NLRB v. Amax Coal Co.*, 453 U.S. 322, 331–34, 101 S.Ct. 2789, 2795–97, 69 L.Ed.2d 672 (1981).

**4. Genuine issues of material fact preclude the Court from granting summary judgment to any of the parties on the Trustee's remaining Retention Claims or on the Trustee's Distribution Claim.**

The Court concludes that genuine issues of material fact exist regarding the Trustee's Retention Claims that are not time-barred — *i.e.*, regarding any Retention Claims that accrued on or after December 14, 2001 (6 years before the Trustee filed his complaint). And the same thing is true as to the Trustee's Distribution Claim. The genuine issues of material fact concern the arguments made by the Trustee, and also the arguments made by Coenen, summarized above. And regarding the Retention Claims, the genuine issues of material fact include whether, during the time period after December 14, 2001, the Plan could have divested itself of the preferred and common stock in a way that would have avoided or reduced the alleged losses to the Plan, and if so, when and how this could have been done, and by how much this would have reduced or avoided the alleged losses to the Plan. The Court must determine these issues, among others, in order to determine if Coenen and Kosanke breached their fiduciary duties after December 14, 2001 by allowing the Plan to retain the Trans-Industries, Inc.'s common and preferred stock. If it was impossible during the relevant time period to divest the Plan of the stock, or to the extent such divestiture would not have helped the Plan, then continued retention of the stock would not have been a breach of fiduciary duty.

67

While an extended discussion of all the disputed issues is not necessary at this point, the Court will address one of the arguments Kosanke makes about the Distribution Claim, in opposing the Trustee's summary judgment motion. Kosanke argues that he had no discretion in permitting the distributions to Coenen and Fields because the Plan required distributions of a participant's entire vested balance if that individual was terminated.[122] However, this is not accurate. Although Paragraph 6.4 of the Plan does state this requirement, neither this provision nor any other provision of the Plan states what is to be done if the Plan does not have enough assets to make distributions to employees who have been terminated.

There is no provision in the Plan that Kosanke has cited that requires or permits the series of transactions that were made regarding Plan assets in the case where the Plan is unable to pay all benefits when they become due. But ERISA does have a provision that deals with this situation. Under ERISA, a Plan may be terminated under these circumstances. 29 U.S.C. § 1342 provides, in relevant part:

> (a) Authority to institute proceedings to terminate a plan
>
> The [Pension Benefit Guaranty C]orporation may institute proceedings under this section to terminate a plan whenever it determines that--
>
>> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4971(a) of Title 26,

---

[122] *See* Tr. of Kosanke Dep. (Ex. # 2 of Pl.'s Response in Opp'n to Def. Fields's Mot. for Summ. J. (Docket # 300) at 33 (Kosanke alleging that all questions regarding eligibility of employees to participate or remain a participant in the Plan "was all dictated by the [P]lan document"), 188-89 (Kosanke alleging that the eligibility of Plan participants, and the calculation of distributions that Plan participants were entitled to "was all spelled out in the Plan"); Tr. of oral argument on Summ. J. Mots. (Docket # 395) at 50: 9-12 ("Kosanke "had no authority for managing the assets or discretion or authority in the administration of the [P]lan.").

**(2) the plan will be unable to pay benefits when due,**

(3) the reportable event described in section 1343(c)(7) of this title has occurred, or

(4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342 (emphasis added). Upon the termination of a plan, ERISA provides how assets are to be allocated to participants and beneficiaries of the plan. *See, e.g.* 29 U.S.C. § 1344 (covering the allocation of assets "[i]n the case of the termination of a single-employer plan").

ERISA also provides a method for the appointment of a trustee, where one of the determinations of subpart (a) of 29 U.S.C. § 1342 is made, or otherwise, "upon the petition of a plan administrator or the corporation" to "the appropriate United States district court" where, as here, "the interests of the plan participants would be better served by the appointment of the trustee." 29 U.S.C. § 1342(b)(1)-(2). And "[t]he corporation and plan administrator may agree to the appointment of a trustee without proceeding in accordance with the requirements of paragraphs (1) and (2)" [of 29 U.S.C. § 1342(a)]. 29 U.S.C. § 1342(b)(3). The appointment of an independent trustee would have been one way to remove the taint of a conflict of interest.

Terminating the Plan was an option that was repeatedly discussed in considering what to do about the Plan's inability to honor Fields's and Coenen's distribution requests. Coenen and Kosanke therefore knew that there was at least one option available, consistent with ERISA, other than the course ultimately taken.

And even if Coenen and Kosanke sincerely believed that *the Plan* required them to make distributions to Coenen and Fields in this situation, where there is a conflict between what the Plan requires and what ERISA requires, ERISA controls. 29 U.S.C. § 1104(a)(1)(D) (providing

69

that "[s]ubject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan **insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter)** (emphasis added):

> [Section 1104(a)(1)(D) of ERISA] makes clear that the duty of prudence trumps the instructions of a plan document, such as an instruction to invest exclusively in employer stock even if financial goals demand the contrary. See also § 1110(a) (With irrelevant exceptions, "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility . . . for any . . . duty under this part shall be void as against public policy").

*Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2468 (2014); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 568 (1985) ("[T]rust documents cannot excuse trustees from their duties under ERISA[.]").  As discussed above, ERISA requires that fiduciaries act for the benefit of all plan participants in a nondiscriminatory manner.  And Paragraph 10.15 of the Plan, consistent with ERISA, required all Plan provisions to be "interpreted and applied in a uniform, nondiscriminatory manner."  Paragraph 6.4 of the Plan, when interpreted along with this provision and other provisions of the Plan and ERISA, cannot be construed as *requiring* the actions taken by the fiduciaries of the Plan.

## VI.  Conclusion

For the reasons stated in this opinion, the Court will enter an order (1) granting, in part, Coenen's and Kosanke's motions for summary judgment, only to the extent described above regarding the statute of limitations, and otherwise denying the motions; and (2) denying the Trustee's motion for summary judgment.

**Signed on September 25, 2015**                    /s/ Thomas J. Tucker
                                                    Thomas J. Tucker
                                                    United States Bankruptcy Judge