UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                                    Case No. 06-43993

TRANS-INDUSTRIES, INC., *et al.*,                         Chapter 7
                                                          (Jointly Administered)[1]
                        Debtors.                          Judge Thomas J. Tucker
_____/

STUART A. GOLD, TRUSTEE,

                        Plaintiff,

v.                                                        Adv. Pro. No. 07-6790

JOAN PARKER COENEN,
in her capacity as representative of the
estate of Dale S. Coenen, deceased, *et al.*,

                        Defendants.
_____/

## TRIAL OPINION

### I.  Introduction and background[2]

      In this adversary proceeding, the Chapter 7 Trustee asserts multi-million dollar breach of

fiduciary duty claims against Dale S. Coenen ("Coenen") and Kai R. Kosanke ("Kosanke"), two

alleged fiduciaries of the Debtor Trans-Industries, Inc.'s pension plan — the "Trans-Industries,

---

[1]  This case (*In re Trans-Industries, Inc.*, Case No. 06-43993) is being jointly administered with
the following cases: *In re Transign, Inc.*, Case No. 06-43995; *In re Transmatic, Inc.*, Case No. 06-43997,
and *In re Vultron, Inc.*, Case No. 06-43998. ("Order Pursuant to Fed. R. Bankr. P. 1015 Directing Joint
Administration of This Chapter 11 Case with Three Affiliated Cases" (Docket # 35)).

[2]  Some portions of this opinion are taken from the Court's "Opinion Regarding Cross-Motions
for Summary Judgment" (Docket # 483), which is published as *Taunt v. Coenen* (*In re Trans-Indus.,
Inc.*), 538 B.R. 323 (Bankr. E.D. Mich. 2015).

Inc. Employees' 401(k) Profit Sharing Plan & Trust" (the "Plan").[3]   The Trustee brings these

claims under the Employee Retirement Income Security Act ("ERISA").[4]   He does so in his

capacity as successor to the Debtor, in its capacity as plan administrator of the ERISA Plan,

based on 11 U.S.C. § 704(a)(11).   The breach of fiduciary duty claims are based on (1) the Plan's

purchase of 19,000 shares of Series A Preferred Stock of Trans-Industries, Inc. on June 5, 2001,

referred to below as the "June 5, 2001 Transaction," which claim is referred to below as the

"Acquisition Claim;" (2) the Plan's retention of that preferred stock for a period of several years

thereafter, and the Plan's retention of the Debtor's common stock allegedly in amounts too great

and for too long to be prudent (the "Retention Claims"); and (3) a series of transactions between

the Plan, the Debtor, Coenen, and Delmar F. Fields ("Fields") in June 2005, which resulted in

Coenen and Fields receiving lump sum cash distributions of the entire amount of their vested

interests in the Plan, and which left the Plan unable to satisfy its obligations to all of the other

Plan participants (the "Distribution Claim").

The Trustee filed a summary judgment motion against both Coenen and Kosanke, and

Coenen filed a cross-motion for summary judgment (collectively, the "Cross-Motions for

Summary Judgment").[5]   After the Court held a hearing on the Cross-Motions for Summary

Judgment, in which counsel for Defendant Kosanke participated, Kosanke filed a motion seeking

---

[3]   The Trustee originally sued two additional defendants, Richard A. Solon ("Solon") and Delmar F. Fields ("Fields"), but later settled all claims against those defendants.  Defendant Coenen is now deceased, and Coenen's widow, Joan Parker Coenen, has been substituted as Defendant in place of Coenen, but "only in her capacity as representative of the estate of Dale S. Coenen, deceased," and not in her personal capacity.  References in this opinion to "Coenen" are to the late Dale S. Coenen, unless otherwise noted.

[4]   29 U.S.C. § 1001 *et seq*.

[5]   Docket ## 286, 278.

to join the summary judgment motion filed by Defendant Coenen, but only with respect to Coenen's arguments about the statute of limitations.[6]  The Court granted that motion and allowed Kosanke to "join" Coenen's summary judgment arguments about the statute of limitations.[7]

The Court issued an opinion ruling on the Cross-Motions for Summary Judgment,[8] and entered an order which, in relevant part, dismissed with prejudice "[t]he Trustee's claims against Coenen and Kosanke consisting of (a) the Acquisition Claim; and (b) any Retention Claims that are based on actions or inactions that occurred before December 14, 2001, based on the statute of limitations (the "Summary Judgment Order").[9]  The Summary Judgment Order also dismissed with prejudice the Trustee's claims against Coenen, "to the extent they are based on any action or inaction that occurred on or after November 16, 2005, when Coenen ceased being a Plan fiduciary.[10]  After entry of the Summary Judgment Order, the Trustee's remaining claims against Coenen are (1) the Retention Claims that are based on actions or inactions that occurred between December 14, 2001 and November 16, 2005; and (2) the Distribution Claim.  The Trustee's remaining claims against Kosanke are the Retention Claims that are based on actions or inactions that occurred on or after December 14, 2001 and the Distribution Claim.

---

[6]  *See* Docket # 405.

[7]  *See* "Opinion and Order Granting Defendant Kai Kosanke's Motion to Join Defendant Coenen's Motion for Summary Judgment, Regarding Statute of Limitations Issues" (Docket # 422).

[8]  "Opinion Regarding Cross-Motions for Summary Judgment" (Docket # 483); *Taunt v. Coenen* (*In re Trans-Industries, Inc.*), 538 B.R. 323 (Bankr. E.D. Mich. 2015).

[9]  "Order Regarding Cross-Motions for Summary Judgment" (Docket # 484) at 2.

[10]  *Id.*

The Court held a trial on these remaining claims.[11]  During trial, the Plaintiff Trustee

made an oral motion for a default judgment against Defendant Joan Parker Coenen, in her

capacity as a representative of the estate of Dale S. Coenen, deceased ("the "Oral Default

Motion").[12]  After holding a hearing on the Oral Default Motion and ruling on it,[13] the Court

entered an order (the "Default Order") which, in relevant part, granted a "default judgment . . . in

favor of the Plaintiff [Trustee]. . . ., and against Defendant Joan Parker Coenen, in her capacity as

representative of the estate of Dale S. Coenen, deceased . . . as to liability only, on all of

Plaintiff's claims that remain after the Court's entry of [the Summary Judgment Order]."[14]  The

Default Order further stated that "[a]fter the completion of the trial that is currently underway,

the Court will determine whether, and to what extent, Defendant Coenen is liable for damages,

and the amount, if any, of such damages."[15]  Following a 6-day trial, the parties filed post-trial

briefs.[16]

The Court has considered all of the oral and written arguments of the parties; all of the

exhibits admitted into evidence at trial (the Trustee's Exhibit Nos. 1 through 106); and the

testimony at trial of the following witnesses: Defendant Kosanke; David J. Witz ("Witz"), the

---

[11]  Transcripts of all of the trial days are on file in this adversary proceeding, at Docket ## 533, 534, 536, 553, 554, and 557.

[12]  *See* "Order Granting in Part, and Denying in Part, Plaintiff's Oral Motion for Default Judgment Against Defendant Joan Parker Coenen, Etc." (Docket # 519) at 1.

[13]  *See* Trial Tr. (Docket # 536) at 36-43.

[14]  *See* "Order Granting in Part, and Denying in Part, Plaintiff's Oral Motion for Default Judgment Against Defendant Joan Parker Coenen, Etc." (Docket # 519)  at 1-2 ¶ 2.

[15]  *Id.* at 2 ¶ 3.

[16]  Docket ## 539, 543, 546, 547.

4

Trustee's expert witness on fiduciary standards of care under ERISA; and Thomas Frazee ("Frazee"), the Trustee's expert witness on valuation and damages.

This Opinion states the Court's findings of fact and conclusions of law. For the reasons stated in this Opinion, the Court will enter judgment in favor of the Plaintiff Trustee and against Defendants Coenen and Kosanke on the Trustee's breach of fiduciary duty claims, to the extent those claims are based on the Plan's retention of the common stock of Trans-Industries, Inc. and on the distributions to Coenen and Fields. Put another way, the Court finds for the Plaintiff Trustee on the Retention Claim in part, and on the Distribution Claim.

## II. Facts

### A. Background regarding the Debtor and its key officers

The Debtor Trans-Industries, Inc. was "formed . . . sometime in the late [19]60s for the sole purpose of acquiring Transign[, Inc.]."[17] From its inception, until he was forced to resign in March 2005, Coenen was Chief Executive Officer ("CEO"), a Director, and Chairman of the Board of Directors of Trans-Industries, Inc. (the "Board").[18] Although Coenen resigned as CEO and Chairman of the Board in March 2005, he remained a Director until November 2005.[19] Kosanke was Chief Financial Officer ("CFO"), Vice President, and Treasurer of Trans-Industries, Inc. from 1989 until he left the company in April 2006.[20] Fields worked in several

---

[17] Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 15.

[18] Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 16-18; Second Amended Joint Final Pre-Trial Order (Docket # 503) at 6-7 (Stipulation of Facts and Law).

[19] Second Amended Joint Final Pre-Trial Order (Docket # 503) at 7 (Stipulation of Facts and Law).

[20] Second Amended Joint Final Pre-Trial Order (Docket # 503) at 7 (Stipulation of Facts and Law); Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 10-11, 87.

positions for Transign, Inc. both before and after its acquisition by Trans-Industries, Inc. He was the President of Transign, Inc. at the time he was fired in August 2004.[21]

## B. The Plan

On December 31, 1989, Trans-Industries, Inc. created the "Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan and Trust," which had an effective date of January 1, 1989 (the "Plan").[22] This was done by Trans-Industries, Inc. entering into an agreement with Coenen, as Trustee of an existing plan called the "Trans-Industries, Inc. Salaried Employees' Retirement Plan." That plan was a profit sharing plan and trust which Trans-Industries, Inc. had previously established, with an effective date of December 15, 1974, and which was later amended, restated, and renamed "Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust," effective January 1, 1987.[23] The agreement in 1989 was to amend that profit sharing plan and trust "in its entirety"; rename it the "Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan and Trust," and restate it so that, among other things, it provided for a pre-tax savings feature qualifying under Internal Revenue Code Section 401(k).[24] Coenen signed the

---

[21] Tr. of Fields Dep. (Pl.'s Trial Ex. 85) at 15.

[22] Second Amended Joint Final Pre-Trial Order (Docket # 503) at 7 (Stipulation of Facts and Law); Pl.'s Trial Ex. 1 ("Trans-Industries, Inc. Employees' 401[k] Profit Sharing Plan and Trust") at pdf. pp. 2, 102-107; Pl.'s Trial Ex. 77 ("Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust Amendment # 2").

[23] *See* Pl.'s Trial Ex. 1 ("Trans-Industries, Inc. Employees' 401[k] Profit Sharing Plan and Trust") at pdf. p. 2; Pl.'s Trial Ex. 77 ("Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust Amendment # 2") at 1.

[24] *See* Pl.'s Trial Ex. 1 ("Trans-Industries, Inc. Employees' 401[k] Profit Sharing Plan and Trust"). The Plan documents define the Internal Revenue Code as the "Code."

6

Plan on behalf of Trans-Industries, Inc., the employer, and as Trustee of the Plan.[25]  Kosanke and one other individual signed the Plan as witnesses.[26]

### 1. The Plan's named fiduciaries

The Plan provided, in relevant part: "The 'named Fiduciaries' of this Plan are (1) the Employer, (2) the Administrator and (3) the Trustee."[27] Coenen was the only individual who was designated by name as the Trustee of the Plan.[28]  Regarding the position of Administrator, the Plan stated, in relevant part:

> The Employer shall appoint one or more Administrators. Any person, including, but not limited to, the Employees of the Employer, shall be eligible to serve as an Administrator.  Any person so appointed shall signify his acceptance by filing written acceptance, with the Employer.  An Administrator may resign by delivering his written resignation to the Employer or be removed by the Employer by delivery of written notice of removal, to take effect at a date specified therein, or upon delivery to the Administrator if no date is specified.
>
> The Employer, upon the resignation or removal of an Administrator, shall promptly designate in writing a successor to this position.  If the Employer does not appoint an Administrator, the Employer will function as the Administrator.[29]

There is no document in the record which indicates that an Administrator was appointed.  So the Administrator of the Plan was the "Employer" – *i.e.*, the Debtor Trans-Industries, Inc.

---

[25]  *Id.* at pdf. p. 102.

[26]  *Id.*

[27]  *Id.* at 95 ¶ 9.12 ("NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY").

[28]  *See id.* at 1, 17 ¶ 1.63, 101.

[29]  *Id.* at 23 ¶ 2.4 ("ASSIGNMENT AND DESIGNATION OF ADMINISTRATIVE AUTHORITY").

## 2. The Plan's provisions authorizing investment in the Debtor

Paragraph 7.2 of the Plan authorized the Trustee of the Plan:

> to acquire or sell shares of [Trans-Industries, Inc.] . . . provided that:
>
> (1) no more than 50 percent of the Trust Fund assets shall be invested in such securities at any time;
>
> (2) such acquisition or sale may only be made with respect to Employer contributions other than those which are made pursuant to a Participant's salary reduction election, (whether such election reduces the Participant's salary on either a pre-tax or after-tax basis); and
>
> (3) before making such acquisition or sale, the Trustee shall make a determination that the acquisition or sale is in compliance with the [A]ct and the Code.[30]

Paragraph 7.10 of the Plan also gave the Trustee the power to "acquire and hold"

qualifying securities of Trans-Industries, Inc. provided that such securities were not more than

50% of the fair market value of the Plan's assets.  It also stated the requirement that any

---

[30]  Pl.'s Trial Ex. 77 ("Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust Amendment # 2").  The Court notes that the amendment labeled "Amendment # 2," which allowed the Plan to invest "no more than 50 percent of the [Plan's] assets" in securities of Trans-Industries, Inc., was executed February 8, 1989, with an effective date of January 1, 1989 (the same effective date of the Plan ("Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan and Trust").  Amendment # 2 references the amendment that added the 401(k) feature of the Plan (the " 401(k) Amendment").  However, the 401(k) Amendment was not executed until December 31, 1989 (more that 10 months after Amendment # 2 was executed).  Amendment # 2 states that "Section 7.2 [of the Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust] shall be amended by inserting the following at the end thereof[.]"  This statement is followed by the language quoted above giving the Trustee power to invest in stock of Trans-Industries, Inc.  This language does not appear at the end of Section 7.2 of the Plan.  (*See* Pl.'s Trial Ex. 1 at 81-82.)  It is therefore unclear whether Amendment # 2 was still part of the Plan when it was amended on December 31, 1989.  For purposes of this opinion, the Court will assume that it was, because whether this language is actually a part of the Plan is not material to the Court's decision.  The parties agree that the Plan as it existed in 1989 allowed the Trustee to invest up to 50% of the fair market value of the Plan's assets in securities of Trans-Industries, Inc. and this provision is not inconsistent with Paragraph 7.10 of the Plan which also grants the Trustee the power to acquire and hold the company's securities. *See* Pl.'s Trial Ex. 1 at 90 ¶ 7.10.

8

securities of Trans-Industries, Inc. in which the Trustee invests, must be "qualifying Employer

securities." Paragraph 7.10 of the Plan states:

> The Trustee shall be empowered to acquire and hold
> "**qualifying Employer securities**" and "qualifying Employer real
> property", **as those terms are defined in [ERISA]**, provided,
> however, that the Trustee shall not be permitted to acquire any
> qualifying Employer securities or qualifying Employer real
> property if, immediately after the acquisition of such securities or
> property, the fair market value of all qualifying Employer
> Securities and qualifying Employer real property held by the
> Trustee hereunder should amount to more than 100% of the fair
> market value of all the assets in the Trust Fund. Provided,
> however, that **the Trustee is empowered to acquire and hold no
> more than 50% of the fair market value of Trust assets,
> excluding therefrom Participant Salary Reduction
> Contributions in qualifying Employer securities.**[31]

### 3. Legal advice obtained before including provisions in the Plan permitting the Trustee to acquire and hold securities of Trans-Industries, Inc.

The provisions in the Plan permitting the Trustee to acquire and hold securities of Trans-

Industries, Inc. were included in the Plan after legal advice was obtained on the propriety of such

an investment. One form of such legal advice was in a memorandum, dated February 8, 1989,

from Jonathan A. Kenter ("Kenter") to Robert J. Ruben ("Ruben"), a member of the Board and

an attorney, regarding "whether the Trans-Industries, Inc. Employees' Profit Sharing Plan and

Trust . . . permit[ted] the [T]rustee to purchase employer securities and whether the securities

[could] be unissued or treasury shares purchased directly from the company" (the "Kenter

---

[31] Pl.'s Trial Ex. 1 at 90 ¶ 7.10 (emphasis added). ERISA § 1107(d)(1) defines "employer security" as "a security issued by an employer of the employees covered by the plan or an affiliate of such employer." 29 U.S.C. § 1107(d)(1). ERISA § 1107(d)(5)'s definition of "qualifying employer security" includes "an employer security which is . . . stock." 29 U.S.C. § 1107(d)(5).

Memo").[32]  Kenter opined that "[t]he [P]lan confers broad latitude upon the [T]rustee of such

[P]lan, Dale S. Coenen, in the investment of securities with [T]rust fund assets" and that

"[a]lthough the [Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust] does not

specifically authorize the [T]rustee to purchase employer securities, the language of [that Plan] in

permitting the [T]rustee to purchase 'any securities,' seems to contemplate the purchase of

employer securities."[33]  Despite this conclusion, Kenter opined that it was "imperative to amend

the [Plan] to specifically authorize the [T]rustee to purchase and hold 'employer securities.'"[34]

Kenter explained that "[n]ormally, [under ERISA § 407(b),] no more than 10 percent of pension

plan assets may be invested in employer securities" but that "an 'eligible individual account plan'

would not be subject to the 10 percent limitation, and would be able to purchase employer

securities with all plan assets other than contributions made pursuant to an employee salary

reduction election (pre-tax or after-tax.)" Kenter further explained that "an 'eligible individual

account plan' includes a profit sharing plan, **provided that such plan 'explicitly provides for

acquisition and holding of qualifying employer securities**[.]'"[35]  Kenter reasoned that "[s]ince

the [Plan] does not specifically provide for the acquisition and holding of 'employer' stock," the

[Plan] should be amended "to so state to insure compliance with ERISA Section 407(d)(3)(B)."[36]

Kenter explained that another advantage of the Plan being classified as an "eligible individual

---

[32]  *See* Pl.'s Trial Ex. 76 at 1.

[33]  *Id.* at 1-2.

[34]  *Id.* at 2.

[35]  *Id.* at 2-3 (emphasis added).

[36]  *Id.* at 2-4.

account plan" is that it would be exempt from ERISA's prohibition against "[t]ransactions between plans and sponsoring companies . . . **provided that the acquisition or sale is for 'adequate consideration' and no commissions are charged with respect thereto.**"[37]

Kenter noted that it was represented to him that "the Plan's assets presently amount[ed] to $1.2 million and that the Plan wish[ed to] invest $300,000 in employer securities such that 25 percent of the Plan's assets would be comprised of company stock."[38]  Given these assumptions, Kenter concluded that  "[t]he [T]rustee would be permitted to purchase employer securities in this amount **provided he makes a determination that such an investment would be prudent and for the exclusive benefit of employees in accordance with ERISA Sections 404(a)(1)(A) and (B)"** and "**provided that the acquisition or sale is for 'adequate consideration' [('determined as of the date(s) the shares are to be purchased")]** and no commissions are charged with respect thereto."[39]

Kenter also discussed the diversification component of the prudence requirement:

> ERISA Section 404(a)(2).  Under ERISA, a fiduciary is, among other things, required to invest the assets of a plan prudently and diversity the investments of the plan to minimize the risk of large losses.  Under ERISA Section 404(a)(2), however, fiduciaries of profit sharing plans are specifically exempted from the prudence requirement (to the extent prudence dictates that plan assets be diversified) and from the diversification requirement mentioned above.

> Consequently, the trustee of the Plan would be relieved of these enumerated fiduciary diversification duties in using plan assets to purchase company stock, **provided the underlying determination to purchase**

---

[37]  *Id.* at 4 (citing ERISA Sections 408(e)(1), 408(e)(2) and 408(e)(3)).

[38]  *Id.* at 3.

[39]  *Id.* at 3-5 (emphasis added).

**company stock, in and of itself, was made prudently and for the exclusive purpose of providing benefits to participants and their beneficiaries.**[40]

Another source of legal advice regarding the propriety of the Plan investing in the stock of Trans-Industries, Inc. was a letter dated March 29, 1989, addressed to Coenen from Randall R. Schmidlin ("Schmidlin") of the law offices of Hicks and Schmidlin ("the Schmidlin Letter").[41] Schmidlin noted in his letter that he had "reviewed the [Kenter Memo] prepared by Mr. Ruben's office with regard to the purchase of Trans-Industries[, Inc.] stock by the above captioned Profit Sharing Plan." The Schmidlin Letter stated that "the [Kenter M]emo glossed over § 404 of ERISA ("Fiduciary Duties")."[42] After providing the relevant portion of the text of Section 404(a) of ERISA, the Schmidlin Letter stated:

> Mr. Ruben correctly indicates that for individual account plans the diversification requirement in not violated by acquiring and holding of qualifying employer securities. **However, the exclusive benefit rule and the prudent man rule do apply to such purchases. Acquisitions of stock** *for the purpose of providing cash flow to the corporation* **may not be prudent but are** *certainly not for the exclusive benefit of participants.*[43]

> Theoretically, to determine prudence one would have to place himself in the position of a disinterested party and ask if such disinterested party would have purchased stock of the company in view of other investment opportunities available.

> Also, there is some question in my mind as to how [the United States Securities and Exchange Commission] rules with regard to inside

---

[40] *Id.* at 5 (emphasis added) (footnotes omitted); *see also id.* at 2 ("[T]he [T]rustee would be exempt from the asset diversification requirement of ERISA pursuant to ERISA Section 404(a)(2).)"

[41] *See* Pl.'s Trial Ex. 79.

[42] *Id.* at 1.

[43] *Id.* at 2 (emphasis added). The Court notes that it was Kenter, not Ruben, who wrote the memorandum referred to.

information relate to your ability to buy and sell stock in the Plan. In your capacity as President and member of the Board of Directors of Trans-Industries, Inc., as well as Trustee of the Plan, you may be putting yourself into an uncomfortable position with regard to the sale or purchase of stock in the Plan.[44]

Schmidlin warned Coenen: "If the stock does not do well and participants find their account balance decreasing, you are very likely to see a lawsuit(s) filed alleging (whether true or not) a breach of the Trustee's duty to invest for the exclusive benefit of participants and the 'prudent man' rule."[45] Schmidlin attached a copy of the text of ERISA Sections 406 ("Prohibited Transactions"); 407 ("Limitations with respect to acquisition and holding of employer securities and employer real property by certain plans"); and 408 ("Exemptions from prohibited transactions").

### 4. Legal advice obtained after adding a provision to the Plan permitting the Trustee to acquire and hold securities of Trans-Industries, Inc.

Legal advice regarding the propriety of investing in stock of Trans-Industries, Inc. was again sought and obtained, after the Plan was amended to expressly permit such an investment. In a letter dated October 23, 1995, again from Schmidlin to Kosanke (the "Second Schmidlin Letter"), Schmidlin stated, in relevant part:

As concerns the acquisition by the Plan of employer stock, the law has not changed since the correspondence from Mr. Ruben in 1989 and my follow-up letter dated March 29, 1989 (a copy of which is attached as part of this opinion letter). As such, any purchase of employer stock by the Plan must comply with all provisions of law and ERISA **including, but not**

---

[44] *Id.*

[45] *Id.* at 2-3 (emphasis in original).

13

**limited to, the exclusive benefit and prudent investment rules.**[46]

## C. Trans-Industries, Inc. experiences financial difficulties

Sometime in the mid to late 1990s (1995, 1996 or 1997), Trans-Industries, Inc. "began a downward spiral" where it was experiencing a "[l]oss of market share, drop of revenues, loss in profits, that type of thing."[47] "As the company's profits went down, the stock [value] went down, [and Trans-Industries, Inc. was] late on several [Securities and Exchange Commission ("SEC")] filings."[48]

The downward spiral continued until 2006 when Trans-Industries, Inc. filed bankruptcy.[49] On March 22, 2001, Trans-Industries, Inc. "received a Nasdaq Staff Determination letter . . . notifying [it] that the market value of its common shares held by public shareholders was less than the minimum market value requirement as set forth in the Marketplace Rule 4450(a)(2) and that its securities [were] subject to delisting from the Nasdaq National Market."[50] "[Trans-Industries, Inc.] requested a hearing before a Nasdaq Listing Qualifications Panel to review the Staff Determination."[51] Until that time, the price of the common stock for Trans-Industries, Inc. had been in a steady decline.[52]

---

[46] Pl.'s Trial Ex. 80 (emphasis added). As noted above, the correspondence referred to in the Second Schmidlin Letter was from Kenter not Ruben.

[47] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 80; *see also* Trial Tr. (Docket # 536) at 188.

[48] Trial Tr. (Docket # 536) at 207 (testimony of Kosanke).

[49] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 80-81.

[50] Pl.'s Trial Ex. 73.

[51] *Id.*

[52] Trial Tr. (Docket # 533) at 15 (testimony of Witz).

**D. The Plan's purchase of Trans-Industries, Inc. Series A Preferred Stock (the June 5, 2001 Transaction)**

On June 5, 2001, when Trans-Industries, Inc. was experiencing operating losses and the possibility of not being able to continue operations, and needed to raise capital, the Board unanimously approved a consent agreement authorizing Trans-Industries, Inc. to issue 19,000 shares of Series A Preferred Stock, with the intent of selling those shares to the Plan to raise capital for the company.[53] Kosanke expressed reservations to Coenen about purchasing the Series A Preferred Stock. Kosanke told Coenen that he thought that such a purchase was "extremely risky and may not be viewed as a prudent investment."[54] His reservations were based on the financial condition of Trans-Industries, Inc. at that time, and questions he had about "whether the company would survive long-term."[55] Kosanke knew that if the Plan purchased the Series A Preferred Stock, he could "end up with nothing" and that "[i]f his portion [of the Plan] was at risk, so [were the portions of Plan of the other Plan participants]."[56] Kosanke believed "that was more risk than [he] would personally take with [his] own portfolio."[57] When Kosanke expressed these reservations to Coenen, Coenen asked him: "'What do you want to do? Do you want to let the company go under and then everybody is going to lose their jobs?'"[58] Coenen also

---

[53] Second Amended Joint Final Pre-Trial Order (Docket # 503) at 8 (Stipulation of Facts and Law); Pl.'s Trial Ex. 3 at 1-5 ("Trans-Industries, Inc. Consent of Directors"); Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 58-59; Tr. of Robert Paul Anderson Dep. (Pl.'s Trial Ex. 86) at 40-41.

[54] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 94-96; *see also* Trial Tr. (Docket # 536) at 187.

[55] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 94, 217.

[56] *Id.* at 94.

[57] *Id.* at 94-95.

[58] *Id* at 98.

asked Kosanke if "[he had] a better idea on how to make the company more liquid and at the same point in time have a good investment for the employees."[59]  Kosanke told Coenen that he thought "that Chapter 11 was a possibility to kind of position [Trans-Industries, Inc.'s] debt, in particular [the company's] payables, give [Trans-Industries, Inc.] some breathing room to recapitalize the company and then move forward."[60]

Coenen rejected bankruptcy as an option, stopped talking to Kosanke about the Plan's investments, and caused the Plan to purchase the 19,000 shares of Series A Preferred Stock at a cost of $100 per share, for a total of $1.9 million.[61]  In order to obtain the funds to purchase the Series A Preferred Stock, it was necessary for the Plan to liquidate the 47,051 shares of Sound Shore Fund that it held at the time, which had been valued at $1,585,631 several months earlier, as of December 2000.[62]

The Series A Preferred Stock was not publicly traded; had "[a] cumulative dividend rate of $8.25 per share (or 8.25% per annum) . . . payable on the last day of May and November each year;" had a higher priority than the common stock in the payment of dividends or in a liquidation; and was "redeemable at the discretion of the Board of Directors . . . [for] $100 per

---

[59]  *Id.* at 95.

[60]  *Id.* at 95-96; *see also* Trial Tr. (Docket # 536) at 187.

[61]  Second Amended Joint Final Pre-Trial Order (Docket # 503) at 8 (Stipulation of Facts and Law); Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 96.

[62]  *See* Pl.'s Trial Ex. 66 ("Financial Statement and Report of Independent Certified Public Accountants Trans-Industries, Inc. Employees' 401(k) Profit Sharing Plan And Trust December 31, 2001 and 2000" of Grant Thornton at 7.

16

share plus all accumulated dividends."[63]   The dividends on the Preferred Stock were payable

"when and as declared by the Board of Directors" and if not declared by the Board and paid ,

were cumulative, and would "accrue and accumulate beyond the expiration of each . . . fiscal

period without interest."[64]   The holders of the Series A Preferred Stock had no voting rights; did

not have "any right to participate in any meeting"; and were not "considered stockholders fo the

purpose of any election, meeting, consent or waiver of notice under the provisions of any law . . .

in force or which may . . . be enacted."[65]   The $1.9 million dollars received from the sale of the

Series A Preferred Stock to the Plan was rapidly consumed by operating losses of Trans-

Industries, Inc.[66]

Although Kosanke believed that the purchase of the Series A Preferred stock was risky,

he testified that the believed that such purchase was compliant with ERISA regulations, because

Coenen showed Kosanke opinion letters from three different attorneys stating that as long as the

purchase of company stock did not exceed 50% of the Plan's assets, such purchase was

consistent with ERISA requirements, and because the Board had approved such purchase.[67]

Kosanke testified that he believed that Coenen and the members of the Board had superior

knowledge and expertise regarding investments and issues with the Plan, and that they also had

access to alternative funding sources that he did not know about.  Kosanke testified that he "had

---

[63] Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Pl.'s Trial Ex. 63) at pdf. pp. 8, 12; Pl.'s Trial Ex. 3 (Trans-Industries, Inc. Consent of Directors).

[64] Pl.'s Trial Ex. 3 (Trans-Industries, Inc. Consent of Directors).

[65] *Id.*

[66] Trial Tr. (Docket # 533) at 104, Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 110-111.

[67] *See* Trial Tr. (Docket # 536) at 188, 211.

worked for these people for 25 years," they had taught him anything he knew about business, accounting and investment banking, and every time he had disagreed with them about a course of action for the company or the Plan to take, they had never once in 25 years been wrong.[68]  He testified that he had "been through a lot of crises in the 25 years and . . . Coenen and the [B]oard always seemed to find an opportunity and a way to fix things."[69]  For these reasons, Kosanke did not report the June 5, 2001 Transaction to the Department of Labor ("DOL") or some other federal agency.[70]

**E.  The February 15, 2002 letter to Kosanke from Fields**

On February 15, 2002, Fields sent a letter to Kosanke seeking information regarding the Plan.  The letter stated, in relevant part:

> Dear Kai [Kosanke],
>
> This letter is in regard to our deferred income, profit sharing program.  As the employee representative, and in light of the Enron fiasco as well as several others of late, I have the following questions:
>
> •  Am I still the employee representative?
> •  Is this [P]lan safe, or dependent upon the success of the company?
> •  I do understand that funding of the [P]lan yearly depends on profits, but aside from that, are the balances secure or encumbered in any way?
> •  Also, as the employee representative I used to get quarterly printouts of the portfolio of investments.  Has this been eliminated?[71]

Fields attached several documents to his letter.  One of the documents was entitled "Plan

---

[68]  *See id.* at 128-132.

[69]  *Id.* at 206.

[70]  *Id.* at 126.

[71]  Pl.'s Trial Ex. 4 at DC00210.

Description Salaried Employees' Retirement Plan Trans-Industries, Inc."[72]  It identified the Plan

Trustees and described their authority, in relevant part, this way:

> 1.  Brief Description of the Plan
>
>     The Retirement Plan is a non-discriminatory, portable, rapidly vesting IRS "Qualified" and **completely Company-financed** retirement plan for **salaried** employees of Trans-Industries, Inc., and its subsidiary companies.
>
> . . .
>
> 5.  Board of Trustees
>
>     a.  Investment of all assets (contributions plus earnings) of the Plan shall be administered by a Board of Trustees consisting of the Chairman, Trans-Industries, Inc., **the Treasurer, Trans-Industries, Inc.**, and one other person appointed by the Board of Directors, Trans-Industries, Inc.
>
>     . . . .
>
>     d.  Trustees are authorized to pay all reasonable administrative and operating expenses from Plan proceeds and, at their discretion may hire or appoint a professional Plan Manager or Fund Trustee(s) to administer the Plan and/or its investments, or retain or engage one or more investment counselors.
>
> 6.  Investments
>
>     Trustees may invest Plan funds in stocks of public companies; high quality corporate, municipal or governmental bonds; mutual funds; certificates of deposit; developed or income-producing real estate; first mortgages; or other appropriate investment vehicles of **readily determinable value which in their sole discretion offer the best opportunities for generous return at acceptable risk**.
>
> . . . .

---

[72]  *Id.* at DC00212-DC00219.

12. Termination

> The plan is intended to be a permanent benefit for Trans-Industries employees. However, it may be amended, or terminated upon six (6) months advance written notice, by the Board of Directors of Trans-Industries, Inc. to the Trustees and the participants. Upon notice of such impending termination, the Trustees shall proceed to convert all Plan assets to cash and, after providing for payment of all Plan debts and obligations, terminate said Plan and make full and complete distribution of funds in lump sum to participants in proportion with their interests.

> It is specifically understood that amounts credited to participants' accounts are non-forfeitable upon termination or partial termination of the Plan. Further, in the case of a merger or consolidation with another plan, or transfer of assets or liabilities to another plan, each participant shall be entitled to the same or greater benefit as if the Plan had terminated.[73]

After Kosanke received Fields' February 15, 2002 letter, Kosanke had a discussion with Fields in which he told Fields "[t]hat [he] was concerned too . . . [a]nd yes, the [P]lan was dependent upon the success of the company at that point."[74] Kosanke also expressed his concern about the Plan being invested in more than 50% of company stock, in conversations with Sue Hornung and Bud Dealey, who were participants with sizeable balances in the Plan, with his assistant, Keith LaCombe, and with possibly "three, four, [or] five other people."[75]

**F. Kosanke expresses concern to Coenen in early 2002**

In early 2002, Kosanke brought up to Coenen the problem that by then, more than 50% of the Plan's assets consisted of company stock (both preferred stock and common stock), and

---

[73] *Id* (emphasis added).

[74] Trial Tr. (Docket # 533) at 108.

[75] Trial Tr. (Docket # 536) at 136, 205-06.

Kosanke suggested that maybe it was time for the Plan to "unload" some of the common stock.[76]

According to Kosanke, Coenen "didn't want to hear anything [Kosanke] had to say" because

Coenen was the one who was doing all of the investment for the Plan.[77] At that time, Kosanke

did not consider "having a third party come in and evaluate the prudence of the [P]lan's

investments" because it was so "obvious" that there was a problem with the mix of the assets in

the Plan.[78]

**G. Amherst Capital Partners, L.L.C. Values the Series A Preferred Stock in October 2003**

Before the Plan paid Trans-Industries, Inc. the $1.9 million to purchase the Series A

Preferred Stock, no market valuation study of the stock was performed. It was not until more

than two years later, on October 16, 2003, that such a valuation study was completed by Amherst

Capital Partners, L.L.C. ("Amherst"). Amherst was hired "to estimate the market value for 100%

of the privately held Series A [P]referred stock of Trans[-]Industries, Inc. . . . on June 30, 2003

and December 31, 2002."[79] Amherst valued the Series A Preferred Stock at $1,964,879 as of

December 31, 2002, and at $1,906,671 as of June 30, 2003.[80] The valuation relied on financial

information that Trans-Industries, Inc. provided to Amherst, including "the book values [of

assets] contained in the audited statements of [Trans-Industries, Inc.]," and the fact that

**"management ha[d] indicated a desire to complete redemption of the preferred shares over**

---

[76] Trial Tr. (Docket # 533) at 109, 111.

[77] *Id.*

[78] *Id.* at 110.

[79] Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Pl.'s Trial Ex. 63) at pdf. p. 5.

[80] *Id.* at pdf. pp. 6, 18.

**the 2004-2005 time frame."**[81]  Amherst's valuation study noted that Trans-Industries, Inc. had

not been paying dividends on the Series A Preferred Stock.  Based on that fact, Amherst

compared the Series A Preferred Stock to publicly-traded preferred stocks not paying dividends.

Amherst's valuation study stated, in relevant part:

> The quantity of comparable, publicly traded preferred stocks that are not
> paying dividends is quite limited.  Of the 75 preferred stocks listed in
> Attachment F that have suspended dividend payment, the majority of the
> firms are in bankruptcy (e.g., Enron, Worldcom) and have minimal chance
> of paying significant amounts out to the preferred shareholders.  These
> stocks trade at distressed values that are a fraction of the total book value of
> the liquidation preference and accrued dividends.

> Only a small number of shares have maintained value after suspension of
> dividends.  These shares belong to companies where financial difficulties
> are being encountered, but the market believes substantial payment of the
> amount due will be made at some undetermined future date.[82]

Amherst's October 16, 2003 valuation report further noted that:  "**on June 30, 2003,**

**[Trans-Industries, Inc.] was facing a severe cash shortage and contemplating bankruptcy;"**

**"dividend  payments had been suspended;" Trans-Industries, Inc. was a small company;**

**the stock of Trans-Industries, Inc. was thinly traded; and that all of these facts increased**

**the risk of holding the Series A Preferred Stock**.[83]  Nevertheless, Amherst stated that it was

"probable the next valuation done subsequent to June 30, 2003 [would] show a market increase

in total share value," if the changes management had made to the structure of the company and

its lending situation yielded the expected result of moving the company's performance in a

---

[81]  *Id.* at pdf.  pp. 5, 13, 18 (emphasis added).

[82]  *Id.* at pdf. p. 16.

[83]  *See id.* at pdf. p. 17 Paragraphs 3-4 (emphasis added).

22

positive direction, **given Trans-Industries, Inc.'s expressed "desire to complete redemption of the [Series A Preferred Stock] over the 2004-2005 time frame."**[84]

Amherst updated the original stock valuation on December 21, 2004, opining that as of December 31, 2003, the Series A Preferred Stock was worth $2,035,614 and that as of September 30, 2004, the stock was worth $2,087,843.[85] Amherst later performed a third valuation, dated November 15, 2005, finding that as of December 31, 2004 the fair market value of the Series A Preferred Stock was $2,378,019, and that as of September 30, 2005, the fair market value of the Series A Preferred Stock was $980,874.[86]

The valuation of the Series A Preferred Stock in each of Amherst's three valuation reports **"assumed that [Trans-Industries, Inc.] would redeem the preferred stock in the near future."**[87]

The three Amherst reports showed that value of the Series A Preferred Stock, including accrued dividends, was, as the years progressed, an increasing percentage of the total Trans-Industries, Inc. equity.[88] In his expert report, Witz prepared a table which reflected this:

---

[84] *Id.* at pdf. p. 18 (emphasis added).

[85] *See* Pl.'s Trial Ex. 64 at pdf. p. 6.

[86] *See* Pl.'s Trial 65 at pdf. p. 5.

[87] Witz's Expert Report (Pl.'s Trial Ex. 93) at 9 ¶ 28(H) & n.43 (emphasis added).

[88] *See* Pl.'s Trial Ex. 63 (Amherst's Oct. 16, 2003 report) at 6; Pl.'s Trial Ex. 64 (Amherst's Dec. 21, 2004 report) at 13; Pl.'s Trial Ex. 65 (Amherst's Nov. 15, 2005 report) at 9; Pl.'s Trial Ex. 93 (Witz's Expert Report) at 8 ¶ 28(D).

23

| Date of Value | Preferred Share Value as a Percent of Equity |
|---|---|
| 12-31-02 | 24% |
| 6-30-03 | 27% |
| 12-31-03 | 39% |
| 9-30-04 | 45% |
| 12-31-04 | 100% |
| 9-30-05 | 59%[89] |

Amherst's three reports show "a consistent pattern of credit downgrading" for the Series A Preferred Stock.[90] In its October 16, 2003 report, Amherst rated the Series A Preferred Stock "the lowest investment grade rating and just above non-investment grade."[91] In Amherst's December 21, 2004 report, Amherst rated the Series A Preferred stock "just above the highly speculative ratings and just below the lowest investment grade rating."[92] In its November 14, 2005 report, Amherst rated the Series A Preferred Stock in "credit ratings that fall into the Highly Speculative category."[93]

## H. The Plan as amended in 2004, when Kosanke became a named Trustee

On January 11, 2004, the Plan was amended, with an effective date of January 1, 2003.[94]

---

[89] Witz's Expert Report (Pl.'s Trial Ex. 93) at 8 ¶ 28(D).

[90] *Id.* at 8 ¶ 28(E).

[91] Witz's Expert Report at 8 ¶ 28(E)(I); *see also* Pl.'s Trial Ex. 63 at pdf. p. 14.

[92] Witz's Expert Report at ¶ 28(E)(ii); *see also* Pl.'s Trial Ex. 64 at pdf. p. 14.

[93] Witz's Expert Report at ¶ 28(E)(iii); *see also* Pl.'s Trial Ex. 65 at pdf. p. 10.

[94] *See* Pl.'s Trial Ex. 2 at TBA 0078-0079, TBA 0102, TBA 0109, TBA 0115.

Kosanke and Coenen executed various documents that amended the Plan. One of those documents was entitled "Adoption Agreement for The Benefit Advantage, Inc. Non-Standardized 401(k) Profit Sharing Plan and Trust" (the "Adoption Agreement").[95]

Under the Adoption Agreement, Trans-Industries, Inc. "adopt[ed] The Benefit Advantage, Inc. Prototype Non-Standardized 401(k) Profit Sharing Plan and Trust" and elected various other provisions. Although The Benefit Advantage, Inc. "completely filled out" the Adoption Agreement, Kosanke provided The Benefit Advantage, Inc. with the information it needed to do so, and Kosanke and Coenen received a copy of the Adoption Agreement, and had an opportunity to review it and "ma[k]e any necessary changes [to it they] thought appropriate[,]" before signing it.[96]

The Adoption Agreement stated that "Kai Kosanke" and "Dale S. Coenen" would "serve as discretionary Trustee(s) over assets not subject to control by a corporate Trustee."[97] Consistent with this statement, on January 11, 2004, "Kai Kosanke" and "Dale S. Coenen" signed the Adoption Agreement *as Trustees*.[98] The Plan, as amended in 2004, provided that "'Trustee' means the person or entity named in the Adoption Agreement, or any successors thereto."[99]

The Adoption Agreement stated that the Plan Administrator was the "Employer" (Trans-

---

[95] *See, e.g.,* Pl.'s Trial Ex. 2 at TBA 0078-TBA 0102, TBA 0109, TBA 0115. *Id.* at TBA 0078.

[96] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 181-82, 192-93; Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 24-25.

[97] Pl.'s Trial Ex. 2 at TBA 0079 at ¶ 10; Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 191.

[98] Pl.'s Trial Ex. 2 at TBA 0102.

[99] *Id.* at TBA 0016 ¶ 1.80.

Industries, Inc.).[100]  And in addition to signing as Plan Trustees, Kai Kosanke and Dale S. Coenen also signed the Adoption Agreement on behalf of the "PARTICIPATING EMPLOYER, Trans-Industries, Inc."[101]

Another document that amended the Plan was entitled "EGTRRA [(Economic Growth and Tax Relief Reconciliation Act of 2001)] Amendment to the Trans-Industries, Inc. Employee's 401[(k)] Profit Sharing Plan & Trust."[102]  Kosanke signed this document on January 11, 2004 on behalf of Trans-Industries, Inc., the "EMPLOYER."[103]  That same day, Kosanke signed another document that amended the Plan, entitled "Trans-Industries, Inc. Employee's 401[(k)] Profit Sharing Plan & Trust Post-EGTRRA Amendment," on behalf of Trans-Industries, Inc. and its subsidiaries, the "EMPLOYER."[104]

The Plan, as amended, states who the fiduciaries of the Plan are and describes the powers and duties of those fiduciaries.

Paragraph 10.12 of the Plan states that "[t]he 'named Fiduciaries' of this Plan are (1) the Employer, (2) the Administrator, (3) the Trustee (if the Trustee has discretionary authority as elected in the Adoption Agreement or as otherwise agreed upon by the Employer and the Trustee)[.]"[105]

---

[100]  *Id.* at TBA 0080 ¶ 11.a, TBA 0102.

[101]  *Id.* at TBA 0102.

[102]  *Id.* at TBA 0104-TBA 0109.

[103]  *Id.* at TBA 0109.

[104]  *Id.* at TBA 0115.

[105]  *Id.* at TBA 0059.

26

Paragraph 7.2(a) of the Plan provides, in relevant part, that

> if the Employer in the Adoption Agreement . . .
> designates the Trustee to administer all or a portion
> of the trust as a discretionary Trustee . . . then the
> Trustee has the discretion and authority to invest,
> manage, and control those Plan assets except . . .
> those assets which are subject to the investment
> direction of a Participant . . . or an Investment
> Manager, the Administrator, or other agent
> appointed by the Employer."[106]

Because the Adoption Agreement states that "Kai Kosanke" and "Dale S. Coenen" would "serve

as **discretionary Trustee(s)** over assets not subject to control by a corporate Trustee,"[107] both

Kosanke and Coenen had "discretion and authority to invest, manage, and control those Plan

assets" under Paragraph 7.2(a) of the Plan.

Paragraph 7.2(c) of the Plan lists powers of the Trustee, in relevant part:

> (c)     The Trustee, in addition to all powers and authorities under
> common law, statutory authority, including the Act, and other
> provisions of this Plan shall have the following powers and
> authorities to be exercised in the Trustee's sole discretion:
>
> . . .
>
> (2)     To sell, exchange, convey, transfer, grant options to
> purchase, or otherwise dispose of any securities or other
> property held by the Trustee . . . .[108]

Paragraph 2.4 of the Plan describes the powers and duties of the Administrator of the

Plan. Of the following stated powers and duties, the Court has bolded the ones that Kosanke has

---

[106] *Id.* at TBA 0048.

[107] Pl.'s Trial Ex. 2 at TBA 0079 at ¶ 10 (emphasis added); Tr. of Kosanke Dep. (Pl.'s Trial Ex.
83) at 191.

[108] Pl.'s Trial Ex. 2 at TBA 0048.

27

testified to having performed, in his deposition and trial testimony:

## 2.4 POWERS AND DUTIES OF THE ADMINISTRATOR

The primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan. The Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and determine all questions arising in connection with the administration, interpretation, and application of the Plan. Benefits under this Plan will be paid only if the Administrator decides in its discretion that the applicant is entitled to them. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan: provided however, that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan continue to be deemed a qualified plan under the terms of Code Section 40l(a), and shall comply with the terms of the Act and all regulations issued pursuant thereto. The Administrator shall have all powers necessary or appropriate to accomplish its duties under this Plan.

The Administrator shall be charged with the duties of the **general administration of the Plan** and the powers necessary to carry out such duties as set forth under the terms of the Plan, including, but not limited to the following:

**(a)  the discretion to determine all questions relating to the eligibility of an Employee to participate or remain a Participant hereunder and to receive benefits under the Plan**;

(b)  the authority to review and settle all claims against the Plan, including claims where the settlement amount cannot be calculated or is not calculated in accordance with the Plan's benefit formula. **This authority specifically permits the Administrator to settle, in compromise fashion, disputed claims for benefits and any other disputed claims made against the Plan;**

**(c)  to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any**

28

**Participant shall be entitled hereunder**;

**(d) to authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust Fund;**

**(e) to maintain all necessary records for the administration of the Plan**;

**(f) to interpret the provisions of the Plan** and to make and publish such rules for regulation of the Plan that are consistent with the terms hereof;

**(g) to determine the size and type of any Contract to be purchased from any Insurer and to designate the Insurer from which such Contract shall be purchased**;

**(h) to compute and certify to the Employer and to the Trustee from time to time the sums of money necessary or desirable to be contributed to the Plan;**

**(I) to Consult with the Employer and the Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee can exercise any investment discretion (if the Trustee has such discretion), in a manner designed to accomplish specific objectives**;

(j) to prepare and implement a procedure for notifying Participants and Beneficiaries of their rights to elect Joint and Survivor Annuities and Pre-Retirement Survivor Annuities if required by the Plan, Code and Regulations hereunder;

**(k) to assist Participants regarding their rights, benefits, or elections available under the Plan;**

(l) to act as the named Fiduciary responsible for communicating with Participants; as needed to maintain Plan compliance with Act Section 404(c) (if the Employer intends to comply with Act Section 404(c)) including but not limited to, the receipt and transmission of Participants' directions as to the investment of their accounts under the Plan and the formation of policies, rules, and procedures pursuant to which Participants may give investment instructions with respect to the Investment of their

29

accounts; and

> (m) to determine the validity of, and take appropriate action with respect to, any qualified domestic relations order received by it.[109]

Paragraph 6.4(a) of the Plan provides that "[i]f a Participant's employment with the Employer is terminated for any reason other than death, Total and Permanent Disability, or retirement, then . . . the Administrator shall direct that the entire Vested portion of the Terminated Participant's Combined Account be payable to such Terminated Participant provided the conditions, if any, set forth in the Adoption Agreement have been satisfied."[110]

Paragraph 10.15 of the Plan provides that "[a]ll provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner."[111]

The Plan gives the Employer the right to terminate the Plan. Paragraph 8.2 of the Plan provides:

> (a) The Employer shall have the right at any time to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. Upon any full or partial termination all amounts credited to the affected Participants' Combined Accounts shall become 100% Vested and shall not thereafter be subject to forfeiture and all unallocated amounts, including Forfeitures, shall be allocated to the accounts of all Participants in accordance with the provisions hereof.

> (b) Upon the full termination of the Plan, the Employer shall direct the distribution of the assets to Participants in a manner that is consistent with and satisfies the provisions of Section 6.5. Distributions to a Participant shall be made in cash (or in property

---

[109] *Id.* at TBA 0018-0019 (emphasis added).

[110] *Id.* at TBA 0036.

[111] *Id.* at TBA 0060.

30

if permitted in the Adoption Agreement) or through the purchase of
irrevocable nontransferable deferred commitments from the
Insurer. Except as permitted by Regulations, the termination of the
Plan shall not result in the reduction of "Section 411(d)(6)
protected benefits" as described in Section 8.l(e).[112]

Paragraph 7.14 of the Plan increased the maximum amount of "qualifying employer

securities" that the Plan could acquire and hold from 50% to 100%. It stated, in relevant part:

The Trustee shall be empowered to acquire and hold "qualifying Employer
securities" and "qualifying Employer real property," as those terms are
defined in the Act. However, no more than one hundred percent (100%), in
the case of a Profit Sharing Plan or 401(k) Plan, . . . of the fair market value
of all the assets in the Trust Fund may be invested in "qualifying Employer
securities" and "qualifying Employer real property."[113]

Importantly, the Plan did not expressly provide procedures for Kosanke and Coenen to

allocate, as between themselves, any of their fiduciary responsibilities as named Trustees.

## I. The Summary Plan Description of the Plan as amended in 2004

The Benefit Advantage, Inc. also prepared a summary plan description which was

provided to all Plan participants, which was designed to help them better understand the various

provisions of the Plan, as amended in 2004, and their rights under the Plan. It was entitled

"Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan & Trust Summary Plan

Description" (the "Summary Plan Description").[114] The Summary Plan Description stated, in

---

[112] *Id.* at TBA 0055-0056 ("TERMINATION").

[113] *Id.* at TBA 0054 ("EMPLOYER SECURITIES AND REAL PROPERTY").

[114] Pl.'s Trial Ex. 95; *see also* Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 188; Trial Tr. (Docket # 533) at 51-53. A summary plan description is created after the employer, who is sponsoring the plan, signs a prototype plan (a plan that is pre-filed with the Internal Revenue Service for preapproval) and an adoption agreement (part of the plan where the sponsoring employer may make all of its choices in terms of requirements for eligibility, matching contributions, etc.) is signed. It serves the disclosure requirement to the plan participants. Trial Tr. (Docket # 534) at 74 (testimony of Witz). The Court notes that during his deposition, Kosanke stated that the Summary Plan Description which listed him as one of

31

relevant part, that Trans-Industries, Inc. is the Plan Administrator, and that Kosanke and Coenen

are the Trustees of the Plan.  It states the following, under the caption "**Trustee Information**":

>All money that is contributed to the Plan is held in a
>trust fund.  The Trustees are responsible for the
>safekeeping of the trust fund.  The trust fund
>established by the Plan's Trustees will be the
>funding medium used for the accumulation of assets
>from which benefits will be distributed.
>
>The names and address of the Plan's Trustees are:
>Kai Kosanke, Trustee
>Dale S. Coenen, Trustee
>2637 N. Adams Road
>Rochester Hills, Michigan 48309[115]

Article XI of the Summary Plan Description, captioned "Protected Benefits," explains

that the general rule is that each participant's "vested interest" in the Plan cannot be alienated,

but it states that there are two exceptions to this rule.  One of those exceptions is that if you are a

participant in the Plan

>involved with the Plan's operation . . . [and i]f you
>are found liable for any action that adversely affects
>the Plan, the Administrator can offset your benefits
>by the amount that you are ordered or required by a
>court to pay the Plan.  All or a portion of your
>benefits may be used to satisfy any such obligation
>to the Plan.[116]

## J.  Fiduciary liability coverage

---

the Trustees, and which was provided to the Plaintiff Trustee out of Trans-Industries, Inc.'s document
files, was provided to all of the Plan participants.  At trial, Kosanke stated that he didn't know if the
version in which he was listed as a Trustee was the version that went out to the Plan participants.  He
alleged that another version in which he was not listed as a Trustee went out to the Plan participants.  But
Kosanke did not produce that alleged other version, and it is not in the record.

[115]  Pl.'s Trial Ex. 95 at 23.

[116]  *Id.* at 17.

Until the Debtors filed bankruptcy, Trans-Industries, Inc. had liability coverage for the fiduciaries of the Plan. In procuring the fiduciary liability coverage, "the intent was to cover anybody that worked with the [P]lan, whether they were a fiduciary or not[;]" namely the assistant treasurer, (which was either Keith LeComb or Paul Clemo depending on the time frame involved); Coenen and Kosanke.[117]

## K. Some of the duties actually performed for the Plan by Kosanke and Coenen

Kosanke performed numerous administrative functions for the Plan.[118] As discussed in Parts II.H and IV of this Opinion, both Coenen and Kosanke were named Trustees of the Plan with authority over the investment of Plan assets. Despite this, in practice, Coenen always determined what investments the nonparticipant-directed, profit-sharing portion of Plan (the "Plan assets") made and retained.[119]

## L. The liquidity problems with the Plan

In March 2004, Richard Solon ("Solon"), became the President and Chief Operating Officer ("COO"), of Trans-Industries, Inc., and a member of the Board.[120] In August 2004, Solon fired Fields from his position as President of Transign, Inc.[121] On August 28, 2004, after Solon fired him, Fields wrote a letter addressed to Kosanke, with copies to Solon and to Coenen,

---

[117] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 120-22, 139, 146-48, 188-89.

[118] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 12, 16, 26-27, 30-31, 33, 65, 122, 130-34, 188-89, 199-200; *see also* Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 24-25, 31-32, 37, 45-52, 116-17, 124-29; Tr. of Solon Dep. (Pl.'s Trial Ex. 84) at 145-46; Pl.'s Trial Ex. 103 (Form 5500 for 2003) at 1; Pl.'s Trial Ex. 104 (Form 5500 for 2004) at 1; Trial Tr. (Docket # 533) at 49, 65, 73, 80-81.

[119] Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 21, 34.

[120] Tr. of Solon Dep. (Pl.'s Trial Ex. 84) at 22-23.

[121] Tr. of Fields Dep. (Pl.'s Trial Ex. 85) at 15, 21.

33

requesting payment of his entire vested interest in the Plan.[122]  Fields's vested interest was about

36% of the Plan assets, which had a stated total value of approximately $3.9 million as of August

31, 2004.[123]  Trans-Industries, Inc. reported to Fields "that he ha[d] a profit sharing balance of

approximately $1.4 million as of August 31, 2004."[124]  But as of that date, 70% of the Plan assets

consisted of preferred and common stock of Trans-Industries, Inc.[125]  Fields's request created a

liquidity crisis for the Plan, because even if Trans-Industries, Inc. liquidated all of the Plan's

investments other than the stock it held in Trans-Industries, Inc., there would be a shortfall of

more than $300,000.00 in cash needed to pay Fields his vested interest in full.[126]

## M.  Options considered for dealing with the Plan's liquidity crisis

In response to this liquidity crisis, Trans-Industries Inc. hired Relational Advisors, later

known as RA Capital Advisors, LLC, to advise it.[127]  In addition, upon the advice of Robert Paul

Anderson ("Anderson"), who was outside legal counsel for Trans-Industries, Inc., and Secretary

to the Board of Trans-Industries, Inc.,[128] Coenen, Kosanke, and Anderson met with Charles Kelly

("Kelly"), an attorney who, according to Anderson, was more experienced in ERISA issues than

---

[122]  Pl.'s Trial Ex. 14.

[123]  *See* Oct. 6, 2004 Memo (Pl.'s Trial Ex. 26) at 2.

[124]  *Id.*

[125]  *Id.*

[126]  *Id.*

[127]  Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 156; Tr. of Solon Dep. (Pl.'s Trial Ex. 84) at 48-49.

[128]  Anderson's duties as Secretary of the Board of Trans-Industries, Inc. included regularly attending meetings of the Board of Directors; keeping the Minutes of those meetings; attending the Annual Meeting of Shareholders, filing a report at that meeting, and preparing some resolutions.  Tr. of Anderson Dep. (Pl.'s Trial Ex. 86) at 12-14.

34

he was, to discuss the Plan's liquidity problems.[129]

On September 17, 2004, the Board held a meeting to discuss the June 5, 2001 Transaction, in which the Plan had paid Trans-Industries, Inc. $1.9 million for the Series A Preferred Stock.[130]  By decision of the Board, "[o]n the advice of counsel and on its own initiative, [Trans-Industries, Inc.] . . . decided to unwind [the June 5, 2001 Transaction]" and "to appoint two of its Directors who were not involved in [the June 5, 2001 Transaction; namely James O'Brien ("O'Brien") and Solon,)] to make a recommendation of a method and formula for unwinding the transaction."[131]

After the Board's September 17, 2004 meeting, attorney Kelly prepared a memorandum dated October 6, 2004 (the "Kelly Memorandum").[132]  The Kelly Memorandum stated that the administrator of the Plan is Trans-Industries, Inc. and "the Individual Trustees who serve as discretionary Trustees over the assets of the [P]lan are Kai Kosanke and Dale Coenen."[133]  The Kelly Memorandum raised serious concerns about possible breaches of fiduciary duty under ERISA based on the June 5, 2001 Transaction, and the continued retention of the Series A Preferred Stock in the Plan, and warned that "ERISA and IRS provide for substantial penalties and personal liability of fiduciaries," and that "'an ERISA Event' would place [Trans-Industries,

---

[129]  *Id.* at 6-9, 11-19, 34-42.

[130]  Memorandum prepared by Anderson dated November 22, 2004 (Pl.'s Trial Ex. 32).

[131]  Memorandum prepared by Anderson dated November 22, 2004 (Pl.'s Trial Ex. 32); *see also* Tr. of Anderson Dep. (Pl.'s Trial Ex. 86) at 76-77.

[132]  Pl.'s Trial Ex. 26.

[133]  *Id.* at 9.

35

Inc.] in violation of its [current credit arrangement] covenants."[134]  The Kelly Memorandum had

an attachment entitled "Fiduciary Responsibility Under ERISA," which contained a detailed

explanation of relevant ERISA law and included the following topic headings: "Basic Duty of

Fiduciary;" "The Exclusive Benefit Rule;" "The Prudent Man Rule;" The Diversification

---

[134]  *Id.* at 2 ¶¶ II.D-II.E.  The Kelly Memorandum included the following:

II.  Initial Concerns

A.      Did the original acquisition of the [Series A P]referred [S]tock breach the fiduciary standards established by ERISA?

B.      Does continuing to hold the [Series A P]referred [S]tock in the portfolio [of the Plan] violate ERISA requirements?

I.       Exclusive Benefit Rule - Investments must be made for the exclusive benefit of the Plan participants and beneficiaries.

ii.      Prudent Investor Rule: diversification, liquidity and rate of return.

C.      Compliance with Plan documents

I.       Was the [Series A] Preferred [S]tock invested "exclusively" for the benefit of the participants and beneficiaries as required by ERISA (see memorandum attached as Exhibit "C")?

ii.      Does the current Plan document require divestment of the [Series A P]referred [S]tock.

D.      ERISA and IRS provide for substantial penalties and personal liability of fiduciaries.

E.      Under [Trans-Industries, Inc.'s] current credit arrangement, an "ERISA Event" would place [Trans-Industries, Inc.] in violation of its [current credit arrangement] covenants.

*Id.* at pdf. pp. 2-3.

Requirement;" "Compliance With Plan Documents;" "Co-Fiduciary Liability;" "Remedial Action Requirement;" "ERISA's Prohibited Transaction Rules;" and "Covenants, Representations and Warranties in Credit and Security Agreement Between Trans-Industries, Inc. and Affiliated Companies and The Huntington National Bank."[135]

The Kelly Memorandum stated that "[i]f the action called for by [a] plan provision is inconsistent with ERISA, the fiduciary is obligated to ignore the plan provision."[136]   The Kelly Memorandum also explained that "[i]f a fiduciary becomes aware of a breach of duty by a co-fiduciary, the fiduciary must try to remedy the breach."[137]   In this regard, the Kelly Memorandum stated:

> A plan fiduciary, plan sponsor, party in interest, or other person in a position to correct a breach may avoid assessment of civil penalties under ERISA Section 502(1) for possible breaches of fiduciary duties by correcting such breaches, and reporting them to [the DOL's] Pension and Welfare Benefits Administration ("PWBA") pursuant to PWBA's Voluntary Fiduciary Correction Program (VFC Program).  To participate in the VFC Program, the plan official must:
>
> 1.   Identify the violation;
>
> 2.   Correct the specific violations identified;
>
> 3.   Restore any plan losses and profits with interest;
>
> 4.   Notify participants and beneficiaries; and
>
> 5.   File an application including documents evidencing corrected financial transactions with the appropriate

---

[135]  *Id.* at pdf. pp. 9-17.

[136] *Id.* at pdf. p. 11.

[137] *Id.* at pdf. p. 12-13.

After he prepared the Kelly Memorandum, Kelly met with Coenen, Kosanke, and Anderson to discuss it.[139]  At that meeting, Kelly expressed his concern that the June 5, 2001 Transaction may have run afoul of ERISA, and advised Coenen, Kosanke, and Anderson that the Plan's purchase of the Series A Preferred Stock should be unwound.[140]  Kelly also advised Coenen, Kosanke, and Anderson that Trans-Industries, Inc. should consult with "a full fledged ERISA firm."[141]  According to Anderson, the meeting ended with a lot of open issues, and the understanding that Coenen and Kosanke were going to have to come up with some plans to address those issues.[142]

On October 25, 2004, Relational Advisors prepared a confidential memorandum entitled "Trans-Industries, Inc. Resolution of Pension Plan Matters" (the "RA Memo"), which had the stated objective of "creat[ing] a win-win solution for Trans-Industries[, Inc.'s] plan participants."[143]  The RA Memo outlined specific steps that could be taken to resolve the liquidity problem with the Plan.  It listed the steps as follows:

- Terminate [P]lan and distribute assets followed by an exchange of existing [Series A P]referred [S]tock for a new redeemable convertible preferred stock.

---

[138]  *Id.* at 12.

[139]  Tr. of Anderson Dep. (Pl.'s Trial Ex. 86) at 36-37.

[140]  *Id.* at 36, 44.

[141]  *Id.* at 42.

[142]  *Id.* at 53.

[143]  *See* Pl.'s Trial Ex. 27 at RA 0038-RA 0045.

38

- Liquidate sufficient securities to pay out all but the top eight (8) plan participants.

- For Messrs. Coenen and Kosanke, distribute preferred stock only.

- For the remaining six (6) plan participants, distribute pro rata the remaining cash plus preferred stock.

- Establish new redeemable convertible preferred stock utilizing the following terms:

  - XX% dividend

  - Convertible premium of XX% ($XX.XX per share)

  - Mandatory redemption by the Company at December 31, 2010

  - forced conversion if [the Company's] share price closes above 150% of the exercise price for 20 consecutive trading day.

  - Other normal and customary terms for securities of this type

- To the extent that any of the 6 remaining plan participant decline to agree with this distribution plan, Mr. Coenen would agree to substitute up to all of the 587,000 [in Company] shares in exchange for the new preferred stock with such contributed shares to be liquidated as necessary to meet the requirements of these specified plan participants.[144]

On November 1, 2004, Relational Advisors prepared a chart listing the objective and the six specific steps listed in the RA Memo to be taken to resolve the liquidity issue with the Plan. The only difference between the chart and the RA Memo was that the chart filled in the blanks for the terms of the new stock in Step 5:

5.   Establish new redeemable convertible preferred stock utilizing the following terms:

     a.   3% dividend

---

[144] *Id.* at RA 0043-RA 0045.

b.      Convertible premium of 31% ($2.35 per share)

c.      Mandatory redemption by the Company at December 31, 2010

d.      Forced conversion if [the Company's] share price closes above $150% of the exercise price for 20 consecutive trading days

e.      Other normal and customary terms for securities of this type[145]

On November 10, 2004, Anderson, Kosanke, Coenen, and Dan Nemes ("Nemes"), a Certified Public Accountant, met to discuss how to redeem the Series A Preferred Stock owned by the Plan.[146] That meeting was described in a memorandum prepared by Anderson, dated November 12, 2004 (the "Anderson Memo").[147] The Anderson Memo stated that the Series A Preferred Stock was valued on the books of Trans-Industries, Inc. at $2,176,000; that Coenen held a 22% vested interest in the Plan, worth approximately $950,000; and that Coenen was "willing to take an in-kind distribution/rollover vested percentage in 100% of the [P]lan's [Series A P]referred [S]tock."[148] It also stated that "[t]he Plan would either be terminated or Mr. Coenen would resign as an employee and enter into a consulting agreement with [Trans-Industries, Inc.], so that he could roll his [Series A P]referred [S]tock into his own separate IRA."[149]

On November 18, 2004, O'Brien, Solon, and Anderson had a telephone conference to

---

[145] Pl.'s Trial Ex. 29.

[146] Tr. of Anderson Dep. (Pl.'s Trial Ex. 86) at 69-70.

[147] Pl.'s Trial Ex. 30.

[148] *Id.* at 1 ¶¶ 1, 3-4.

[149] *Id.* at 2 ¶ 10.

further discuss how to unwind the June 5, 2001 Transaction. Among other things, they discussed the possibility of Coenen taking a distribution of his vested interest in the Plan in kind, — *i.e.*, in the form of shares of the Preferred Stock rather than in the form of cash — and the Plan being amended to allow for a distribution in kind.[150]

Sometime in late 2004, someone at the law firm of Calfee, Halter & Griswold, LLP, prepared a document entitled "Trans-Industries, Inc. Employee Profit Sharing Plan Issues" outlining "a course of action designed to resolve issues relating to the . . . Plan" (the "Plan Issues Document").[151] This document was prepared after various attorneys from that firm, including Rick Hauer (specializing in employee benefits), Brent Ballard, and Tom Jorgensen, had participated in a series of meetings with, among others, Joel Reed of RA Capital Advisors, and Anderson, Solon, Coenen, and Kosanke of Trans-Industries, Inc., to discuss issues caused by the Plan holding a large amount of the stock of Trans-Industries, Inc.[152]

The Plan Issues Document stated that Fields's interest in the Plan was 35.6%, valued at $1,451,052.60 as of June 30, 2004.[153] In the Plan Issues Document, there was an assumption that the Plan would be terminated and all participants of the Plan would receive distributions of their

---

[150] Memorandum prepared by Anderson dated November 22, 2004 (Pl.'s Trial Ex. 32) at ¶¶ 3-4.

[151] *See* Pl.'s Trial Ex. 35; Tr. of Solon Dep. (Pl.'s Trial Ex. 84) at 53-54; Tr. of Brent T. Ballard Dep. (Pl.'s Trial Ex. 90) at 66-67.

[152] *See* Tr. of Brent T. Ballard Dep. (Pl.'s Trial Ex. 90) at 20, 46-52, 62-67; Pl.'s Trial Ex. 42 (letter dated November 8, 2004 from Brent D. Ballard of Calfee, Halter & Griswold, LLP. to Solon explaining, in relevant part, that the law firm of Calfee, Halter & Griswold, LLP. had "helped to propose various alternative resolutions to the Plan issues"; and that in any discussion relating to the Plan issues, the firm's client was Harry E. Figgie, Jr. and related family members and entities, and "not Trans-Industries, Inc. or any of its directors, officers or other shareholders" or the Plan or its Trustees).

[153] Pl.'s Trial Ex. 35 at 4 ¶ V.A.

vested interest in the Plan, either in cash or in kind.[154]  The Plan Issues Document stated that "[i]t

may not be possible to liquidate the Series A Preferred Stock."[155]   For this reason, the Plan

Issues Document stated that "[c]onsideration should be given to converting the Series A

Preferred Stock to a Series C Preferred Stock with terms that may be more attractive to

participants to facilitate voluntary in-kind distribution."[156]  The Plan Issues Document stated that

Coenen and Kosanke, as Plan Trustees, would be asked to voluntarily take an in-kind distribution

of "newly created" Series C Preferred Stock in full satisfaction of their vested interests in the

Plan.  Coenen's percentage interest in the Plan was calculated at 22.4% and valued at

$913,191.04 as of June 30, 2004, and Kosanke's percentage interest in the Plan was calculated at

4.6% and valued at $187,364 as of June 30, 2004.[157]  The Plan Issues Document further stated

that some identified Plan participants, including Fields, would be asked to voluntarily "take some

Series C Preferred Stock in satisfaction of their interests in the [Plan]";[158] and that "[s]ince some

[P]lan participants will be given a choice as to whether to receive a [P]lan distribution in cash or

Series C Preferred Stock, all [P]lan participants must be given the same right to elect to receive

their [P]lan distributions in either cash or Series C Preferred Stock."[159]  The Plan Issues

Document "assumed that all participants but the participants named in th[e] outline [as being

---

[154] *Id.* at 1 ¶ I.B.1, 6 ¶¶ VII.D-VII.E.

[155] *Id.* at 2 ¶ III.A.

[156] *Id.*

[157] *Id.* at 2-4 ¶¶ III.A-III.E, IV.A-IV.E.

[158] *Id.* at 4 ¶ V.A.

[159] *Id.* at 5 ¶ VI.A.

asked to receive Series C Preferred Stock] w[ould] elect cash."[160]

On November 17, 2004, the Board conducted a regular meeting at which it discussed the Plan. Present at the meeting were Coenen, O'Brien, Ruben, and Solon. At the meeting the Board unanimously approved a motion to amend the Plan "to allow for a distribution or roll over in kind."[161]

## N. Coenen's resignation deepens the Plan's liquidity crisis

The Plan's liquidity crisis deepened on March 16, 2005, when Coenen was forced to resign and became entitled to receive his 22.4% vested interest in the Plan assets, valued at $913,191.04 as of June 30, 2004.[162]

## O. The June 2005 Plan distributions to Fields and Coenen

As noted above, one option repeatedly discussed for dealing with the Plan's liquidity crisis was to terminate the Plan and make distributions to all of the Plan participants based on their vested interests in the Plan. But that approach was not followed. Rather than terminating the Plan, Trans-Industries, Inc. entered into various agreements with Coenen and Fields, under which Coenen and Fields would receive cash distributions from the Plan, on the condition that they would use a portion of the cash received to purchase restricted common stock of Trans-Industries, Inc. from the Company. The Company then would use the money received from such

---

[160] *Id.*

[161] Nov. 17, 2004 Board Meeting Minutes (Pl.'s Trial Ex. 51) at 8.

[162] *See* Pl.'s Trial Ex. 45 ("Agreement for Management Succession, Resignation and Severance of CEO, and Other Miscellaneous Matters") at ¶ 1.1 (noting that Coenen's resignation was effective March 16, 2005); Pl.'s Trial Ex. 35 at 3 ¶ IV.B.1 (valuing Coenen's interest in the Plan).

common stock purchases to redeem Series A Preferred Stock from the Plan.[163]

### 1. Trans-Industries, Inc.'s agreements with Coenen

On March 16, 2005, the Board; namely Coenen, Harry E. Figgie ("Figgie"), Solon, O'Brien, Ruben, and H. Sean Mathis; signed a special resolution, which provided for the resignation of Coenen as CEO of Trans-Industries, Inc., the appointment of Solon in Coenen's place; and the making of various agreements with Coenen.  Those agreements with Coenen were: (I) the "Agreement for Management Succession, Resignation and Severance of CEO and Other Miscellaneous Matters;" (ii) the "Severance Agreement and Release of Claims;" (iii) the "Stock Purchase Agreement;" (iv) Amendment No. 3 to the Right of First Refusal Agreement; and (v) the "Stock Restriction Agreement" (collectively, the "Coenen Transaction Agreements").[164]

Trans-Industries, Inc. and Coenen actually executed the Coenen Transaction Agreements, which were drafted by Anderson, on May 23, 2005, with an effective date of March 16, 2005. Under the "Agreement for Management Succession, Resignation and Severance of CEO and Other Miscellaneous Matters," Coenen resigned as CEO, effective March 16, 2005, but was to "remain a member of the Board of Directors until his earlier resignation or removal in

---

[163]  Anderson described the approach taken as follows:

> In a nutshell, . . . cash distributions were going to be made out to [Coenen and Fields] and they were going to immediately turn around and purchase corporate Trans-Industries[, Inc.] stock.  And Trans-Industries[, Inc.] would immediately take the cash and put it into the profit sharing [P]lan and redeem[] the [Series A Preferred Stock].

Tr. of Anderson Dep. (Pl.'s Trial Ex. 86) at 85.

[164]  *See* Pl.'s Trial Ex. 45.

44

accordance of with the bylaws of [Trans-Industries, Inc.], or otherwise."[165] Coenen also was to

"continue to act as Trustee of the . . . Plan until the earlier of November 16, 2005 or the

termination of the . . . Plan."[166] The Agreement also provided for distribution of Coenen's

vested interest in the Plan, and its rollover into Coenen's IRA, conditioned on Coenen using the

distributed amount less $59,000 to purchase common stock from Trans-Industries, Inc.[167] The

"Severance Agreement and Release of Claims," provided for a severance payment of

$120,000.00 to Coenen; health care coverage until November 16, 2005 "at the current employee

cost" to be deducted from the severance payment; and payment for a company vehicle until

November 1, 2005.[168]

### 2. Trans-Industries, Inc.'s stock purchase agreement with Fields

Fields also entered into an agreement with Trans-Industries, Inc. that required him to

purchase common stock from the Company, after receiving a distribution of his vested interest in

the Plan. Under his "Stock Purchase Agreement" with the Company, Fields agreed to purchase

$400,000 worth of common stock of Trans-Industries, Inc., on the date that he received a

distribution of his vested interest in the Plan.[169] This agreement was negotiated at a meeting

between Fields, Solon, Kosanke, and Anderson.[170]

---

[165] *Id.* at pdf. p. 5 ¶¶ 1.1-1.2.

[166] *Id.* at pdf. p. 6 ¶ 1.3.

[167] *Id.* at pdf. p. 6 ¶¶ 3.1-3.2.

[168] *Id.* at pdf. pp. 12-13 ¶¶ 1-2, 4, 6.

[169] Pl.'s Trial Ex. 46 at pdf. pp. 2-3 ¶¶ 2.1, 3.1, and 4.1.

[170] Tr. of Fields Dep (Pl.'s Trial Ex. 85) at 76-77.

45

## 3. The impact on the Plan of Trans-Industries, Inc.'s transactions with Coenen and Fields

As a result of the agreements between Trans-Industries, Inc., Coenen and Fields, and the related transactions under those agreements, only Coenen, Fields and a few other employees received cash distributions from the Plan in June 2005. On June 17, 2005, the Plan had a cash balance of $985,068.00. After a series of transactions with, and distributions to, Coenen and Fields based on their vested interests in the Plan, only $3,719.24 *of cash* remained in the Plan for the rest of the approximately 175 Plan participants. The cash distributions from the Plan are detailed in a document entitled "Trans Industries, Inc. Profit Sharing Plan Cash Transaction 'Checklist' June 17, 2005."[171] It shows the following:

|  | Date | Activity | Balance |
|---|---|---|---|
| Cash Balance | 6/17/05 | 985,068.00 | 985,068.00 |
| Coenen Distribution | 6/21/05 | (59,000.00) | 926,068.00 |
| Coenen IRA Outgoing Wire | 6/21/05 | (910,763.65) | 15,304.35 |
| Misc. Employee Distributions | 6/21/05 | (2,247.11) | 13,057.24 |
| Loan from TI | 6/21/05 | 15,000.00 | 28,057.24 |
| Coenen IRA Incoming Wire to TI | 6/23/05 | 0.00 | 28,057.24 |
| TI Wire (Coenen) | 6/23/05 | 910,763.65 | 938,820.89 |
| Figgie Wire to TI | 6/22/05 | 0.00 | 938,820.89 |
| Figgie Wire (From TI) | 6/24/05 | 250,000.00 | 1,188,820.89 |
| Fields IRA Outgoing Wire | 6/29/05 | (410,000.00) | 778,820.89 |
| Fields IRA Incoming Wire to TI | 6/30/05 | 0.00 | 778,820.89 |
| Fields Wire From TI | 6/30/05 | 400,000.00 | 1,178,820.89 |
| Fields Distribution | 6/30/05 | (1,175,101.65) | 3,719.24 |

After the June 2005 cash distributions, the only other assets remaining in the Plan, other than the $3,719.24 in cash, were Series A Preferred Stock and common stock of Trans-Industries, Inc. The Checklist quoted above was attached to a memorandum dated June 17, 2005 from Kosanke

---

[171] Pl.'s Trial Ex. 43.

to Anderson, Solon, and Keith Lacombe, regarding "Trans Industries Profit Sharing Distributions," which stated:

> Attached is a suggested time table for making the Coenen and Fields payouts. (Cash Tab) Please note incoming wires to the [P]lan must come from Trans Industries[, Inc]. That means the wires from the different IRA accounts must be sent to Trans Industries[, Inc.] NOT the Plan. Please review and let me know if I've missed a step or if the time table can not be achieved.[172]

At no time after Fields's and Coenen's distribution requests were the other plan participants informed about the liquidity crisis, the options that were being discussed for handling the crisis, or the planned distributions to Coenen and Fields.[173]

At the time of the June 2005 cash distributions listed in the document quoted above, Coenen and Kosanke were still the named "discretionary Trustees" of the Plan.

## P. The delisting of Trans-Industries, Inc. common stock

On December 15, 2005, the common stock of Trans-Industries, Inc. was delisted from NASDAQ. On February 10, 2006, Trans-Industries, Inc. publicly announced its intent to file a de-registration statement with the Securities and Exchange Commission.[174]

## Q. The bankruptcy cases

Less than a year after the June 2005 Plan distributions to Coenen and Fields, on April 3, 2006, Trans-Industries, Inc. and four of its wholly-owned subsidiaries filed voluntary petitions for relief under Chapter 11. The bankruptcy cases have been jointly administered under the

---

[172] *Id.*

[173] Tr. of Solon Dep. (Pl.'s Trial Ex. 84) at 59-60; Tr. of Coenen Dep. (Pl.'s Trial Ex. 82 at 127-29.

[174] Pl.'s Trial Ex. 92 (Addendum to Thomas Frazee's Expert Report) at 5.

47

Trans-Industries, Inc. case number, 06-43993. On October 17, 2006, the cases were converted to Chapter 7. The Chapter 7 Trustee, David Allard, filed this adversary proceeding. During the pendency of this adversary proceeding, Trustee Allard died, and Charles J. Taunt was appointed successor Chapter 7 Trustee.[175] Because the claims in this adversary proceeding were brought by David W. Allard in his official, representative capacity as Chapter 7 Trustee, the successor Chapter 7 Trustee, Charles J. Taunt, was automatically substituted for David W. Allard, Trustee, as the Plaintiff in this adversary proceeding.[176] And the Court formally ordered this substitution, as permitted by Civil Rule 25(d), to make this clear to all concerned.[177]

Unfortunately, this pattern of events was later repeated, because the successor Trustee, Charles J. Taunt, also died. Stuart A. Gold was then appointed as the successor Trustee, and he was substituted, both automatically and by recent order, for Charles J. Taunt, as the Plaintiff in this adversary proceeding.[178]

## III. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). As discussed at length in a prior opinion in this case, the Court has "related to" subject matter jurisdiction over this adversary proceeding, and this is a non-core proceeding. *See Allard v. Coenen (In re Trans-*

---

[175] *See* the Notice at Docket # 901 in Case No. 06-43993.

[176] *See* Fed. R. Civ. P. 25(d), which applies in this adversary proceeding under Fed. R. Bankr. P. 7025.

[177] *See* "Order Substituting Successor Chapter 7 Trustee as Plaintiff in this Adversary Proceeding, . . . ." (Docket # 444) at 3.

[178] *See* the Notice at Docket ## 1031, 1032 in Case No. 06-43993; "Order Substituting Successor Chapter 7 Trustee as Plaintiff in this Adversary Proceeding" (Docket # 558) at 2.

48

*Industries, Inc.*), 419 B.R. 21, 24-25 (Bankr. E.D. Mich. 2009).  All the remaining parties in this

adversary proceeding (*i.e.*, the Trustee and Defendants Dale S. Coenen and Kai R. Kosanke)

expressly consented to the bankruptcy court conducting any trial in this adversary proceeding and

entering a final judgment, under 28 U.S.C. § 157(c)(2).[179]  For this reason, this bankruptcy court

has both statutory and constitutional authority to enter a final judgment on the Trustee's claims.

*See* 11 U.S.C. § 157(c)(2); Fed. R. Bankr. P. 7012(b); *see generally Wellness Int'l Network, Ltd.

v. Sharif*, 135 S. Ct. 1932 (2015).

## IV. Discussion

As noted in Part I of this Opinion, the Trustee's remaining claims that were tried are the

Retention Claim (to the extent it is based on actions or inactions occurring on or after December

14, 2001), and the Distribution Claim.

### A. The law governing the Trustee's breach of fiduciary duty claims

The Court described the law governing the Trustee's breach of fiduciary duty claims in its

opinion ruling on the Cross-Motions for Summary Judgment.  The Court now reiterates that

discussion, and will quote it at length:

#### a. Elements, including causation and damages

29 U.S.C. § 1109(a) renders fiduciaries of an ERISA plan, who violate
any of their duties, personally liable for any damages suffered by the Plan
that are caused by the breach of fiduciary duty. Section 1109(a) provides,
in relevant part:

(a) Any person who is a fiduciary with respect to a plan who
breaches any of the responsibilities, obligations, or duties imposed

---

[179]  *See* Second Amended Joint Final Pretrial Order (Docket # 503) at 1 (incorporat[ing] by
reference what [the Court] said in Part III of its summary judgment opinion) (citing *Taunt v. Coenen* (*In
re Trans-Industries, Inc.*), 538 B.R. at 338-39.

49

upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

"To state a claim under ERISA [§ 1109(a) ] ... for breach of [a] fiduciary duty, plaintiffs must allege that (1) defendants were fiduciaries of the plan who, (2) acting within their capacities as plan fiduciaries, (3) engaged in conduct constituting a breach of an ERISA fiduciary duty." *See In re Pfizer Inc. ERISA Litig.*, [No. 04 Civ. 10071(LTS)(JFE),] 2009 WL 749545, at *6 (S.D.N.Y. Mar. 20, 2009) (citing 29 U.S.C. § 1109; *Pegram v. Herdrich*, 530 U.S. 211, 222–224, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)).

*Severstal Wheeling Inc. v. WPN Corp.*, 809 F.Supp.2d 245, 254 (S.D.N.Y. 2011).

A claimant who seeks damages for a breach of fiduciary duty must also show that the Plan was harmed and that the breach of fiduciary duty was the cause of the harm. *See Miller v. Yazaki North America, Inc.*, 254 Fed.Appx. 466, 468–69 (6th Cir.2007)(affirming judgment for defendant on breach of fiduciary duty claim because the plaintiff did not prove that the breach of fiduciary duty was the proximate cause of the damages claimed); *Miller v. Yazaki North America, Inc.*, No. 06–10841, 2006 WL 3446246, at *4 (E.D.Mich. Nov. 27, 2006) (internal quotation marks and citations omitted)("Another element Plaintiff must establish to prevail on either theory of an ERISA breach of fiduciary duty [claim] is causation. In other words, there must be a showing of some causal link between the alleged breach ... and the loss plaintiff seeks to recover.").

**b. Who is a "fiduciary"**

Under ERISA,

A party is a fiduciary, and consequently owes duties to an ERISA plan, if he falls under one of two statutory categories. The first category of ERISA fiduciaries are "named" fiduciaries, which are parties explicitly listed as

50

fiduciaries in a plan instrument. 29 U.S.C. § 1102(a); *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). ERISA requires every plan to have at least one "named" fiduciary. § 1102(a). The second category of ERISA fiduciaries is that of "unnamed" fiduciaries. A party will be considered an "unnamed" fiduciary if:

> (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

§ 1002(21)(A).

*Pfahler v. Nat'l Latex Prods. Co.*, 517 F.3d 816, 828 (6th Cir. 2007). Because under 29 U.S.C. § 1102(a), "[n]amed fiduciaries" "shall have authority to control and manage the operation and administration of the plan," ERISA defines both named and unnamed fiduciaries in functional terms. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)) ("ERISA ... defines 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan, *see* 29 U.S.C. § 1002(21)(A), thus expanding the universe of persons subject to fiduciary duties—and to damages—under § 409(a)."); *Walker v. Fed. Express Corp.*, No. 11–5201, 2012 WL 2855580, at *5 (6th Cir. July 11, 2012) (quoting *DeLuca v. Blue Cross Blue Shield of Michigan*, 628 F.3d 743, 747 (6th Cir.2010))("'ERISA defines fiduciary . . . in functional terms of control and authority over [a] plan.'"). Therefore,

> [i]n every case charging breach of ERISA fiduciary duty, . . . the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint.

*Pegram v. Herdrich*, 530 U.S. 211, 226, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000).

51

Consistent with 29 U.S.C. § 1002(21)(A), and the case law interpreting that provision, the Sixth Circuit uses a functional test to determine fiduciary status, which "examine[s] the conduct at issue to determine whether it constitutes 'management' or 'administration' of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary standards." *Hamilton v. Carell*, 243 F.3d 992, 997 (6th Cir.2001); *see also Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir.2006) (citation omitted)("[S]everal courts have focused on the phrase 'to the extent' [in 29 U.S.C. § 1002(21)(A) ] in holding that '[f]iduciary status ... is not an all or nothing concept,' and that they must therefore 'ask whether a person is a fiduciary with respect to the particular activity in question.'"); *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir.1999) (citations omitted)("[T]he definition of a fiduciary under ERISA is a functional one, is intended to be broader than the common law definition, and does not turn on formal designations such as who is the trustee."). For example, conveying information to plan participants regarding the plan is "administration" of the plan within the meaning of ERISA § 1002(21)(A), and an individual is an administrator performing a fiduciary act when he does so. *See Varity v. Howe*, 516 U.S. 489, 502–03, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)(explaining that "[c]onveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power 'appropriate' to carrying out an important plan purpose[,]" and would constitute "administration").

### c. Nature of the fiduciary duties

Section 404(a) of ERISA, 29 U.S.C. § 1104(a)(1), describes standards of care which apply to fiduciaries who administer plans governed by ERISA:

(a) Prudent man standard of care

(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(I) providing benefits to participants and their beneficiaries; and

52

(ii) defraying reasonable expenses of
administering the plan;

(B) with the care, skill, prudence, and diligence under the
circumstances then prevailing that a prudent man acting in
a like capacity and familiar with such matters would use in
the conduct of an enterprise of a like character and with like
aims;

(C) by diversifying the investments of the plan so as to
minimize the risk of large losses, unless under the
circumstances it is clearly prudent not to do so; and

(D) in accordance with the documents and instruments
governing the plan insofar as such documents and
instruments are consistent with the provisions of this
subchapter and subchapter III of this chapter.

29 U.S.C.A. § 1104(a)(1). The fiduciary duties encompassed within the
§ 1104(a)[(1)(A) and § 1104(a)(1)(B) requirements] have three
components. *See Krohn v. Huron Mem'l Hosp.*, 173 F.3d 542, 547 (6th
Cir.1999)(citing *Berlin v. Michigan Bell Tel. Co.*, 858 F.2d 1154, 1162
(6th Cir.1988)).

The first is a "duty of loyalty" which requires that "all decisions
regarding an ERISA plan must be made with an eye single to the
interests of the participants and beneficiaries.  Second, ERISA
imposes a "prudent person" fiduciary obligation, which is codified
in the requirement that a plan fiduciary exercise his duties "with
the care, skill, prudence, and diligence under the circumstances
then prevailing that a prudent man [sic] acting in a like capacity
and familiar with such matters would use in the conduct of an
enterprise of like character and with like aims." 29 U.S.C.
§ 1104(a)(1)(B) [.] The prudent person standard, in combination
with the duty of loyalty, "imposes an unwavering duty on an
ERISA trustee to make decisions with single-minded devotion to a
plan's participants and beneficiaries and, in so doing, to act as a
prudent person would act in a similar situation."  Finally, ERISA
requires that a fiduciary "act 'for the exclusive purpose' of
providing benefits to plan beneficiaries."

*Id*. at 547 (citations omitted); *See also Cent. States, Se. & Sw. Areas
Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570, 105 S.Ct. 2833,

86 L.Ed.2d 447 (1985)(citing, in part, 29 U.S.C. § 1104(a)(1))("The manner in which trustee powers may be exercised . . . is . . . defined in [ERISA] through the provision of strict standards of trustee conduct, also derived from the common law of trusts-most prominently, a standard of loyalty and a standard of care.")

The Supreme Court recently discussed the fiduciary's duty of prudence, in [*Tibble v. Edison Int'l*, ⎯⎯ U.S. ⎯⎯, 135 S.Ct. 1823 (2015)]. And the Supreme Court recently ruled, in the context of a plan fiduciary who had inside information, that:

> To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.

*Fifth Third Bancorp v. Dudenhoeffer*, ⎯⎯ U.S. ⎯⎯, 134 S.Ct. 2459, 2472, 189 L.Ed.2d 457 (2014).

In *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir.1987), the court expounded on the fiduciary's duty of loyalty that is codified in 11 U.S.C. § 1106(b):

> [T]he duty of loyalty [i]s codified in ERISA Section 406(b), which provides in pertinent part:
>
>> A fiduciary with respect to a plan shall not-(1) deal with the assets of the plan in his own interest or for his own account, [(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries,] or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.  29 U.S.C. § 1106(b). This rule both assures protection to plan beneficiaries and provides notice to plan fiduciaries of their obligations. It protects beneficiaries by prohibiting transactions tainted by a conflict of interest and thus highly susceptible to self-dealing. It gives notice to fiduciaries that they must either avoid the transactions

54

described in Section 406(b) or cease serving in their capacity as fiduciaries, no matter how sincerely they may believe that such transactions will benefit the plan. Such protection of beneficiaries and notice to fiduciaries requires that Section 406(b) be broadly construed, *see Leigh v. Engle*, 727 F.2d 113, 126 (7th Cir.1984), and that liability be imposed even where there is "no taint of scandal, no hint of self-dealing, no trace of bad faith," *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir.1979)[.]

*Id.* The court stated that transactions prohibited under 29 U.S.C. § 1106(b) "deserve exacting scrutiny." *Id.* at 1215.

In *Gregg*, the court expounded on ERISA's "prudent person" fiduciary duty. It stated that "[c]ourts define 'prudent person' as that term is employed in the common law of trusts" and that "'[p]rudent person' is an objective standard." 343 F.3d at 840 n. 3 (citations omitted). The court in *Morse v. Stanley*, 732 F.2d 1139, 1145 (2d Cir.1984) (citations omitted), explained that the "prudent person" duty is "a duty to exercise such care and skill as a person of ordinary prudence would exercise in dealing with his own property and, bearing in mind the special nature and purpose of an employee profit sharing plan, to use care and skill to preserve the trust corpus." The *Morse* court further explained that this prudent person standard of conduct requires fiduciaries to act *in a nondiscriminatory manner for the benefit of all participants and the plan as the whole, rather than for the benefit of one group of participants*:

[A] trustee has a duty to deal impartially with beneficiaries. In this case there are working Plan participants and retired beneficiaries and/or their families. The trustee must deal even-handedly among them, doing his best for the entire trust looked at as a whole. *See* II A. Scott, *The Law of Trusts*, § 183 at 1473; *Restatement (Second) of Trusts* § 183; Note, *The Duties of Employee Benefit Plan Trustees Under ERISA in Hostile Tender Offers*, 82 Colum.L.Rev. 1692, 1706–07 (1982). That is to say, a trustee's duty is not to prefer the present interest of one group, e.g., here the departing plan participants, but also not to unduly delay payment of benefits to such participants to their detriment. This is a salutary rule because at the slightest suggestion that any action taken was with other than the beneficiaries in mind, a trustee is subject to liability for resulting injury that the beneficiaries may suffer. *See* 29 U.S.C. § 1109(a) (1982); *NLRB v. Amax Coal Co.*, 453 U.S. 322, 331–34, 101 S.Ct. 2789, 2795–97, 69 L.Ed.2d 672 (1981).

55

538 B.R. at 361–65.

The Trustee bears the burden of proof with regard to each element of his breach of fiduciary claim, including the causation element. *See Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 429 (6th Cir. 2009) (citation omitted) ("To prevail on a breach-of-fiduciary-duty claim under ERISA, a plaintiff must generally prove that the defendant not only breached its fiduciary duty but also caused harm by that breach. A causal connection between the alleged breach and the alleged harm is thus a necessary element of an ERISA-participant's breach-of-fiduciary-duty claim.").

There is a split of authority among the federal circuits regarding the burden of proof with respect to the causation element of an ERISA breach of fiduciary duty claim. On the one hand, four federal appellate circuits, not including the Sixth Circuit, apply a burden-shifting approach to the elements of causation and damages. *See Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 362-63 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 2887 (2015) (applying the burden-shifting framework from the common law of trusts to an ERISA breach of fiduciary claim, which framework provides that, after the plaintiff has proven a breach of fiduciary duty and a loss related to that breach, the burden of persuasion that such loss was not caused by the breach shifts to the defendant-fiduciary); *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995), *cert. denied*, 516 U.S. 1174 (1996) (footnotes omitted) (internal quotation marks and citations omitted) (explaining that "[t]o establish a claimed breach of fiduciary duty, an ERISA plaintiff must prove a breach of a fiduciary duty and a prima facie case of loss to the plan" and that "[o]nce the plaintiff has satisfied these burdens, the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty"); *Martin v. Feilen*, 965

56

F.2d 660, 671 (8th Cir. 1992), *cert. denied sub nom*, *Henss v. Martin,* 506 U.S. 1054 (1993) (citations omitted) ("[O]nce the ERISA plaintiff has proved a breach of fiduciary duty and a prima facie case of loss to the plan . . . , the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty."); *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 39 (1st Cir. 2018) (*petition for cert. filed*, Jan. 11, 2016) ("align[ing] . . . with the Fourth, Fifth, and Eighth Circuits and hold[ing] that once an ERISA plaintiff has shown a breach of fiduciary duty and loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that the resulting investment decision was objectively prudent.").

On the other hand, five federal circuits, including the Sixth Circuit, have not applied the burden-shifting approach, and have held simply that the plaintiff bears the burden of proof with regard to each element of a breach of fiduciary duty claim, including causation. *See Romberio v. Unumprovident Corp.*, 385 F. App'x 423, 429 (6th Cir. 2009); *Pioneer Centres Holding Co. Employee Stock Ownership Plan & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1335-36 (10th Cir. 2017), *cert. dismissed sub nom., Pioneer Centres Holding v. Alerius Fin.*, 139 S. Ct. 50 (2018) (citations omitted) (holding that a plaintiff asserting an ERISA breach of fiduciary claim bears the burden of proving each of the elements of such claim, including the causation element, and rejecting "outright the . . . argument that ERISA breach of fiduciary duty claims should be resolved under a burden-shifting framework" under which the burden of persuasion is shifted "to the fiduciary to disprove causation . . . once an ERISA plaintiff has proven a breach and a prima facie case of loss to the plan . . . related to the breach"); *Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98, 105 (2d Cir. 1998), *cert. denied*, 525 U.S. 876 (1998) ("Causation of damages is

57

therefore an element of the [plaintiff's breach of co-fiduciary duty] claim, and the plaintiff bears the burden of proving it."); *Wright v. Oregon Metallurgical Corp.*, 360 F.3d 1090, 1099 (9th Cir. 2004) ("As the Sixth Circuit noted in *Kuper* [*v. Iovenko*, 66 F.3d 1447 (6th Cir.1995)], a 'fiduciary's failure to investigate an investment decision *alone* is not sufficient to show that the decision was not reasonable. . . . [A] plaintiff must show a *causal link* between the failure to investigate and the harm suffered by the plan.' *Id*. at 1459 (second emphasis added)."); *Willett v. Blue Cross & Blue Shield of Alabama*, 953 F.2d 1335, 1343–44 (11th Cir. 1992).

This Court is bound by the Sixth Circuit case law cited above, which does not apply the burden-shifting approach.  So this Court will not apply the burden-shifting approach in this case.

## B.  Whether Kosanke was a fiduciary of the Plan

A threshold issue to be decided with regard to the Trustee's breach of fiduciary claim is whether Kosanke was a fiduciary of the Plan.  In its opinion ruling on the Cross-Motions for Summary Judgment, the Court determined that Kosanke, as a named discretionary Trustee of the Plan in the Adoption Agreement, was a named fiduciary of the Plan.[180]  Kosanke has requested "that the [C]ourt take a second look at this [conclusion in the] opinion by reviewing the transcripts admitted in evidence" at trial.[181]  During the trial and in their post-trial briefs, the Trustee and Kosanke argued extensively about whether Kosanke was a fiduciary of the Plan. And the record is now more developed on this issue due to the trial.  So the Court's will revisit this issue.

### 1.  The Trustee's position

---

[180]  538 B.R. at 366-68.

[181]  Def. Kosanke's Post-Trial Br. With Tr. Citations (Docket # 546) at 1.

58

The Trustee argues that Kosanke was both a named fiduciary, and functional fiduciary of the Plan under ERISA, who "exercised authority and control over the Plan's assets" and "exercised discretionary authority and control over the Plan's management."[182]  The Trustee relies on the Adoption Agreement and the other documents described above, which explicitly designate Kosanke, by name, as a "discretionary" Trustee of the Plan, to establish that Kosanke was a named fiduciary of the Plan.  He also relies on the document entitled "Plan Description Salaried Employees' Retirement Plan Trans-Industries, Inc." that Fields attached to his February 15, 2002 letter to Kosanke.  In that document, the Treasurer of Trans-Industries, Inc. is listed as one of the three Trustees on the Board of Trustees who are responsible for the "[i]nvestment of all assets (contributions plus earnings) of the Plan."[183]  The Trustee argues that Kosanke was a named Trustee in this summary plan description, by virtue of his holding the position of Treasurer.

The Trustee also relies on the administrative responsibilities that Kosanke performed with regard to the Plan to argue that Kosanke was, functionally, a Plan Administrator.  The Trustee relies, in part, on the deposition testimony of Coenen.  Coenen testified that Kosanke was "formally appointed as the Plan [A]dministrator . . . [f]or several years;" that Kosanke was the one who worked with The Benefit Advantage, Inc. to fill out the Adoption Agreement because Kosanke was the Plan Administrator; that Kosanke was the person responsible for making decisions on how to interpret a Plan provision because he was "in charge of administration;" and

---

[182]  "Second Amended Joint Final Pretrial Order" (Docket # 503) at 2 ¶¶ 2a)-2d); *see also* Compl. (Docket # 1) at 7 ¶ 34 ("During the relevant time period, Defendants were fiduciaries of the Plan by virtue of being either named as such or by acting in a fiduciary capacity with regard to [the Plan].").

[183]  *See* Part II.E of this Opinion.

that Kosanke, in conjunction with Coenen, was "responsible for making sure that the Plan was adequately funded given the types of claims that were in the pipeline for the Plan or whether it was adequately funded."[184]  The Trustee further relies on Kosanke's own testimony during his deposition and at trial about what administrative functions he performed for the Plan.  And lastly, the Trustee also relies on the conclusion of his expert witness, Witz, that Kosanke was not only a named Trustee of the Plan during the relevant period but also that he was a Plan Administrator.

### 2. Kosanke's position

Kosanke denies that he was a fiduciary of the Plan.  Kosanke denies that he was a Trustee of the Plan, denies that he was an Administrator of the Plan, and denies that he performed any discretionary functions for the Plan.[185]  Kosanke alleges that he "did administrative duties" but "didn't administer the [P]lan."[186]  Kosanke alleges that Trans-Industries, Inc. was the sole Plan Administrator, and that it was Coenen, not him, who acted as the Plan Administrator on behalf of the Company.[187]  Kosanke alleges that the only position he held with regard to the Plan was custodian of the records.  According to Kosanke, he did not have "any authority to act, to give any meaningful advice or otherwise influence the decisions of the Trustee [of the Plan] or the Board of Directors."[188]  Kosanke alleges that he did not make any discretionary decisions, and he did not have the power or authority to make any discretionary decisions, as he was not a member

---

[184]  *See* Pl.'s Trial Ex. 82 at 20, 24-25, 50, 52.

[185]  *See* Trial Tr. (Docket # 533) at 48-49, 58.

[186]  *Id.* at 49.

[187]  *Id.* at 48-49.

[188]  "Second Amended Joint Final Pretrial Order" (Docket # 503) at 6 ¶¶ 3b.i-3b.ii.

of the Board.[189]  According to Kosanke, the only reason he was in attendance at meetings, during which issues regarding the Plan's ownership of company stock and the distribution requests of Fields and Coenen were discussed, was to supply financial information and records.[190]  Kosanke alleges that to the extent that his name appears as a "Trustee" of the Plan on any document, that is an error, and to the extent that any individual believed that he was a Trustee or an Administrator of the Plan, that individual was mistaken.  Kosanke testified at trial, in relevant part, that:

- the listing of his name as "discretionary Trustee(s)" along with Coenen's under Paragraph 10 of the Adoption Agreement was "an error;"[191]

- The Benefit Advantage, Inc., which filled out the Adoption Agreement, assumed that he was a Trustee because he was the point person for the Plan, but it was mistaken;[192]

- the identification of Kosanke and Coenen as "EPSP [("Employee Profit Sharing Plan")] trustees" on the Plan Issues Document by Calfee, Halter & Griswold, LLP, was "an error."[193]

- Kelly was mistaken when he stated in his October 6, 2004 memorandum that Kosanke and Coenen "serve as discretionary Trustees over the assets of the [P]lan";[194] and

- Coenen misspoke in his deposition, when he testified that Kosanke was formally appointed as Plan Administrator "for several years."[195]

---

[189] *See* Def. Kosanke's Post-Trial Br. With Tr. Citations (Docket # 546) at 2.

[190] *See* Trial Tr. (Docket # 536) at 147-49, 152, 154, 166-67.

[191] *See* Trial Tr. (Docket # 533) at 40, 43.

[192] *Id.* at 43.

[193] *Id.* at 55-56, 159.

[194] *Id.* at 57-59.

[195] *Id.* at 63-64.

Despite Kosanke's allegation that he was not a Trustee of the Plan, Kosanke's counsel admitted that Kosanke signed at least one letter with a Trustee designation under his signature.[196] According to Kosanke's counsel, Kosanke "had no recollection of that" but stated that "if it was done it was at somebody else's direction that he signed that . . . [a]nd oftentimes it was done just to move things along."[197] And despite Kosanke's denial that he was a Trustee of the Plan, he testified that he may have noticed that his name was listed as a Trustee on the Adoption Agreement but did not bother to bring it to the attention of The Benefit Advantage, Inc.[198] Kosanke also testified that even if he had noticed that he was named as a Trustee; in the Summary Plan Description, (and he does not recall whether or not he noticed that), he doubted that he would have brought the inaccuracy in the list of the Trustees to the attention of The Benefit Advantage, Inc.[199]

### 3. Kosanke was a named fiduciary and also functional fiduciary of the Plan.

Kosanke's denial that he was ever a fiduciary of the Plan is not supported by any persuasive evidence. On the contrary, the overwhelming evidence presented at trial compels the conclusion that Kosanke was both a named fiduciary and a functional fiduciary of the Plan.

### a. Kosanke was a named fiduciary of the Plan as amended in 2004.

ERISA requires that the written instrument that establishes an employee benefit plan "shall provide for one or more named fiduciaries who jointly or severally shall have authority to

---

[196]  Tr. of oral argument on Cross-Mots. for Summ. J. (Docket # 395) at 51.

[197]  *Id.*

[198]  Kosanke Dep. Tr. (Pl.'s Trial Ex. 83) at 192-93.

[199]  *Id.* at 186-87.

control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

Consistent with this requirement, Paragraph 9.12 of the Plan as amended in 2004 provided for

three named fiduciaries of the Plan: "(1) the Employer, (2) the Administrator and (3) the

Trustee."[200] As discussed in Part II.H of this Opinion, Kosanke was explicitly named, along with

Coenen, as one of the "discretionary" Trustees of the Plan in the Adoption Agreement and

Kosanke signed the Adoption Agreement as a Trustee.[201] Kosanke also was named as a Trustee

in the Summary Plan Description given to all Plan participants. In fact, it appears from the

evidence introduced at trial that Kosanke was originally the only Trustee named in the Adoption

Agreement and the Summary Plan Description. In a letter dated February 13, 2004 from The

Benefit Advantage Inc. to "Mr. Kai Kosanke" and to "Mr. Dale S. Coenen," of Trans-Industries,

Inc., "Trustees," The Benefit Advantage, Inc. enclosed replacement pages for the Plan and for the

Summary Plan Description due to the fact that "Mr. Dale S. Coenen ha[d] been added as

Trustee" and requested that the Trustees "sign both copies of the signature page and return one

copy to [its] office in the enclosed envelope."[202] The letter stated that Kosanke and Coenen

should feel free to call if they had any questions.[203] Although Kosanke was the "day to day

contact person for The Benefits Advantage, Inc.," Kosanke admits that he never told The Benefit

Advantage, Inc. or anyone else that listing him as a Trustee in the Plan and the Summary Plan

Description was an error, and he never requested the removal of his name as Trustee from these

---

[200] Pl.'s Trial Ex. 95.

[201] *See* Pl.'s Trial Ex. 2 at TBA 0102.

[202] *See* Pl.'s Trial Ex. 97.

[203] *Id.*

63

documents, even though he had the opportunity to, and did, review them.[204]

    In addition to the fact that Kosanke was named as a discretionary Trustee in the Plan documents, the following evidence further supports the conclusion that Kosanke was a discretionary Trustee of the Plan. Kosanke signed at least one letter as a Trustee of the Plan, and Kosanke prepared the annual report for the Plan, which Paragraph 7.9 of the Plan requires the "Trustee or his agent" to prepare. Therefore, not only was Kosanke explicitly named in the Plan as a discretionary Trustee, but also he actually performed some of the functions listed in the Plan as functions to be performed by the Trustee. Kosanke is also listed as a Trustee in the Plan Issues Document discussed in Part II.M of this Opinion.[205] Kelly, The Benefit Advantage, Inc., Relational Advisors, and Calfee, Halter & Griswold, LLP all believed, and operated under the assumption, that Kosanke was a discretionary Trustee of the Plan. Kosanke knew this, but did nothing to correct their alleged misunderstanding of his position. Finally, Plaintiff's expert witness, Witz, opined that Kosanke was a Trustee of the Plan because he was named a Trustee in the Plan documents and signed those documents as Trustee, and also because he performed some of the functions of a Trustee.[206] This opinion testimony by Witz was admitted into evidence at trial, without objection.

    Kosanke's mere denial that he was a Trustee of the Plan, absent any credible objective evidence to support it, does not support a finding in his favor, given the overwhelming evidence that he was a named Trustee. "[T]he test [for fiduciary status under ERISA] is objective; a

---

[204]  *See* Trial Tr. (Docket # 533) at 53-54.

[205]  *See* Pl.'s Trial Ex. 35 at 3, Section IV.A.

[206]  *See id.* at 167.

person's subjective belief that he is or is not a fiduciary is immaterial." *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 703 (W.D. Mich. 2007), *subsequent determination*, No. 1:04-cv-694, 2007 WL 1032367 (W.D. Mich. Apr. 02, 2007) (citing *Farm King Supply, Inc. Integrated Profit Sharing Plan & Trust v. Edward D. Jones & Co.*, 884 F.2d 288, 292 (7th Cir. 1989)). All of the credible objective evidence presented at trial supports the conclusion that Kosanke was a named discretionary Trustee of the Plan beginning when it was amended on January 11, 2004. The Court therefore finds that Kosanke was a named fiduciary of the Plan after the Plan was amended in 2004.

### b. Kosanke was *not* a named fiduciary of the Plan before the Plan was amended in 2004.

The Trustee argues that not only was Kosanke a named Trustee of the Plan after it was amended in 2004, but also that he was a Trustee of the Plan beginning as early as 1989. The Trustee relies on Witz's expert report and his testimony at trial as support for this argument. In his expert report, Witz opined:

> The 1989 Plan document identifies Mr. Coenen as Trustee. The 2003 Plan document [(the Plan as amended in 2004 and effective in 2003)] identifies Mr. Coenen and Mr. Kosanke as Trustees. **Regardless of the date of appointment, both Mr. Coenen and Mr. Kosanke functioned in the role prior to the formal appointment date.**[207]

Witz testified at trial that even though Kosanke was not named as a Trustee in the Plan as it existed in 1989, and did not sign as a Trustee of the Plan in 1989, in his opinion Kosanke was nevertheless a Trustee in 1989.[208] Witz reasoned that the Plan "makes it very clear that the

---

[207] Witz's Expert Report (Pl.'s Trial Ex. 93) at 6 ¶ 20 (emphasis added); *see also* Trial Tr. at 207 (testimony of Witz); Trial Tr. (Docket # 534) at 6, 83-84 (testimony of Witz).

[208] Trial Tr. (Docket # 534) at 82 (testimony of Witz).

65

employer has the ability to amend the [P]lan as well as appoint both a [P]lan administrator and a trustee and they can appoint them via the document but they also have the ability to appoint them through another means."[209]  Although Witz admits that there is no evidence in the record that Kosanke was ever formally appointed as a Trustee by the Board of Directors,[210] Witz argues that Kosanke was a Trustee in 1989 by virtue of his position as the Treasurer of Trans-Industries, Inc. Kosanke was the Treasurer from 1989 until 2006.[211]

In support of his position, Witz relies, in part, on a provision of the summary plan description entitled "Plan Description Salaried Employees' Retirement Plan Trans-Industries, Inc.," which was attached to Fields's February 15, 2002 letter to Kosanke.[212]  That provision stated:  "Investment of all assets (contributions plus earnings) of the Plan shall be administered by a Board of Trustees consisting of the Chairman, Trans-Industries, Inc., **the Treasurer, Trans-Industries, Inc.**, and one other person appointed by the Board of Directors, Trans-Industries, Inc."[213]  Because Kosanke was the Treasurer of Trans-Industries, Inc. in 1989, Witz concluded that he was a Trustee of the Plan in 1989.

A major problem with Witz's conclusion is that the evidence does not establish, by a preponderance of the evidence, that the summary plan description attached to the February 15,

---

[209]  *Id.* at 82-85.

[210]  *See id.* at 6.

[211]  "Kosanke was CFO and Treasurer of [Trans-Industries, Inc.], from 1989 until April of 2006." Second Amended Joint Final Pre-Trial Order (Docket # 503) at 7 (Stipulation of Facts and Law).

[212]  *See supra* Part II.E of this Opinion.

[213]  *See* Pl.'s Trial Ex. 4 ("Plan Description Salaried Employees' Retirement Plan Trans-Industries, Inc.") at DC00213-DC00214, DC00216-DC00217 (emphasis added); *see also* Trial Tr. (Docket # 534) at 82-85 (testimony of Witz).

66

2002 letter from Fields to Kosanke actually was for the Plan as it existed at any time in 1989, or later, while Kosanke was the company Treasurer.  When Witz was asked at trial whether he was "able to tell looking at the document whether this was – the summary plan description for the 1989 [P]lan," Witz responded:  "I think that it is the 1989 [P]lan document."[214]  Also when asked what specific Plan documents he reviewed "to make initial determinations on who was a fiduciary and who was a formal fiduciary, [and] who is a functional fiduciary," Witz said, in relevant part: "The summary plan description which appears to be the 1989 summary plan description, **it could be before that** or right around that time frame."[215]  Witz explained why he thought it was a summary plan description for the 1989 Plan document:

> Many of the provisions are the same.  There is some slight differences.  And that was because I believe that the . . . [Plan] document was . . . amended.  You'll notice the [Plan] document was signed December 31 of 1989.  But there was an amendment that went back to February of 1989 that added 401k deferrals as well as employer stock.  So . . . my theory is . . . that the first [Plan] document that they signed is what this [summary plan description] is based off of.  And [for] the second [Plan] document the [summary plan description] was not – either it wasn't created and distributed or it was and we don't have a copy of it.[216]

When asked whether Kosanke was the Treasurer of Trans-Industries, Inc. "for the entire time this plan was in place," Witz admitted: "Not for the entire time.  The plan was set up back in 1974 . . . ."[217]

The plan to which Witz referred that "was set up back in 1974," when Kosanke was **not**

---

[214]  Trial Tr. (Docket # 534) at 83 (testimony of Witz).

[215]  *Id.* at 72-73.

[216]  *Id.* (emphasis added).

[217]  *Id.* at 84.

the Treasurer of Trans-Industries, Inc., was entitled "Trans-Industries, Inc. Salaried Employees'
Retirement Plan" (the "1974 Plan").  The 1974 Plan was the first retirement plan that Trans-
Industries, Inc. established, and it appears that the 1974 Plan was the only retirement benefit plan
that restricted eligibility for participation in it to only "salaried" employees.  All plans Trans-
Industries, Inc. sponsored after the 1974 Plan removed "salaried" from the title of the plan.[218]

From the way the summary plan description at issue was titled – "Plan Description
Salaried Employees' Retirement Plan Trans-Industries, Inc.,"  it appears to be the summary plan
description for the 1974 Plan of the same title.  On the other hand, paragraph 13 of this summary
plan description, captioned "Transfer of Funds from Predecessor Plan" indicates that the
description concerns the 1987 version of the Plan, namely, the "Trans-Industries, Inc.
Employees' Profit Sharing Plan and Trust" which was effective January 1, 1987, when Kosanke

---

[218]  The following is a summary of the names of the various plans sponsored by Trans-Industries,
Inc., their effective dates and the amendments:

1.      "Trans-Industries, Inc. Salaried Employees' Retirement Plan"

        The first profit sharing plan and trust which Trans-Industries, Inc. sponsored with an
        effective date of December 15, 1974

2.      "Trans-Industries, Inc. Employees' Profit Sharing Plan and Trust,"
        effective January 1, 1987

3a.     "Trans-Industries, Inc. Employees' 401[(k)] Profit Sharing Plan and Trust"

        Created on December 31, 1989 by Trans-Industries, Inc.  with an effective date of
        January 1, 1989 (the "Plan") (amending "Trans-Industries, Inc. Employees' Profit
        Sharing Plan and Trust," effective January 1, 1987)

3b.     Feb. 8, 1989 Amendment # 2 (amending "Trans-Industries, Inc. Employees' Profit
        Sharing Plan and Trust," effective January 1, 1987), effective January 1, 1989.

4.      2004 Amendment to the Plan amending "Trans-Industries, Inc. Employees' 401[(k)]
        Profit Sharing Plan and Trust," dated January 11, 2004, effective January 1, 2003.

68

was not yet the Treasurer of Trans-Industries, Inc. The 1987 Plan was the immediate successor to the 1974 Plan. The summary plan description cited by Witz says that "the Salaried Employee Retirement Program of December 15, 1974 . . . is being terminated" and that "[t]he Plan will accept, subject to any legal restrictions or requirements, the transfer of all proceeds from the Salaried Employee Retirement Program of December 15, 1974."[219] Paragraph 13 states further that "[a]ll participants of the former [plan] on its date termination shall be participants of the new [p]lan" and that proceeds from the former plan will be credited to the accounts of the participants of the new plan "in accordance with their interests" and will be "immediately fully vested." "Trans-Industries, Inc. Salaried Employees' Retirement Plan" is the predecessor plan.

In addition to these indications in the summary plan description that it does not relate to the Plan as it existed in 1989, as Witz speculates, the descriptions of key plan provisions in this 6-page summary plan description are inconsistent with the provisions of the very lengthy Plan document as it existed from 1989 forward. The following chart compares some of these key inconsistent provisions:

| "Plan Description Salaried Employees' Retirement Plan Trans-Industries, Inc.," | The Plan as it existed in 1989 |
| --- | --- |
| Paragraph 1 captioned "Brief Description of the Plan" describes the plan as "completely Company-financed" and for "salaried employees of Trans-Industries, Inc. and its subsidiary companies. | The Plan was not completely Company-financed. Under Paragraph 4.2 of the Plan, participants could make contributions to the Plan by electing to defer a portion of their Compensation. |

---

[219] *See* Pl.'s Trial Ex. 4 ("Plan Description Salaried Employees' Retirement Plan Trans-Industries, Inc.") at DC00217.

69

| | |
|---|---|
| Paragraph 2 states that eligibility to participate in the plan is limited to "[a]ll full-time **salaried** employees of Trans-Industries, Inc. and its subsidiary companies with one or more years' service." (emphasis added). | Eligibility to participate in the Plan in 1989 was not restricted to salaried employees. Paragraph 1.4 of the Plan stated, in relevant part, that "'Eligible Employee' means **any** Employee." (emphasis added). |
| Trans-Industries, Inc.'s annual contributions to the "non-participating" plan were "initially established at ten (10) percent of each participant's annual base salary" with future adjustments to the rate being determined by action of the Board of Directors | Under Paragraph 4.1 of the Plan, Trans-Industries, Inc. was to make matching contributions "equal to a percentage of each Participant's deferred compensation to be determined each year by "Trans-Industries, Inc.] but only up to 6% of each participant's deferred compensation was to be considered for purposes of the matching contribution. |
| Paragraph 11 did not allow participants to borrow from their accounts. | There is no provision prohibiting participants from borrowing from their account. |

The Court is unable to find the purported "similarities" Witz referred to between the descriptions of plan provisions in the summary plan description and the actual provisions of the 1989 Plan.

For all of these reasons, the Court finds that the Trustee failed to prove that the summary plan description at issue is related to the Plan as it existed in 1989 or later. The Trustee also failed to prove that Kosanke was a named Trustee of the Plan in 1989, or at any time before he was named a discretionary Trustee in the 2004 amendments to the Plan.

### c. **Kosanke also was an unnamed, functional fiduciary of the Plan during the relevant period.**

Not only was Kosanke a named Trustee of the Plan from January 2004 forward, but also he was an unnamed fiduciary of the Plan during that same period. Coenen testified during his deposition that Kosanke was the Plan Administrator, and that Kosanke was formally appointed to that position for several years. Although there is nothing in the record, other than the testimony of Coenen, that evidences the formal appointment of Kosanke as a Plan Administrator, there is

70

considerable evidence in the record that Kosanke acted as a Plan Administrator on behalf of Trans-Industries, Inc., which was named the Plan Administrator in Plan documents.

First, the Plan, the Adoption Agreement, and the Summary Plan Description all indicate that the "Employer" Trans-Industries, Inc. was the Administrator of the Plan, and "Kai Kosanke" signed numerous documents which amended the Plan on behalf of the Employer Trans-Industries, Inc., including the Adoption Agreement; the document entitled "EGTRRA Amendment to the Trans-Industries, Inc. Employee's 401[(k)] Profit Sharing Plan & Trust;" and the document entitled "Trans-Industries, Inc. Employee's 401[(k)] Profit Sharing Plan & Trust Post-EGTRRA Amendment." Kosanke's name also appears on Form 5500 as the "individual signing as employer, plan sponsor or DFE as applicable." Plaintiff's expert, Witz, concluded that Kosanke's preparing, or having someone under him prepare the Form 5500 for his approval to submit to the Internal Revenue Service, is significant, because "it basically shows you that he's operating in a plan administrator role."[220]

Second, Kosanke was designated as the plan administrator in the Internal Revenue Service Form 5500s (Annual Return/Report of Employee Benefit Plan) for 2003 and 2004. These forms were prepared at Kosanke's direction and approved by him.[221] In causing those forms to be filed with the United States Department of Labor (the "DOL"), Kosanke declared under penalty of perjury that the information provided in those forms was true and accurate.[222]

---

[220]  *Id.* at 79.

[221]  *See* Pl.'s Trial Exs. 103-104 (Forms 5500 for 2003 and 2004).

[222]  *See id.* (Form 5500 for 2003 and 2004). Each Form 5500 designating "Kai Kosanke" as the "individual signing as plan administrator" stated, in relevant part: "Under penalties of perjury and other penalties set forth in the instructions, I declare that I have examined this return/report, including accompanying schedules, statements and attachments, and to the best of my knowledge and belief, it is

According to the testimony of Plaintiff's expert witness, Witz, Kosanke's "signing" of Form 5500, is "taking discretionary authority or control over the management of the [P]lan, or . . . exercising authority over the management of the [P]lan," which renders him a fiduciary under ERISA.[223]  Applicable ERISA law supports this conclusion.  *See* 29 U.S.C. § 1002(21)(A)(I). The Court notes that although Kosanke did not actually sign the Form 5500 – his name was typed on the form – that fact is of no significance, according to Witz.  Witz testified that "[Form 5500] was submitted to the [DOL] . . . with [Kosanke's] name on it, so it doesn't matter whether his name [was] signed or not."[224]  Witz indicated that typing a name on Form 5500 is effectively the same as signing the document because the DOL accepts forms without a handwritten signature on them, and the person whose name is typed on the form is still warranting that the information on the form is accurate and complete under the penalty of perjury.[225]

Third, Kosanke performed many other responsibilities which the Plan assigned to the Plan Administrator, including retaining records; administrative reporting; accounting; procuring fiduciary liability insurance; creating "a monthly balance sheet/income statement, including a spreadsheet that showed . . . the various stocks the [P]lan had invested in and to what extent" and valuing the Plan assets; computing the amount "of money necessary or desirable to be contributed to the [P]lan;" distributing quarterly reports to Plan participants; preparing participation certificates for employees "that stated what their beginning balance was, the activity

---

true, correct, and complete."

[223]  Trial Tr. (Docket # 533) at 167.

[224] Trial Tr. (Docket # 534) at 31 (testimony of Witz).

[225]  *Id.* at 78-79.

72

in the [P]lan for that quarter, and their ending balance;" providing financial information about the Plan assets, and the company, including draft profit and loss balance sheet statements, to outside accountants so they could prepare the annual reports required by Paragraph 7.9 of the Plan; distributing the annual reports required by Paragraph 7.9 of the Plan to Plan participants; interpreting Plan provisions; preparing and/or supervising the preparation of and approving, along with Coenen and the accountant, Internal Revenue Service Form 5500, in which he was named as the Plan Administrator; determining the eligibility of Plan participants; communicating with Plan participants; determining or calculating the distributions that Plan participants were entitled to; and determining when and how the Plan participants would be paid.[226] These were duties to be performed by the Plan Administrator under Paragraphs 2.4 and 7.9 of the Plan.

Despite all this, Kosanke argues that performing these duties did not make him a functional Plan Administrator. This is so, according to Kosanke, because in performing these administrative duties, he did not possess or exercise any discretionary authority or discretionary responsibility regarding the management or administration of the Plan; and he did not exercise any authority or control with respect to the management or disposition of assets of the Plan. Rather, according to Kosanke, the tasks he performed were purely ministerial. In performing these functions, he was only implementing policies and procedures within parameters and guidelines established by fiduciaries who had decision-making power and authority. Kosanke argues that he cannot be deemed a Plan Administrator, given his total lack of discretionary

---

[226]   Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 12, 16, 26-27, 30-31, 33, 65, 122, 130-34, 188-89, 199-200; *see also* Tr. of Coenen Dep. (Pl.'s Trial Ex. 82) at 24-25, 31-32, 37, 45-52, 116-17, 124-29; Tr. of Solon Dep. (Pl.'s Trial Ex. 84) at 145-46; Pl.'s Trial Ex. 103 (Form 5500 for 2003); Pl.'s Trial Ex. 104 (Form 5500 for 2004); Trial Tr. (Docket # 533) at 49, 65, 73, 80-81.

authority.

There is legal support for Kosanke's position that performing some of the duties listed above did not make him a functional Plan Administrator, but **only if** Kosanke did not "exercise[] any discretionary authority or discretionary control respecting management of such [P]lan or exercise[] any authority or control respecting management or disposition of its assets," and did not have "any discretionary authority or discretionary responsibility in the administration of such plan." *See* 29 U.S.C. §§ 1002(21)(A)(I), 1002(21)(A)(iii); 29 C.F.R. § 2509.75-8 ("a person who performs purely ministerial functions" is not a fiduciary with respect to the Plan, unless he performs "one or more of the functions described in [29 U.S.C. § 1002(21)(A)])."[227] However,

---

[227] The DOL, acting under its statutory authority, issued interpretive bulletins, in the form of questions and answers "relating to certain aspects of fiduciary responsibility under [ERISA,]" including questions relating to the fiduciary status of persons who perform certain administrative functions for an employee benefit plan, "[p]ending the issuance of regulations or other guidelines." *See* the bulletin at 29 C.F.R. § 2509.75-8. One of those bulletins is relevant to the issue raised by Kosanke. *See id.* This interpretive bulletin stated, in relevant part, that "persons may rely on the answers to these questions in order to resolve the issues that are specifically considered" subject to "subsequent legislation, regulations, court decisions, and interpretive bulletins." *Id.* This interpretative bulletin included the following question and answer:

> D–2 Q: Are persons who have no power to make any decisions as to plan policy, interpretations, practices or procedures, but who perform the following administrative functions for an employee benefit plan, within a framework of policies, interpretations, rules, practices and procedures made by other persons, fiduciaries with respect to the plan:
>
> (1) Application of rules determining eligibility for participation or benefits;
>
> (2) Calculation of services and compensation credits for benefits;
>
> (3) Preparation of employee communications material;
>
> (4) Maintenance of participants' service and employment records;
>
> (5) Preparation of reports required by government agencies;

as the Court previously concluded in its opinion ruling on the Cross-Motions for Summary

Judgment, at least some of the above described responsibilities performed by Kosanke clearly

required Kosanke to exercise discretionary authority and discretionary control over the

management and the disposition of the Plan assets, and discretionary authority and discretionary

responsibility over the administration of the Plan.[228]

And, in addition to performing the above described responsibilities, Kosanke was

intimately involved in the decision-making process for determining how to unwind the June 5,

---

(6) Calculation of benefits;

(7) Orientation of new participants and advising participants of their rights and options under the plan;

(8) Collection of contributions and application of contributions as provided in the plan;

(9) Preparation of reports concerning participants' benefits;

(10) Processing of claims; and

(11) Making recommendations to others for decisions with respect to plan administration?

A: No. Only persons who perform one or more of the functions described in section 3(21)(A) of the Act [29 U.S.C. § 1002(21)(A)] with respect to an employee benefit plan are fiduciaries. Therefore, a person who performs purely ministerial functions such as the types described above for an employee benefit plan within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

29 C.F.R. § 2509.75-8.

[228] 538 B.R. at 366-67.

2001 Transaction and how to deal with the distribution requests of Coenen and Fields. This is

described in detail in Parts II.L through II.O of this Opinion. Kosanke attended and actively

participated in the meetings regarding these issues with Coenen, Anderson, Kelly, Nemes,

Relational Advisors, and Calfee, Halter & Griswold, LLP. Correspondence and memoranda,

including attorney-client privileged memoranda, regarding these issues were sent to Kosanke, as

well as others involved in the decision-making process. Kosanke also attended, and the Court

finds, despite his assertions to the contrary, Kosanke actively participated in, meetings with

Coenen and Fields in which their distribution requests were discussed and negotiations over their

distributions occurred. Kosanke was responsible for determining what amounts Coenen and

Fields were entitled to on account of their vested interests in the Plan; in what form Coenen and

Fields would receive their vested interests in the Plan (*e.g.*, whether Coenen and Fields would

receive distributions in cash and/or stock, and whether they would receive other benefits on

account of their vested interests in the Plan); the timetable for making the distributions to Fields

and Coenen; providing the wiring instructions necessary to consummate the distributions; and

writing the checks for the cash distributions to Coenen and Fields.[229] These facts belie Kosanke's

allegations that he was only present at meetings to provide the decision-makers with financial

information, and that he did not exercise discretionary authority or control over the Plan's

management or disposition of Plan assets.

Because Kosanke exercised control and authority over Plan he acquired the status of a

---

[229] *See* Pl.'s Trial Ex. 43 (email from Kosanke to Anderson regarding time table for making the distributions and wiring instructions); Pl.'s Trial Ex. 99 (email from Kosanke to Anderson containing Kosanke's determination of the dollar amount owed to Coenen and Fields on account of their vested interest in the Plan; Trial Tr. (Docket # 536) at 177.

fiduciary with regard to those functions he performed, including making distributions to Plan participants. *See, e.g.*, Briscoe v. Fine, 444 F.3d 478, 494 (6th Cir.2006) ("[u]nder the DOL regulation [(29 C.F.R. § 2509.75–8, D–2)], a third-party administrator 'without the power to make plan policies or interpretations but who performs purely ministerial functions such as processing claims, applying plan eligibility rules, communicating with employees, and calculating benefits, is not a fiduciary under ERISA'" but "a third-party administrator performing the tasks described in the DOL regulation can nevertheless acquire fiduciary status where, in addition to its other actions, it exercises control over plan assets").

Fourth, Plaintiff's expert, Witz, opined at trial that Kosanke was one of the multiple Plan Administrators of Trans-Industries, Inc., because he performed many of the high level functions of a plan administrator and signed documents on behalf of Trans-Industries, Inc., who was the named Plan Administrator: "signing a 5500 form, providing participant disclosures, ruling on benefit claims, maintaining [P]lan records."[230] Witz's testimony at trial was consistent with his expert report, in which he also concluded that Kosanke functioned in the role of Plan Administrator, and that some of the functions he performed that made him a functional Plan Administrator were the signing of Form 5500; providing disclosures to Plan participants, ruling on benefit claims; and maintaining Plan records.[231] Kosanke did not present any expert testimony or report to counter Witz's testimony and report, so other than Kosanke's bald denial that he was a Plan Administrator, Witz's conclusions are unrebutted.

---

[230] Trial Tr. (Docket # 533) at 162, 165. Plaintiff's expert, Witz, opined that "there were multiple people who acted as the [P]lan [A]dministrator" of Trans-Industries, Inc.; namely Kosanke, Coenen, Solon, and Fields. (*Id.* at 162.)

[231] *See* Witz's Expert Report (Pl.'s Trial Ex. 93) at 11.

77

Therefore, even if Kosanke was never formally appointed the Plan Administrator, and even if Kosanke did not consider himself a Plan Administrator, he would still be considered an "'unnamed' fiduciary'" under ERISA Section 1002(21)(A)(I), because in performing many of the functions of a Plan Administrator, he exercised "authority or control respecting management or disposition of [Plan] assets."

For all of these reasons, the Court concludes that Kosanke was both a named fiduciary (discretionary Trustee) and an unnamed, functional Plan Administrator.

### 4. Kosanke owed fiduciary duties to the Plan due to his status as a named Trustee and an unnamed fiduciary of the Plan.

Because Kosanke was a fiduciary of the Plan in these two capacities (as a named Trustee and an unnamed Plan Administrator), he owed fiduciary duties to the Plan based on each of these roles. *See Taunt v. Coenen,* 538 B.R. at 362 (parties who are statutory "'named'" fiduciaries and parties who are statutory "'unnamed'" fiduciaries "owe[] duties to an ERISA plan"). However, the scope of the fiduciary duties Kosanke owed to the Plan is also at issue in this case. For this reason, the Court must determine whether, on account of Kosanke's fiduciary status as a named Trustee and as an unnamed Plan Administrator, Kosanke owed fiduciary duties to the Plan with regard to (1) the investment of Plan assets, and (2) the distributions to Plan participants. This determination is necessary because the way in which these two responsibilities were performed are the basis of the Retention Claims and the Distribution Claim.

### C. Whether, because of his status as a named Trustee of the Plan, Kosanke owed any fiduciary duties to the Plan regarding the *investment* of Plan assets

Because the scope of Kosanke's fiduciary duties differ depending on whether in performing a function, he was acting as a named Trustee or an unnamed Plan Administrator, the

Court will discuss Kosanke's fiduciary duties with respect to each of these roles, separately. The Court will first consider whether, on account of Kosanke's status as a named Trustee of the Plan, he owed fiduciary duties to the Plan regarding the investment of Plan assets.

### 1. Kosanke's position

Kosanke alleges that he did not have, and did not exercise, any authority or control over the investment of Plan assets. Kosanke alleges that only Coenen had such discretion and control, and that Coenen made all of the decisions regarding the investment and divestment of Plan assets. According to Kosanke, "Coenen ran the [Plan] as if it were his own, and paid little attention to . . . Kosanke's opinion . . . ."[232] Kosanke points out that even the Plaintiff's expert, Witz, concluded that "Mr. Coenen ran the investments for the Plan as if it was his personal investment account, with little or no awareness of his fiduciary obligations under ERISA."[233] For these reasons, Kosanke argues that he owed no fiduciary duties to Plan participants related to the investment of Plan assets.

### 2. The Trustee's position

The Trustee argues that Kosanke, as a co-trustee of the Plan with Coenen, owed fiduciary duties to the Plan regarding the investment of Plan assets, regardless of who actually made the investment decisions. This is so, according to the Trustee, because the Adoption Agreement, in naming both Coenen and Kosanke as "discretionary" Trustees, granted *both* Coenen and Kosanke discretionary authority and control over the investment of Plan assets. The Trustee

---

[232] *See* Def. Kosanke's Post-Trial Br. (Docket # 546) at 2, 10.

[233] *See* Def. Kosanke's Post-Trial Br. (Docket # 546) at 9-10 (relying on the expert report of Witz (Pl.'s Trial Ex. 93 at 13)).

argues that because the Plan did not allocate fiduciary responsibilities between Coenen and

Kosanke, each Trustee is liable for the acts or omissions of the other Trustee regarding the

investment of Plan assets. The Plaintiff Trustee argues:

> 27. Since Kosanke and Coenen were named fiduciaries of the Plan, there is little doubt as to their fiduciary status under ERISA.

> 28. Notably, neither the Plan nor any other agreement assigns or segregates the fiduciary responsibilities as between Kosanke and Coenen. While ERISA permits a plan to name a fiduciary who has that status only for a particular function, the Trans-Industries[, Inc.] Plan did not do that.

> . . . .

> 30. The person who is named fiduciary is a fiduciary for all purposes of the plan whereas a person who is a fiduciary solely as a result of the function performed is a fiduciary only to the extent that it satisfies the designated functional requirement.

> 31. The plain language of the Plan makes clear that Kosanke *possessed* discretionary authority, responsibility and control over the Plan's assets. Even if he abdicated such discretion to another named fiduciary, that does not eliminate his fiduciary status.[234]

**3. Kosanke owed fiduciary duties to the Plan regarding investment of Plan assets**.

The Court agrees with the Trustee that, as a named Trustee of the Plan, Kosanke owed

fiduciary duties to the Plan regarding the investment of Plan assets, even though Coenen actually

made all of the investment decisions. "To determine whether a person is a fiduciary with respect

to a particular function at issue, the ERISA statute requires an examination of the discretionary

authority or responsibility of the person with respect to that function. In this examination, an

initial review of the ERISA plan documents is required." *Tregoning v. Am. Cmty. Mut. Ins. Co.*,

---

[234] Pl.'s Post-Trial Br. (Docket # 539) at 8 (internal quotation marks and citations omitted) (emphasis in original).

815 F. Supp. 1054, 1058 (W.D. Mich. 1992), *aff'd*, 12 F.3d 79 (6th Cir. 1993) (citation omitted).

In this case, the Plan documents clearly and definitively gave *both* Kosanke and Coenen discretionary authority regarding the investment of the assets of the Plan.  The Adoption Agreement stated that "Kai Kosanke" and "Dale S. Coenen" would "serve as **discretionary Trustee(s)** over assets not subject to control by a corporate Trustee."[235]   Paragraph 7.2(a) of the Plan granted *both* Kosanke and Coenen "discretion and authority to invest, manage, and control those Plan assets."[236]   Paragraph 7.2(c) of the Plan granted *both* Kosanke and Coenen the power and authority, "[t]o sell, exchange, convey, transfer, grant options to purchase, or otherwise dispose of any securities or other property held by the Trustee" with such power and authority "to be exercised in [their] sole discretion."[237]

Both Kosanke and Coenen also possessed discretionary authority over investment of Plan assets under ERISA § 1103(a), by virtue of their being named discretionary co-trustees in the Plan documents.  Section 1103(a) provides that, with exceptions not applicable here, "the trustee or trustees [of an employee benefit plan] shall have exclusive authority and discretion to manage and control the assets of the plan. . . ."  29 U.S.C. § 1103(a).  And under ERISA, all that is required for a person to have a fiduciary duty to an employee benefit plan is that the person be granted "any discretionary authority or discretionary responsibility in the administration of such plan."  *See* 29 U.S.C. § 1002(21)(A)(iii).  It is not necessary that the person actually exercise that

---

[235]  Pl.'s Trial Ex. 2 at TBA 0079 at ¶ 10 (emphasis added); Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 191.

[236]  *See* Pl.'s Trial Ex. 2 at TBA 0048.

[237]  *Id.*

discretionary authority or responsibility. *See Daniels v. Nat'l Employee Benefit Servs., Inc.* 858

F. Supp. 684, 689 (N.D. Ohio 1994) ("Subsection (iii) [of 29 U.S.C. § 1002(21)(A)] imposes

[fiduciary] status on 'those individuals who have actually been granted discretionary authority,

regardless of whether such authority is ever exercised.'").  For this reason, the fact that Kosanke

did not exercise his authority to make investment decisions does not relieve him of responsibility

for how the assets of the Plan were invested by Coenen.

Under ERISA, it is possible for an employee benefit plan to provide procedures for

allocating fiduciary responsibilities among named co-fiduciaries, and thereby limit to some

extent a fiduciary's liability for breaches of fiduciary duty, not caused by his own acts or

omission. *But such procedures must be stated in the Plan documents*.  *See* 29 U.S.C. § 1105(c).

> Thus, the plan documents must designate a named fiduciary, but need not
> make all named fiduciaries responsible for all plan functions; instead, the
> document can name fiduciaries for separate functions. *Leigh v. Engle*, 727
> F.2d 113, 134 (7th Cir.1984); *but see Arakelian v. National Western Life
> Ins. Co.*, 680 F. Supp. 400, 404 (D.C.D.C.1987) (named fiduciary is
> fiduciary for all purposes)."

*Daniels*, 858 F. Supp at 690.  It is also possible under ERISA for co-trustees to agree to allocate

specific responsibilities among themselves, and thereby limit their responsibility for acts and

omissions of the other Trustee in performing his fiduciary responsibilities.  *But such an

agreement must be authorized in the trust instrument.  See* 29 U.S.C. § 1105(b).  Sections

1105(b) and 1105(c) of ERISA state, in relevant part:

**(b) Assets held by two or more trustees**

**(1)** Except as otherwise provided in subsection (d) and in section
1103(a)(1) and (2) of this title, if the assets of a plan are held by two or
more trustees--

**(A)** each shall use reasonable care to prevent a co-trustee from committing a breach; and

**(B)** they shall jointly manage and control the assets of the plan, except that **nothing in this subparagraph (B) shall preclude any agreement, authorized by the trust instrument, allocating specific responsibilities, obligations, or duties among trustees**, in which event a trustee to whom certain responsibilities, obligations, or duties have not been allocated shall not be liable by reason of this subparagraph (B) either individually or as a trustee for any loss resulting to the plan arising from the acts or omissions on the part of another trustee to whom such responsibilities, obligations, or duties have been allocated.

**(2)** Nothing in this subsection shall limit any liability that a fiduciary may have under subsection (a) of this section or any other provision of this part.

. . .

**(c) Allocation of fiduciary responsibility; designated persons to carry out fiduciary responsibilities**

**(1)** The instrument under which a plan is maintained **may expressly provide for procedures (A) for allocating fiduciary responsibilities (other than trustee responsibilities) among named fiduciaries, and (B) for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan.**

**(2) If a plan expressly provides for a procedure described in paragraph (1), and pursuant to such procedure any fiduciary responsibility of a named fiduciary is allocated to any person, or a person is designated to carry out any such responsibility,** then such named fiduciary shall not be liable for an act or omission of such person in carrying out such responsibility except to the extent that–

**(A)** the named fiduciary violated section 1104(a)(1) of this title–

(I) with respect to such allocation or designation,

(ii) with respect to the establishment or implementation of the procedure under paragraph (1), or

<blockquote>(iii) in continuing the allocation or designation; or</blockquote>

<blockquote>**(B)** the named fiduciary would otherwise be liable in accordance with subsection (a).</blockquote>

<blockquote>**(3)** For purposes of this subsection, the term "trustee responsibility" means any responsibility provided in the plan's trust instrument (if any) to manage or control the assets of the plan, other than a power under the trust instrument of a named fiduciary to appoint an investment manager in accordance with section 1102(c)(3) of this title.</blockquote>

29 U.S.C. § 1105 (emphasis added).

The DOL, acting under a statutory grant of authority, issued interpretive bulletins in the form of "questions and answers relating to certain aspects of fiduciary responsibility under [ERISA]," including questions related to § 1105(c), "[p]ending the issuance of regulations or other guidelines," which state, in relevant part:

<blockquote>FR–13 Q: If the named fiduciaries of an employee benefit plan allocate their fiduciary responsibilities among themselves **in accordance with a procedure set forth in the plan for the allocation of responsibilities for operation and administration of the plan**, to what extent will a named fiduciary be relieved of liability for acts and omissions of other named fiduciaries in carrying out fiduciary responsibilities allocated to them?</blockquote>

<blockquote>A: If named fiduciaries of a plan allocate responsibilities in accordance with a procedure for such allocation set forth in the plan, a named fiduciary will not be liable for acts and omissions of other named fiduciaries in carrying out fiduciary responsibilities which have been allocated to them, **except as provided in section 405(a) of the Act, relating to the general rules of co-fiduciary responsibility**, and section 405(c)(2)(A) of the Act, relating in relevant part to standards for establishment and implementation of allocation procedures.</blockquote>

<blockquote>**However, if the instrument under which the plan is maintained does not provide for a procedure for the allocation of fiduciary responsibilities among named fiduciaries, any allocation which the named fiduciaries may make among themselves will be ineffective to relieve a named fiduciary from responsibility or liability for the performance of fiduciary responsibilities allocated to other named**</blockquote>

84

**fiduciaries.**

29 C.F.R. § 2509.75-8 (emphasis added); *see also Daniels*, 858 F. Supp at 690 (emphasis added) (citing C.F.R. § 2509.75-8) ("Section 1102(1) notwithstanding, . . . a 'named' fiduciary is not necessarily a fiduciary for all purposes, **provided that the plan documents expressly designate separate functions**.").

Kosanke has not pointed to any procedures in the Plan documents for allocating fiduciary responsibilities among Coenen and Kosanke.[238]  None exist.  Nor has Kosanke cited any provision in the Plan (which is also a trust document) which authorizes any agreement between Kosanke and Coenen to allocate among themselves the trustee responsibilities that they were jointly granted.  None exist.  Therefore, any agreement, understanding, or practice between Coenen and Kosanke under which Coenen alone would make decisions regarding investment and divestment of Plan assets and distributions to Plan participants, including to Coenen and Fields, would not limit Kosanke's fiduciary responsibility for the acts or omissions of Coenen under 29 U.S.C. § 1105(b)(1).  Moreover, even if Kosanke could so limit his fiduciary responsibility under § 1105(b) or § 1105(c), he still would have liability for Coenen's breaches of fiduciary duties to the extent § 1105(a) applied.  That provision states:

**(a) Circumstances giving rise to liability**

In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

---

[238]  To the contrary, Witz testified at trial that "there were 256 references to trustee in the [Plan as amended in 2004 and effective in 2003,]" but that the Plan "doesn't say trustee one does such and such and trustee two does such and such.  It says trustees are responsible for these things."  Trial Tr. (Docket # 533) at 169 (testimony of Witz).

85

**(1)** if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

**(2)** if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

**(3)** if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

29 U.S.C. § 1105(a)(1)-(a)(3).  It is undisputed that Kosanke knew of Coenen's causing the Plan to retain the risky stock of Trans-Industries, Inc.  This was a breach of fiduciary duty by Coenen, under 11 U.S.C. § 1104(a)(1).  Kosanke therefore had a duty to make reasonable efforts under the circumstances to remedy Coenen's breach of fiduciary duty.  Kosanke failed to do this.

For all of these reasons, due to Kosanke's status as a named discretionary Trustee of the Plan, Kosanke owed fiduciary duties to the Plan regarding the investment of the assets of the Plan. But Kosanke owed such fiduciary duties only for the period in which his was actually a Trustee of the Plan.  The provisions in the Plan that made Kosanke a Trustee were not added to the Plan until it was amended on January 11, 2004.  Although those amendments were stated to be effective January 1, 2003, Kosanke was not, in fact, a Trustee in 2003.  During 2003, only Coenen was a Trustee of the Plan.  Kosanke had no power or control over investing the Plan assets in 2003.  Naming Kosanke a Trustee retroactive to 2003 cannot change the historical fact that in 2003, only Coenen, as the only named Trustee of the Plan, had the power to invest the assets of the Plan.  And it is undisputed that Kosanke did not, in 2003 or at any time thereafter, actually make any decisions regarding the investment of Plan assets.  Therefore, prior to January

11, 2004, Kosanke owed no fiduciary duties regarding the investment of Plan assets – until then,

Kosanke was neither a named fiduciary nor a functional fiduciary with respect to the investment

of Plan assets.[239]

### D. Whether, because of his status as a functional Plan Administrator, Kosanke owed any fiduciary duties to the Plan regarding the *distribution* of Plan assets

The scope of Kosanke's fiduciary duty, based on his status as an unnamed, functional

Plan Administrator, is more limited than his fiduciary duty based on his status as a named

Trustee. The Court's finding that Kosanke was a functional Plan Administrator does not

automatically make him a fiduciary regarding all of the functions of a Plan Administrator.

> The language of section 3(21)(A) of ERISA itself provides that a person is a fiduciary with respect to a plan "to the extent" that the person exercises one of the three functions set forth in the statute. On the basis of this language, the federal courts unanimously hold that fiduciary status under ERISA is not "an all or nothing proposition." *See Briscoe v. Fine*, 444 F.3d 478, 486 (6th Cir.2006). The court must therefore examine the conduct at issue to determine whether a defendant had a duty to exercise fiduciary responsibility.

*Ellis,* 484 F. Supp. 2d at 710; *see also Tregoning,* 815 F. Supp. at 1058 (internal quotation marks

and citations omitted) (stating with regard to the "to the extent" language in 29 U.S.C.

§ 1002(21)(A): "That qualifying phrase indicates that a person is a fiduciary only with respect to

those aspects of the plan over which he exercises authority or control.").

### 1. Kosanke's position

Kosanke argues that he did not have any authority or discretion regarding eligibility

---

[239] The Court notes that in his expert report, Witz stated that "Mr. Kosanke functioned in the role of Trustee prior to the formal appointment date. (Pl.'s Trial Ex. 93 at 6 § 20.) But Witz does not provide the basis for this conclusion and the Court is not aware of any evidence in the record that would support such conclusion, at least with regard to the investment of Plan assets.

determinations and distributions to Plan participants. According to Kosanke, because any determinations he made regarding eligibility issues and distributions to Plan participants, including the distributions to Coenen and Fields, were all dictated by the Plan, he did not exercise any discretion in performing these responsibilities. As he did in earlier seeking summary judgment, "Kosanke argues that he had no discretion in permitting the distributions to Coenen and Fields because the Plan required distributions of a participant's entire vested balance if that individual was terminated."[240]

Kosanke also argues that he did not exercise any discretion with regard to distributions or any other administrative responsibilities he performed. And Kosanke alleges that, as Chief Financial Officer, he "made no decisions concerning the approval of distributions."[241] According to Kosanke, Coenen alone was the Plan Administrator and therefore had all the discretion and control over all of the administrative responsibilities concerning the Plan, including distributions to Plan participants. Kosanke alleges that he had no decision-making authority, exercised no authority, and acted solely at the direction of Coenen. For these reasons, Kosanke argues that he was not a fiduciary with respect to the distributions to Coenen and Fields.

### 2. The Trustee's position

The Trustee alleges that Kosanke functioned as the Plan Administrator.[242] The Trustee

---

[240] 538 B.R. at 366; *see* Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 33 (Kosanke alleges that all questions regarding eligibility of employees to participate or remain a participant in the Plan "[were] all dictated by the [P]lan document"), 188–89 (Kosanke alleges that the eligibility of Plan participants, and the calculation of distributions that Plan participants were entitled to "was all spelled out in the Plan"); Tr. of oral argument on Summ. J. Mots. (Docket # 395) at 50: 9–12 ("Kosanke "had no authority for managing the assets or discretion or authority in the administration of the [P]lan.").

[241] Def. Kosanke's Post-Trial Br. (Docket # 546) at 10.

[242] Pl.'s Post-Trial Br. (Docket # 539) at ¶¶ 19-20.

also alleges that "[t]here were numerous . . . instances where Kosanke exercised discretion over the Plan assets."[243]  The Trustee alleges that Kosanke determined the value of Coenen's and Fields's vested interests in the Plan, and how and when he was going to make distributions to Coenen and Fields on account of those interests, and then Kosanke authorized the distributions on behalf of the Plan and signed checks to Coenen and Fields.  Because these were the very functions that the Distribution Claim is based on and required the exercise of discretionary authority and control over Plan assets, the Trustee says, Kosanke owed fiduciary duties to the Plan regarding the distributions to Coenen and Fields.  The Trustee relies, in part, on Anderson's deposition testimony.  Anderson testified that Kosanke was present at multiple brainstorming meetings which discussed solutions to the Plan's liquidity problem caused by Coenen's and Fields's distribution requests; that after such meetings "[t]here [were] a lot of open issues . . . [a]nd Mr. Coenen and Mr. Kosanke were going to have to talk it over and try to come up with some plans" to deal with the liquidity problem; and that Anderson stated that "Kosanke came up with [the] plan [embodied in the document entitled "Trans-Industries Profit Sharing Plan Cash Transaction Checklist, dated June 17, 2005] for distributing the Coenen and Fields' profit sharing plan balances."[244]

### 3.  The Court's summary judgment opinion

In the Court's opinion ruling on the Cross-Motions for Summary Judgment, the Court determined that Kosanke was not simply following the requirements of the Plan in making

---

[243]  *Id.* at ¶¶ 21-24.

[244]  *See* Pl.'s Second Post-Trial Br. (Docket # 547) at 6 (relying, in part, on Anderson's Deposition testimony (Pl.'s Trial Ex. # 86) at 34-37, 53, 69-71, 80-83).

89

distributions to Coenen and Fields, but rather exercised discretion with regard to the distributions to Coenen and Fields. The Court noted that there were numerous proposed solutions to the Plan's liquidity problem caused by the requests by Coenen and Fields for the distribution of their vested interests in the Plan, and it was necessary to make a choice among the various options. And the Court found that among the options was to institute proceedings (1) to terminate the Plan; or (2) to obtain the court appointment of an independent trustee:

> While an extended discussion of all the disputed issues is not necessary at this point, the Court will address one of the arguments Kosanke makes about the Distribution Claim, in opposing the Trustee's summary judgment motion. Kosanke argues that he had no discretion in permitting the distributions to Coenen and Fields because the Plan required distributions of a participant's entire vested balance if that individual was terminated. However, this is not accurate. Although Paragraph 6.4 of the Plan does state this requirement, neither this provision nor any other provision of the Plan states what is to be done if the Plan does not have enough assets to make distributions to employees who have been terminated.

> There is no provision in the Plan that Kosanke has cited that requires or permits the series of transactions that were made regarding Plan assets in the case where the Plan is unable to pay all benefits when they become due. But ERISA does have a provision that deals with this situation. Under ERISA, a Plan may be terminated under these circumstances. 29 U.S.C. § 1342 provides, in relevant part:

> (a) Authority to institute proceedings to terminate a plan.

> The [Pension Benefit Guaranty C]orporation may institute proceedings under this section to terminate a plan whenever it determines that –

>> (1) the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4971(a) of Title 26,

90

**(2) the plan will be unable to pay benefits when due,**

(3) the reportable event described in section 1343(c)(7) of this title has occurred, or

(4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342 (emphasis added). Upon the termination of a plan, ERISA provides how assets are to be allocated to participants and beneficiaries of the plan. *See, e.g.*[,] 29 U.S.C. § 1344 (covering the allocation of assets "[i]n the case of the termination of a single-employer plan").

ERISA also provides a method for the appointment of a trustee, where one of the determinations of subpart (a) of 29 U.S.C. § 1342 is made, or otherwise, "upon the petition of a plan administrator or the corporation"• to "the appropriate United States district court" where, as here, "the interests of the plan participants would be better served by the appointment of the trustee." 29 U.S.C. § 1342(b)(1)-(2). And "[t]he corporation and plan administrator may agree to the appointment of a trustee without proceeding in accordance with the requirements of paragraphs (1) and (2)" [of 29 U.S.C. § 1342(a) ]. 29 U.S.C. § 1342(b)(3). The appointment of an independent trustee would have been one way to remove the taint of a conflict of interest. Terminating the Plan was an option that was repeatedly discussed in considering what to do about the Plan's inability to honor Fields's and Coenen's distribution requests. Coenen and Kosanke therefore knew that there was at least one option available, consistent with ERISA, other than the course ultimately taken.

And even if Coenen and Kosanke sincerely believed that the Plan required them to make distributions to Coenen and Fields in this situation, where there is a conflict between what the Plan requires and what ERISA requires, ERISA controls. 29 U.S.C. § 1104(a)(1)(D) (providing that "[s]ubject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan **insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter**["]) (emphasis added):

[Section 1104(a)(1)(D) of ERISA] makes clear that the duty of

> prudence trumps the instructions of a plan document, such as an
> instruction to invest exclusively in employer stock even if financial
> goals demand the contrary. *See also* § 1110(a) (With irrelevant
> exceptions,"any provision in an agreement or instrument which
> purports to relieve a fiduciary from responsibility . . . for any . . .
> duty under this part shall be void as against public policy.").

> *Fifth Third Bancorp v. Dudenhoeffer*, — U.S. —, 134 S. Ct. 2459, 2468,
> 189 L. Ed. 2d 457 (2014); *see also Cent. States, Se. & Sw. Areas Pension
> Fund v. Cent. Transp., Inc*., 472 U.S. 559, 568, 105 S. Ct. 2833, 86 L. Ed.
> 2d 447 (1985) ("[T]rust documents cannot excuse trustees from their
> duties under ERISA [.]"). As discussed above, ERISA requires that
> fiduciaries act for the benefit of all plan participants in a nondiscriminatory
> manner. And Paragraph 10.15 of the Plan, consistent with ERISA,
> required all Plan provisions to be "interpreted and applied in a uniform,
> nondiscriminatory manner. Paragraph 6.4 of the Plan, when interpreted
> along with this provision and other provisions of the Plan and ERISA,
> cannot be construed as requiring the actions taken by the fiduciaries of the
> Plan.

538 B.R. at 366-67.

Thus, the Court has already held, and now reiterates, that Kosanke had, and actually

exercised, enough discretionary control and authority over Plan assets for him to owe a fiduciary

duty to the Plan regarding distributions to Plan participants.

## E.  The Retention Claim

Having determined that Kosanke owed a fiduciary duty to the Plan regarding the

investment of the Plan assets, and regarding distributions to Plan participants, the Court now

must determine if Kosanke breached those duties.

As noted in Part I of this Opinion, the Court previously entered a default judgment "in

favor of the Plaintiff [Trustee] and against Defendant Joan Parker Coenen, in her capacity as

representative of the estate of Dale S. Coenen, deceased . . . as to liability only, on all of

Plaintiff's claims that remain after the Court's entry of [Summary Judgment Order]."[245]  For that reason, this portion of the Opinion focuses mostly on Kosanke's acts and omissions, and whether such acts or omissions constituted a breach of his fiduciary duties under ERISA.  But to the extent the Court finds breaches of fiduciary duty by Kosanke, such findings also apply to Coenen.

The Court will next discuss the Trustee's Retention Claim.

**1. The Trustee's position**

The Trustee argues that Kosanke breached his fiduciary duties to the Plan (1) by allowing the Plan to retain the Series A Preferred Stock, which was not a "qualifying employer security," during the time period after December 14, 2001; and (2) by allowing the Plan to retain the common stock of Trans-Industries, Inc. allegedly in amounts too great and for too long a period to be prudent, after December 14, 2001.  The Trustee argues that, by allowing the Plan to continue to hold such Preferred Stock and such common stock after December 14, 2001, Kosanke breached his fiduciary duties under 29 U.S.C. § 1104(a) of loyalty; of prudence; to diversify the assets of the Plan so as to minimize the risk of large losses to Plan participants; to act "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries;" and his duty to comply with the requirements in the Plan documents.[246]  Relying on the expert

---

[245]  *See* "Order Granting in Part, and Denying in Part, Plaintiff's July 12, 2016 Oral Motion for Default Judgment Against Defendant Joan Parker Coenen, Etc." (Docket # 519)  at 1-2 ¶ 2.

[246]  *See* Compl. (Docket # 1) at ¶¶ 35-37;  Pl.'s Post-Trial Br. (Docket # 539) at ¶¶ 38-57; Pl.-Trustee's Post-Trial Br. (Reply) (Docket # 543) at ¶¶ 5-10, 13-17, 41.  In his Post-Trial Brief and his "Post-Trial Brief (Reply)," one of the fiduciary duties the Trustee states that Kosanke breached is the fiduciary duty of "adherence."  Witz, in his expert report, also states: "Investing In and Holding [Trans-Industries, Inc.] Common Stock was a Breach of the duties of Loyalty, Prudence, Diversification, and Adherence."  (Pl.'s Trial Ex. 93 at 13.)   The duty of "adherence" according to Witz, was Kosanke's duty to adhere to the provisions of the governing Plan documents. (*See id.* at 24.)

report of Mr. Frazee, the Trustee argues that it was possible to divest the Plan of the Series A Preferred Stock and the common stock after December 14, 2001. According to the Trustee, Kosanke's failure to do so, or to take any other remedial action, caused the Plan to suffer large losses.

### 2. Kosanke's position

Kosanke admits that at the time Coenen proposed that the Plan purchase the Series A Preferred Stock, Kosanke believed that such purchase was "extremely risky" and was not a prudent investment because he, as CFO, knew the company's financial condition had been spiraling downward since 1996 or 1997, and he questioned "whether the company would survive long-term."[247] Kosanke even feared that he would "end up with nothing" for his own vested interest in the Plan if the Series A Stock were purchased.[248] Kosanke also admits that the Series A Preferred Stock was purchased to keep the company running, and so it was not purchased for the exclusive benefit of the Plan participants.[249] Kosanke also admits that, during the period after December 14, 2001, he thought it was risky for the Plan to continue to hold both the Series A Preferred Stock and the Company's common stock. Kosanke believed that it was imprudent for the Plan to be so heavily invested in the stock of Trans-Industries, Inc. "as a whole;" that the Plan's holding of more than 50% of its assets in the form of company stock violated the Plan documents; and that the Plan should be divested of company stock.[250] Kosanke stated: "And

---

[247] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 94-96; Trial Tr. (Docket # 533) at 106; Trial Tr. (Docket # 536) at 187.

[248] Tr. of Kosanke Dep. (Pl.'s Trial Ex. 83) at 94.

[249] *Id.*. at 106.

[250] *Id.* at 222.

94

anybody that looks at their own portfolio it's "Divest, divest, divest."[251] But Kosanke admitted that after December 1, 2001, he did not express his concerns about the Plan continuing to hold the stock to Coenen.[252] Kosanke also admitted that in early 2002, it was "for sure" possible to divest the Plan of all of the Company common stock it held, provided that it was done slowly over a 6-month period ("50,000 shares a day").[253] But Kosanke argues that he was powerless to divest the Plan of the common stock because Coenen refused to do so, and Coenen made all of the investment decisions for the Plan, without considering Kosanke's opinion.[254] Kosanke says that he had spoken to Coenen about his concerns regarding the Plan's ownership of company stock back at the time of the purchase of the Series A Preferred Stock. And because Coenen was the Company's CEO and a Board member, and the person who, in practice, made the investment decisions for the Plan, Kosanke argues that he had done all that he had the power to do to remedy the situation.[255] Kosanke argues that "having a third party come in and evaluate the prudence of the [P]lan's investments" would not have been helpful because it was so "obvious" that there was a problem with the mix of the assets in the Plan.[256] In addition, Kosanke alleges that "the sale of the Company stock would not have realized any significant funds in 2001 through 2006."[257] For

---

[251] *Id.*

[252] *Id.* at 222-25.

[253] Trial Tr. (Docket # 533) at 113.

[254] *Id.* at 127.

[255] *Id.* at 110.

[256] *Id.*

[257] Def. Kosanke's Post-Trial Br. (Docket # 546) at 11.

95

these reasons, Kosanke argues that he did not breach any fiduciary duty to the Plan regarding the Plan's investment in company stock.

### 3. Discussion

In *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015), the United States Supreme Court explained that "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." Applying trust law, the Court determined that "a[n ERISA] fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones;" that a "plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones;" and that "so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely." *Id.* at 1828-29. The *Tibble* Court explained that "[t]his continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 1828. The *Tibble* Court further explained that "the trustee must 'systematic[ally] conside[r] all the investments of the trust at regular intervals' to ensure that they are appropriate;" that such monitoring of investments must "be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved;" and that "'[w]hen the trust estate includes assets that are inappropriate as trust investments, the trustee is ordinarily under a duty to dispose of them within a reasonable time.'" *Id.* (citations omitted) (quoting A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 147-48 (3d ed. 2009) (Bogert 3d); Restatement (Third) of Trusts § 90, Comment *b,* p. 295 (2007); and 4 A. Scott, W. Fratcher, & M. Ascher, Scott and Ascher on Trusts § 19.3.1, p. 1439 (5th ed. 2007)).

The Trustee's Retention Claims against Coenen and Kosanke are based on their alleged

breach of their continuing duty to monitor Plan investments and remove the imprudent ones, which duty, under *Tibble*, flows from the fiduciary duty of prudence. The Trustee argues that this duty required Coenen and Kosanke to divest the Series A Preferred Stock and the common stock from the Plan within a reasonable time after December 14, 2001, and that their failure to do so proximately caused the Plan to suffer damages.

In the Court's summary judgment opinion, the Court framed the issues to be decided in order to determine whether Coenen and Kosanke breached their fiduciary duty by failing to divest the Plan of the Series A Preferred Stock and the common stock, as follows:

> [R]egarding the Retention Claims, the genuine issues of material fact include whether, during the time period after December 14, 2001, the Plan could have divested itself of the preferred and common stock in a way that would have avoided or reduced the alleged losses to the Plan, and if so, when and how this could have been done, and by how much this would have reduced or avoided the alleged losses to the Plan. The Court must determine these issues, among others, in order to determine if Coenen and Kosanke breached their fiduciary duties after December 14, 2001 by allowing the Plan to retain the Trans–Industries, Inc.'s common and preferred stock. If it was impossible during the relevant time period to divest the Plan of the stock, or to the extent such divestiture would not have helped the Plan, then continued retention of the stock would not have been a breach of fiduciary duty.

538 B.R. at 366.

The Court now finds and concludes, after trial, that it was impossible to sell the Series A Preferred Stock of Trans-Industries, Inc. and realize any value for the Plan after December 14, 2001, but that it *was* possible during this period to sell the common stock and avoid the large losses suffered by Plan due to its retention. As a result, the Court concludes that Coenen and Kosanke did not breach any fiduciary duties by failing to divest the Plan of the Series A Preferred Stock after December 14, 2001, but that they each did breach their "prudent person" fiduciary

duty by failing to sell off the common stock.

### 4. The Series A Preferred Stock

It is clear that a prudent person monitoring the investments of the Plan during regular intervals, with the goal of maximizing the Plan assets and minimizing the Plan's losses, would have determined that, in order to comply with his fiduciary duties under ERISA, it was necessary — if possible — to divest the Plan of the Series A Preferred Stock within a reasonable time after December 14, 2001.[258] Coenen was the only Plan Trustee immediately after December 14, 2001, so only Coenen, could have divested the Plan of the Series A Preferred Stock within a reasonable time after December 14, 2001. Because Kosanke did not become a Trustee of the Plan until the Plan was amended on January 11, 2004, his "prudent person" duty to divest the Plan of the Series A Stock could not have arisen until January 11, 2004. Because he became a Trustee of the Plan as of that date, the Court finds that Kosanke had a duty to divest the Plan of the Series A Preferred Stock — if possible — within a reasonable time after January 11, 2004.

In order for the Trustee to establish the breach, causation, and damage elements of his breach of fiduciary duty claim, he needed to prove that the Series A Preferred Stock had value after December 14, 2001 (in Coenen's case), and that it had value after January 11, 2004 (in Kosanke's case), such that it was possible for Coenen and/or Kosanke to sell that stock and realize value for the Plan, so that the failure of Coenen and Kosanke to do so was the cause of the

---

[258] There is overwhelming evidence to support this assumption, including the conclusion in the expert report of Witz that "[a]t no time before or after December 14, 2001, could the [Series A] Preferred Stock have been considered a prudent investment for the Plan" (*see* Pl.'s Trial Ex. 93 (Addendum to Witz expert report) at 2 ¶ III.10). Witz concluded in his expert report: "On any given date after December 14, 2001 and before [Trans-Industries, Inc.] filed for bankruptcy protection in 2006, a prudent and knowledgeable investor would have taken immediate steps to dispose of [Series A] Preferred Stock for the following reasons: [listing reasons (A) - (F)]." (*See id.* at 3 ¶ III.12.)

98

Plan suffering damages. The Trustee has failed to meet his burden of proof on these elements.

During trial, the Trustee relied on the expert opinions of Frazee to try to establish that after December 14, 2001, the Series A Preferred Stock had value; that it could have been liquidated after that date; and that the failure of Coenen and Kosanke to liquidate it proximately caused the Plan to suffer damages. Frazee concluded that the Plan suffered approximately $1.55 million in damages, or alternatively, $1.3 million in damages, due to Coenen's and Kosanke's failure to liquidate the Series A Preferred Stock during the relevant period.[259]

Frazee's conclusions about damages were based on his assumptions that: (1) the Series A Preferred Stock had significant value after December 14, 2001; (2) the Trustee(s) of the Plan could have liquidated the Series A Preferred Stock by January 1, 2003 (a little over one year after December 14, 2001 (the first date on which a fiduciary could be liable for damages under the Court's prior ruling on the applicable statute of limitations)) and realized significant value for the Plan; (3) the money received from that liquidation could have been reinvested in other stock which would have generated a positive return equivalent to the return that would have been generated by the shares of the Sound Shore Fund which the Plan had liquidated to buy the Series A Preferred Stock;[260] (4) the alternative investment would have increased the assets in the Plan;

---

[259] *See* Addendum to Frazee's expert report (Ex. 92) at 2 ¶¶ 5)-6), 3 ¶¶ 8)a, 8)b, Exs. S (damages calculated at $1,545,991), T (damages calculated at $ 1,299,703); Trial Tr. (Docket # 534) at 160-61, 178, 208 (testimony of Frazee); *see also* Trial Tr. (Docket # 536) at 7-10. Frazee updated his initial expert report on damages in the Addendum to reflect the Court's ruling that the Acquisition Claim, and the Retention Claims to the extent they were based on actions or omissions prior to December 14, 2001, were barred by the statute of limitations, and to reflect the fact that no damages could be attributed to Coenen after November 16, 2005 when he ceased being a Trustee of the Plan. (*See* Trial Tr. (Docket # 534) at 156-57, 167 (testimony of Frazee).)

[260] Trial Tr. (Docket # 534) at 156, 159, 163-66, 204 (testimony of Frazee); Trial Tr. (Docket # 536) at 48-53, 97 (testimony of Frazee); Ex. T-2 to Addendum to Frazee's expert report.

99

(5) the additional assets in the Plan would have been used "to satisfy distribution requests from employees over the next four or five years;" (6) the Plan assets would have been distributed in December 2006; and (7) due to the increase in assets from the alternative investment, the Plan would have had a much larger pool of assets in December 2006 from which all of the vested interests of the Plan participants could have been satisfied.[261] Frazee assumed, for purposes of his two alternative damage calculations, that the price the Plan would have received for the Series A Preferred Stock was either the fair market value attributed to the stock by Amherst on December 31, 2002, or alternatively, 80% of that value."[262] Amherst valued the Series A Preferred Stock at $1,964,879 as of December 31, 2002.[263] Frazee also calculated what the damages would have been if the Plan assets were distributed as of October 2005, the month before Coenen ceased being a fiduciary. That damage amount was $1,353,448.[264]

Frazee explained that the reason for assuming a one-year timeline to sell the Series A Preferred Stock was because "[y]ou don't have a market that you can sell that [Series A Preferred Stock] . . . into immediately and so there's a process that needs to occur."[265] He "assumed that there would in fact be an event that would allow the [P]lan to . . . exit from the [Series A

---

[261] Trial Tr. (Docket # 534) at 160 (testimony of Frazee); Trial Tr. (Docket # 536) at 48-53, 58, 68 (testimony of Frazee).

[262] Trial Tr. (Docket # 534) at 161, 191 (testimony of Frazee).

[263] Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Pl.'s Trial Ex. 63) at pdf. p. 5.

[264] Trial Tr. (Docket # 534) at 156, 159, 163-66 (testimony of Frazee); Addendum to Frazee's expert report (Docket # 92) at Ex. S.

[265] Trial Tr.(Docket # 534) at 162 (testimony of Frazee).

100

P]referred [S]tock" within a one-year time frame.[266]  He believed one year was a reasonable

amount of time based on the actual amount of time it took from the date the Board decided to

unwind the June 5, 2001 Transaction (September 17, 2004), until the time when Trans-Industries,

Inc. redeemed many of the shares of the Series A Preferred Stock from the Plan (June 2005), as

part of the series of transactions which resulted in Fields and Coenen receiving their entire vested

interest in the Plan.[267]  Frazee testified: "If that process is at all indicative of the same available

ideas, same . . . portfolio of opportunities to divest, same strategies that would have been

available in 2001 or '02, I think it's a reasonable conclusion to say that a fiduciary beginning the

process at the start of the statute of limitations period would certainly be able to obtain liquidity

[of the Series A Preferred Stock] within approximately a one year period."[268]

Frazee testified that "[t]here was a market for the [Series A P]referred [Stock] but it

required you to do work to find that market and arrange a transaction that everyone could live

with."[269]  Frazee opined that there were multiple ways the Series A Preferred Stock could have

been liquidated.  He specified the following ways this could have been done: (1) Trans-

Industries, Inc. could have redeemed the Series A Preferred Stock as it eventually did, in part, in

June 2005, but at an earlier date;[270] (2) the fiduciaries of the Plan who were responsible for

---

[266] *Id.* at 163.

[267] *See id.* at 163-64.

[268] *Id.* at 164-65.

[269] Trial Tr. (Docket # 534) at 103-04 (testimony of Frazee).

[270]  Trial Tr. (Docket # 534) at 174 (testimony of Frazee); Trial Tr. (Docket # 536) at 69 (Frazee stated that the "June 2005 transaction is an example essentially [of] an outcome that in my view could have been employed with some variation earlier in 2002, or 2003, or 2004 et cetera.")

purchasing the Series A Preferred Stock; namely Kosanke and Coenen, could have been required to take in-kind distributions of the Preferred Stock in satisfaction of their vested interests in the Plan;[271] (3) "Coenen could have bought the [Series A Preferred Stock] using his own cash, or his . . . common shares that he owned personally" (according to Frazee "Coenen had $2,000,000 worth of liquid common stock in 2003 and that [could have been] used to take care of the [Series A Preferred Stock] that was being valued at roughly $2,000,000 in 2003 on January 1st");[272] (4) Coenen alone could have been required to take an in-kind distribution of his entire vested interest in the Plan in Series A Preferred Stock;[273] (5) "Figgie, [a member of the Board and a close personal friend of Coenen's who was wealthy and who had invested in Trans-Industries, Inc. common stock and Series B Preferred Stock,] could have chosen to buy [the] stock from . . . either the . . . [P]lan, or the company";[274] (6) the Series A Preferred Stock "could have been taken

---

[271]   Trial Tr. (Docket # 534) at 174; *; see also* Trial Tr.(Docket # 536) at 90-91 (Frazee stated: "One of the solutions that I recall specifically was that Mr. Coenen instead of receiving any other type of asset from the [P]lan . . . [w]ould instead receive the [Series] A [P]referred [Stock] that had been purchased in 2001. . . in satisfaction of his rights if any under the [P]lan.").

[272]   Trial Tr. (Docket # 534) at 174*; see also* Trial Tr. (Docket # 536) at 70. Frazee stated that "[Coenen] could exchange in a bona fide transaction, not in his role as a [P]lan participant, but could exchange either money or those [common] shares [he owned personally] for the [Series A P]referred [Stock] that were held by the [P]lan."  *Id.* Frazee gave an example of how the process would work:

> Following an ERISA mandated . . . allowed process, the [P]lan could obtain an appraisal of both the proceeds to be received, or the common shares to be received from Mr. Coenen, but also obtain an appraisal of the [Series A Preferred Stock] and could then effectuate a transaction which would have been appropriate under ERISA to exchange the [Series A Preferred Stock] for common [stock]. Common [stock] are then liquid and could . . . be transformed into cash for the [P]lan's benefit or invested into something else."

*Id.* at 70-71.

[273]   Trial Tr. (Docket # 536) at 91.

[274]   Trial Tr. (Docket # 534) at 176; Trial Tr. (Docket # 536) at 86-90.

102

out of the [P]lan and converted into a different class of preferred stock of . . . Trans-Industries[,

Inc.] which had superior features";[275] (7) the Series A Preferred Stock could have been marketed

to outside investors with deep pockets;[276] (8) the Series A Preferred Stock could have been

offered to all of the Plan participants;[277] and (9) the Plan could have been terminated and the

Series A Preferred Stock could have been distributed to the Plan participants who would have an

easier time marketing smaller blocks of that stock.[278]  Frazee said that "[t]here were probably ten

or 15 different methods [of liquidating the Series A Preferred Stock] that were contemplated or

discussed [by attorneys and financial advisors advising Trans-Industries, Inc.] or on the table in

2004" and he believed that "most of those would also apply in 2003 on January 1st."[279]

The Court finds that two key assumptions which formed the foundation of Frazee's

damages calculations were not proven by a preponderance of the evidence.  Those related

assumptions were: (1) that the Series A Preferred Stock had value after December 14, 2001; and

(2) that the Trustees of the Plan somehow could have liquidated the Series A Preferred Stock

after December 14, 2001 and realized value for the Plan.

   **5.  The Trustee did not prove that the Series A Preferred Stock had value after
        December 14, 2001**.

To establish the value of the Series A Preferred Stock after December 14, 2001, Frazee

relied on the fair market value attributed to the Series A Preferred Stock as of December 31,

---

[275]  Trial Tr. (Docket # 536) at 71-72.

[276]  *Id*. at 72.

[277]  *Id.* at 91.

[278]  *Id.* at 74, 91.

[279]  Trial Tr. (Docket # 534) at 172-74 (testimony of Frazee).

2002 in Amherst's valuation report dated October 16, 2003.[280]  That value was $1,964,879.[281]

But the Court finds that the Amherst valuation was unreliable, and in fact wrong.

This is so for the following reasons.  First, the Amherst report was not done until more

than 2 years after the Series A Preferred Stock was issued, and so well *after* Trans-Industries, Inc.

had already given the stock a stated value.[282]  Second, the starting point for the value Amherst

placed on that stock was the face value ascribed to the stock by an interested party (the

Company), whose admitted purpose in issuing and selling the stock was to raise capital for a

failing business, and who had failed to first obtain an appraisal of that stock by a independent and

neutral third party.[283]  Third, there is nothing in the record to establish how Trans-Industries, Inc.

determined its initial stated value of the Series A Preferred Stock.[284]

Fourth, Amherst's initial valuation of the Series A Preferred Stock, and every later

valuation by Amherst, relied heavily on management's representation to Amherst that Trans-

Industries, Inc. intended to redeem the Series A Preferred Stock in the near future.[285]  The

---

[280]  *See* Addendum to Frazee's expert report (Docket # 92) at Ex. S ("January 2003 starting value [of $1,964,879] based on Amherst Appraisal: Valuation Date 12/31/2002").

[281]  *Id.*

[282]  *See* Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Pl.'s Trial Ex. 63).

[283]  Witz noted in his expert report that "[t]he [first] Amherst [valuation] report acknowledged the Board created, issued and established the initial price of the [Series A P]referred Stock."  (Pl.'s Trial Ex. 93 at 9 II.28.(F)) (footnote omitted) (citing Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Pl.'s Trial Ex. 63) at pdf. p. 12).)

[284]  *See generally Smith v. Sydnor*, No. 98-CV-241, 2000 WL 33687953, at *5, 16-17 (E.D. Va. Aug. 25, 2000) (discussing the process that should be used for evaluating assets, including stock).

[285]  *See* Part II.G of this Opinion.  The Witz expert report noted that "[e]ach [Amherst] valuation report assumed that the Company would redeem the preferred stock in the near future."  (Pl.'s Trial Ex. 93 at 9 ¶ II.28.(H)) (footnote omitted).)  The expert report of Frazee also noted: "The importance of a

104

assumption that the Series A Stock would soon be redeemed caused Amherst to ascribe substantial value to the stock which was not justified, particularly given Amherst's notation in its first valuation report that "on June 30, 2003, [Trans-Industries, Inc.] was facing a severe cash shortage and contemplating bankruptcy;" that "dividend payments had been suspended;" that Trans-Industries, Inc. was a small company; that the stock of Trans-Industries, Inc. was thinly traded; and that all of these facts increased the risk of holding the Series A Preferred Stock.[286] Amherst's assumption that Trans-Industries, Inc. would have the ability to, and in fact would, redeem the Series A Preferred Stock in the near future, by paying both the stock's face value and the accrued and accumulated dividends, clearly was not justified given the Company's dire financial circumstances. Amherst's report itself compared the Series A Preferred Stock to the stock of companies (such as Enron and Worldcom) which had suspended the payment of dividends, were in bankruptcy, and "had minimal chance of paying significant amounts out to the preferred shareholders." And Amherst observed that "[t]hese stocks trade at distressed values that are a fraction of the total book value of the liquidation preference and accrued dividends."[287]

Fifth, Frazee himself acknowledged that there were flaws in Amherst's analysis and methodology for determining the value of the Series A Preferred Stock, and that Amherst's valuation of that stock was too high. In Exhibit G to Frazee's Addendum to his expert report, Frazee calculated damages allegedly incurred by the Plan for the Distribution Claim, based on his

planned redemption date [to the value ascribed to the Series A Preferred Stock in the Amherst valuation] is also obvious from the Amherst calculations and related report descriptions." (Pl.'s Trial Ex. 92 at 3 n.4.)

[286] Confidential Preferred Stock Valuation dated October 16, 2003 by Amherst Capital Partners, L.L.C. (Pl.'s Trial Ex. 63) at pdf. p. 17 ¶¶ 3-4.

[287] *Id.* at pdf. p. 16.

theory that the Series A Preferred Stock was overvalued in calculating the distributions owed to Coenen and Fields. This is discussed further in Part IV.F.2 of this Opinion. In the June 2005 distribution, Coenen and Fields were each paid an amount equal to their percentage interests of the total stated value of the Plan assets. The stated value of all of the Plan assets, on which the distributions to Coenen and Kosanke were calculated, was "$3,913,896."[288] But, according to Frazee, that value was too high, because it included a value of the Series A Preferred Stock that was too high. In Exhibit G, Frazee adjusted the value of the total assets of the Plan from "[$]3,913,896 down to "[$]3,115,896"[289] based on a 30% decrease in the value of the Series A Preferred Stock from the value that Amherst had attributed to the stock.[290] In response to questions by the Court regarding this 30% reduction, Frazee testified as follows at trial:

> THE COURT: On your report. So you got Line 1 [in Exhibit G], stated value of plan assets [$3,913,896]. Can you explain that? Line 8, adjusted PSP value, [$]3,115,896. I'm sure you testified about this. Where did this come
> from?
>
> A   So that's for Note C -- THE COURT: Okay.
>
> A   -- describes the adjustment basically. But essentially the idea is that there is a value being placed on the [Series A Preferred S]tock of [$]1.9 million plus preferred distributions or accrued distributions of $730,000. So keeping the math simple, round numbers the [P]lan was stating as of that date that it held this asset called [Series A Preferred S]tock which had a number, an asset value of 2.6 million dollars.

---

[288]  *See* Ex. G to Addendum to Frazee's expert report (Pl.'s Trial Ex. 92) at ln. 1.

[289]  *See id.* at ln. 8.

[290]  *See id.* at n.C ("Stated value of [Series A Preferred Stock], excluding accrued dividends of approximately $730 thousand, was $1.9 million as of 5/31/05. Discount at 30% (on both) equals $798 thousand.").

. . .

A   Thirty percent —- a 30% haircut on that valuation is roughly [$]800,000. And that . . . 30%  haircut is really where . . . Line 8 comes from. It's . . . a 30% or $800,000 reduction against the value of that [Series A P]referred [S]tock.

THE COURT: Which comes from where?

A   The 80 -- I'm sorry, the 30%?

THE COURT: Thirty percent haircut.

A   Yeah, the 30% is based on my analysis of the Amherst appraisal that was present that supported the original [$]2.7 million.  It's based on my understanding of the limitations of that report in terms of its analysis of what's called a marketability discount. Which is not factored into the conclusion from Amherst.  And it also reflects the fact . . . that -- **that analysis from Amherst was based on a premise that . . . was frankly highly suspect.  And . . . that premise was that the company in fact intended to redeem the shares very shortly and was going to do so . . . and had an intention to do so . . . and/or exchange those preferred shares for . . . some other type of Trans-Industries[, Inc.] security. Those factors clearly were not true in hindsight,** but would have been things to reduce the value even as of June of '05.[291]

Frazee's expert report also concluded that Amherst's assumption that Trans-Industries, Inc. would redeem the Series A Preferred Stock in the near future was not justified:

The [Amherst] valuation focused on the perceived ability of [Trans-Industries, Inc.] to pay dividends, an overly optimistic position shared by Mr. Coenen.  However, Mr. Coenen indicated that dividends were not a priority until [Trans-Industries, Inc.] returned to profitability and that it was more important to keep capital in the Company than to pay a dividend to the Plan.  Also, according to Mr. Coenen, Rick Solon who replaced Mr. Coenen as CEO[,] was more focused on holding cash in [Trans-Industries, Inc.] to develop its business.  **All of this would indicate that Amherst's assumption that [Trans-Industries, Inc.] will pay dividends and redeem shares is tenuous during the time of the issued reports.**

---

[291]  Trial Tr. (Docket # 536) at 66-67 (emphasis added).

. . .

**During this time, [Trans-Industries, Inc.] was in default of various
loan covenants with its lenders.[292]**

The Trustee's other expert Witz, indicated that there was no way to establish a value for the Preferred Stock. He testified that "if [the Series A Preferred Stock was] not on an open market and it can't be traded at arm's length, is there a fair market value for it created potentially by an independent third party? No."[293]

Because Frazee relied on the Amherst valuation to establish that the Series A Preferred Stock had value after December 14, 2001, and because, for the reasons described above, the Amherst valuation was not a reliable source for establishing the value of such stock, the Court concludes that the Trustee has not proven by a preponderance of the evidence that the Series A Preferred Stock had any value at any time after December 14, 2001.

**b. The Trustee did not prove that there was a market for the Series A Preferred Stock after December 14, 2001.**

The Trustee also did not prove, by a preponderance of the evidence, that at any time after December 14, 2001, Coenen and Kosanke could have liquidated the Series A Preferred Stock for the benefit of the Plan. Rather, the evidence established that, from the date of its initial purchase by the Plan on June 5, 2001 and including the relevant period after December 14, 2001, Coenen and Kosanke could not have required Trans-Industries, Inc. to redeem or repurchase the Series A Preferred Stock, and there was no viable market for the Series A Preferred Stock. As Frazee stated in his expert report:

---

[292] Pl.'s Trial Ex. 93 at 9-10 ¶¶ II.28.(G) (footnotes omitted), II.29 (emphasis added).

[293] Trial Tr. (Docket # 533) at 187-188 (testimony of Witz).

> [The Plan] had no right to require that [Trans-Industries, Inc.] redeem [the Series A Preferred Stock], and there was no timetable or commitment by [Trans-Industries, Inc.] to a date on which such redemption might occur. . . . [The Series A Preferred Stock] lacked a liquidity mechanism under which [the Plan] could sell the investment (or receive the preferred dividends). There was no ready market for [the Series A Preferred Stock] <u>and the value of it was ultimately dependent on the willingness and ability of [Trans-Industries, Inc.] to repurchase the shares and/pay any accrued dividends.</u>[294]

Even assuming that Trans-Industries, Inc. ever had the *willingness* to redeem or repurchase the Series A Preferred Stock, it is clear from the evidence presented at trial that, from the date that the Series A Preferred Stock was sold to the Plan, Trans-Industries, Inc. lacked the *financial ability* to redeem or repurchase those shares. Without the $1.9 million cash infusion that Trans-Industries, Inc. received from the sale of the Series A Preferred Stock to the Plan, Trans-Industries, Inc. would not have been able to continue its operations without filing bankruptcy. The $1.9 million Trans-Industries, Inc. received in June 2001 from the sale of the Series A Preferred Stock was rapidly consumed by the operating losses of Trans-Industries, Inc.; and Trans-Industries, Inc.'s financial condition continued to deteriorate after the sale of the Series A Stock to the Plan. The Trustee failed to prove that Trans-Industries, Inc. had the financial ability to redeem or repurchase the Series A Preferred Stock at any time after its sale to the Plan.

In addition, the Trustee failed to present any persuasive evidence that the Series A Preferred Stock could have been sold to any person or any entity *other than* Trans-Industries, Inc. at any time, including during the relevant period after December 14, 2001. The unfavorable characteristics of the Series A Preferred Stock made it virtually impossible to sell it even to those

---

[294] Pl.'s Trial Ex. 92 at 2-3 (underlining in original).

insiders of Trans-Industries, Inc. with deep pockets, such as Figgie, who were willing to, and did purchase other types of stock of Trans-Industries, Inc. during the relevant period. There was no generally recognized market for the Series A Preferred Stock. The Series A Preferred Stock was not publicly traded; it was not convertible to common stock; it had no voting rights; it had not paid any dividends, and whether and when it actually paid any dividends was left entirely to the discretion of Board. And no dividends were actually ever paid. In addition, there was no maturity or mandatory redemption date for the Series A Preferred Stock. Rather, it was redeemable entirely at the discretion of the Board, and the redemption amount was only the amount initially paid per share ($100 per share) plus accrued and accumulated dividends (which accrued and accumulated at the rate of $8.25 per share per annum). Given these characteristics of the Series A Preferred Stock, Witz opined that the Plan's purchase of the Series A Preferred Stock from Trans-Industries, Inc. was, in essence, really just "a loan" from the Plan to Trans-Industries, Inc.[295] And if viewed in that light, it was a wholly unsecured loan, for which there was no deadline for any repayment, and for which there was no requirement to actually ever pay any interest. Who in their right mind would ever pay anything to purchase such a "loan" from the Plan?

Professionals hired to deal with the liquidity crisis and how to divest the Plan of Series A Preferred Stock all expressed their concern over whether such divestment could be accomplished. Calfee, Halter & Griswold, LLP, in the Plan Issues Document, stated: "It may not be possible to liquidate the Series A Preferred Stock. Consideration should be given to converting the Series A Preferred Stock to a Series C Preferred Stock with terms that may be more attractive to

---

[295] Trial Tr. (Docket # 533) at 187 (testimony of Witz).

participants to facilitate voluntary in-kind distributions."[296]  Kathy Scott, the Managing Director

of Relational Advisors referred to the Series A Preferred Stock as a "Great piece of paper."[297]

Joel Reed of Relational Advisors referred to it as "Perpetual Preferred-ugly."[298]  Kathy Scott, in

reference to her efforts to find potential buyers for the Series A Preferred Stock stated that "this

is not going to be easy."[299]

Ultimately, despite efforts to find a buyer for the Series A Preferred Stock, no buyer could

be found.

For all these reasons, Frazee's assumption that Coenen and Kosanke could have

liquidated the Series A Preferred Stock during the relevant time frame is without support in the

evidence, is implausible, and is simply incorrect.  Absent a willing buyer of the Series A

Preferred Stock, the only way that the Plan could have divested itself of the Series A Preferred

Stock was for Trans-Industries, Inc. to redeem that stock.  But the Trustees of the Plan, Coenen

and Kosanke, could not force Trans-Industries, Inc. to redeem the stock, either as a legal matter

or as a practical matter.  Under the terms of the Series A Preferred Stock, the Plan had no legal

right to compel the Company to redeem the stock, *ever*.  As a practical matter, the Company

never had the financial ability to redeem the stock, even if it had wanted to do so.

Rather, the only way the Company could redeem any of the Preferred Series A Stock was

by engaging, with the Plan, in the series of June 2005 distribution transactions with Coenen and

---

[296]  Pl's Trial Ex. 35 at 2 ¶ III.A.

[297]  Pl.'s Trial Ex. 3 at RA0004.

[298]  Pl.'s Trial Ex. 19.

[299]  Pl.'s Trial Ex. 20.

Fields.  And those transactions depleted the Plan of all of its cash and valuable assets, which the Trustee alleges was itself a breach of fiduciary duty.  (This is the Distribution Claim, discussed in Part IV.F of this Opinion.)

Nor could the Plan have compelled Coenen to buy the Series A Preferred Stock, which was one of the options that Frazee suggested in his testimony.  Even assuming that Coenen had the financial ability to pay the Plan anything substantial for the Preferred Stock, either in cash or by liquidating or exchanging common stock he owned in the Company, the Plan had no way to compel Coenen to do so.  At most, the Plan could have sued Coenen for a breach of fiduciary duty, based on Coenen's having caused the Plan to purchase the Preferred Stock in the first place, in June 2001.  This is the "Acquisition Claim," which this Court previously ruled is barred by the applicable statute of limitations.  But if the Plan had filed such a claim against Coenen before the claim was time-barred, it might eventually have obtained a judgment against Coenen, which it may or may not have been able to collect.  The Trustee has presented evidence that would meet his burden of proof to show how much money, if any, this option would have obtained for the Plan if it had been pursued.

The Trustee has failed to prove, by a preponderance of the evidence, that during the relevant period, the Series A Preferred Stock had value, and that it was possible for Coenen and Kosanke to liquidate that stock and obtain any value for the Plan.  For this reason, the Court concludes that Coenen and Kosanke did not breach any fiduciary duty by not divesting the Plan of the Series A Preferred Stock after December 14, 2001, and that the Plan did not suffer any damages due to their failure to liquidate the Series A Preferred Stock.  Rather, the breach of fiduciary duty, and damage to the Plan, was done in June 2001, when the Plan purchased the

112

Series A Preferred Stock. But as noted above, this is the Trustee's Acquisition Claim, which is time-barred.

As noted earlier in this Opinion, the Court entered a "default judgment . . . in favor of the Plaintiff [Trustee] Charles J. Taunt and against Defendant Joan Parker Coenen, in her capacity as representative of the estate of Dale S. Coenen, deceased . . . as to liability only, on all of Plaintiff's claims that remain after the Court's entry of [the sumarry judgment order] (Docket # 484)." The Court indicated that it would determine damages related to all of the Trustee's claims later. As to the Trustee's Retention Claims, no damages will be awarded against Coenen, to the extent that they are based on the retention of the Series A Preferred Stock, because the Court has concluded that there are no damages proven as to this part of the claim.

### 7. The common stock

The Trustee also alleges, with regard to his Retention Claims, that Coenen and Kosanke breached their fiduciary duties to the Plan "of loyalty, prudence, diversification, and adherence [to Plan documents]" by retaining the common stock of Trans-Industries, Inc. in the Plan between 2002 and 2005.[300] Because all of these fiduciary duties are encompassed within the "prudent man standard of care" under 29 U.S.C. § 1104(a)(1), the Court will, as it has done earlier in the opinion, refer to all of these duties collectively as "the prudent person fiduciary duty." The Court finds and concludes that the Trustee has sustained his burden of proving that Coenen and Kosanke each breached his prudent person fiduciary duty, by (1) Coenen's failing to divest the Plan of the common stock within a reasonable time after December 14, 2001; and (2) Kosanke's failing to divest the Plan of the common stock within a reasonble time after January

---

[300] Pl.'s Post-Trial Br. (Docket # 539) at 12 ¶ 51.

11, 2004.

### 8. The Trustees of the Plan had a fiduciary duty to divest the Plan of the common stock of Trans-Industries, Inc.

During trial, the Trustee presented persuasive evidence that the Trustee(s) of the Plan had a prudent-person fiduciary duty to divest the Plan of the common stock of Trans-Industries, Inc., at all times after December 14, 2001.[301]  The Trustee proved that at all times on and after December 14, 2001, a prudent person monitoring the investments of the Plan would have determined that the common stock was not a prudent investment.

During trial, Kosanke admitted, and the Trustee proved, that:

- beginning in the late 1990s, Trans-Industries, Inc. "began a downward [financial] spiral," which continued unabated until Trans-Industries, Inc. filed bankruptcy;[302]

- as Trans-Industries, Inc.'s financial condition deteriorated, the company's profits and the value of the common stock also declined;[303]

---

[301]  As explained above with regard to the retention of the Series A Preferred Stock, Coenen was the only Trustee of the Plan immediately after December 14, 2001. For this reason, only Coenen, and not Kosanke, had a duty to divest the Plan of the common stock within a reasonable time after December 14, 2001.  Because Kosanke did not become a Trustee of the Plan until after it was amended on January 11, 2004, his prudent-person duty to divest the Plan of the common stock did not arise until January 11, 2004.

[302]  *See supra* notes 47-52 and accompanying text.

[303]  *Id.; see* Witz Expert Report (Pl.'s Trial Ex. 93) at 6 ¶ 23 (footnote omitted) ("[Trans-Industries, Inc.] experienced a steady decline in profitability which eventually ended in its bankruptcy filing in April 2006.  During this time the common stock price also experienced a steady decline in value as losses accumulated from 2000 through the date of the [b]ankruptcy filing.") (footnote omitted).  In his expert report, Witz provided a chart illustrating the drop in the prices of the common stock over the relevant years and the company's large losses beginning in year 2000.  *Id.*  The portion of that chart beginning in 1995 stated:

| Year | Share Price | Profit/Loss |
|------|-------------|-------------|
| 1995 | $ 2.72      |             |
| 1996 | $ 4.31      |             |
| 1997 | $10.50      |             |

114

- "In 2001, [Trans-Industries, Inc.] received a notice from NASDAQ warning that the [common] stock would be delisted. The notice to delist was the result of the deteriorating financial condition of [Trans-Industries, Inc.] reflected in the precipitous drop in its stock price."[304]

- the common stock of Trans-Industries, Inc. was thinly traded;[305]

- "during [the relevant] time, [Trans-Industries, Inc.] was in default of various loan covenants with its lenders . . . and ha[d] not received a waiver for these defaults while the lender . . . reserved its rights and remedies;"[306]

- Before January 11, 2004, when the Plan was amended, the Plan limited the Plan's investment in "qualifying employer securities" to no more than 50% of the value of the Plan assets, but, in violation of Plan provisions, as early as 2002, more than 50% of the Plan assets consisted of the stock of Trans-Industries, Inc., and by August 31, 2004, 70% of the Plan assets (including both common and preferred) consisted of the stock of Trans-Industries, Inc.[307]

Witz concluded that the rapidly deteriorating condition of Trans-Industries, Inc.; the over-concentration of Trans-Industries, Inc. stock in the Plan in violation of the governing Plan documents, which made the Plan's success over-dependent on the success of the failing company; the inability of the Plan to liquidate the Series A Preferred Stock due to the lack of a

| | | |
|---|---|---|
| 1998 | $ 8.63 | |
| 1999 | $ 5.50 | $ 225,643 |
| 2000 | $ 1.62 | ($2,303,258) |
| 2001 | $ 0.94 | ($3,079,378) |
| 2002 | $ 4.00 | ($1,343644) |
| 2003 | $ 2.99 | ($3,761.090) |
| 2004 | $ 2.88 | ($3,972,755) |
| 2005 | $  .32 | |

*Id.; see also id.* at 12 ¶ 37.

[304] *Id.* at 6 ¶ 24.

[305] *Id.* at 13 ¶ 43(A).

[306] *Id.* at 9-10 ¶ 29 (internal quotation marks and footnote omitted).

[307] *See* Oct. 6, 2004 Memo (Pl.'s Trial Ex. 26) at 2.

115

market for it; and the fact that the common stock was so "thinly traded;" made "the risk [of the retaining the common stock in the Plan] . . . too great to justify the potential return."[308] According to Witz, such retention was inconsistent with "the ultimate objective [of a] fiduciary," namely, "the best interests of the participants" of the plan.[309]

The Court agrees with Witz's conclusions. Under such circumstances, a prudent person would have liquidated the common stock as quickly as possible to minimize the risk of significant losses to the Plan. And Kosanke admitted this. Kosanke testified that "having a third party come in and evaluate the prudence of the [P]lan's investments . . . did not enter [his] mind" because it was so "obvious" that there was a problem with the mix of the assets in the Plan in 2002.[310] Kosanke admitted that anyone who was monitoring his own portfolio would have concluded that divestment of the common stock was necessary, and that he knew that he could lose everything if this was not done.[311] Given the evidence, the Trustee clearly has satisfied his burden of proving that the Trustees of the Plan had a continuing duty to divest the Plan of the common stock within a reasonable time after December 14, 2001, and at all times thereafter.

**9. The Trustees of the Plan breached their fiduciary duties to the Plan by failing to liquidate the common stock of Trans-Industries held by the Plan**

Relying on the expert report and testimony of Witz, the Trustee alleges that because the Trustees of the Plan had a duty to divest the Plan of the common stock of Trans-Industries, Inc. "during the relevant period (2002-2005)," their failure to do so "constituted a breach of

---

[308] Trial Tr. (Docket # 533) at 183 (testimony of Witz).

[309] *Id.* at 184 (testimony of Witz).

[310] *Id.* at 110.

[311] *See supra* Part IV.E.1.b at page 98.

116

Kosanke's [and Coenen's] duties of loyalty, prudence, diversification, and adherence [to Plan documents]."[312] The Court agrees, and concludes that the Plan Trustees' failure to divest the Plan of the common stock during the relevant period was a breach of all of their fiduciary duties encompassed within the prudent person standard of care under 29 U.S.C. § 1104(a)(1).

The evidence established, and Kosanke admitted, that the common stock of Trans-Industries, Inc. had value throughout the relevant period, and that a Trustee of the Plan could have liquidated all of the common stock within a six to nine month period, depending on when the process of liquidating the stock began, and realized value for the Plan.[313] Because Coenen was the only Trustee of the Plan on December 14, 2001, only he, and not Kosanke, had a duty to divest the Plan of the common stock within six to nine months after December 14, 2001. Because Kosanke became a Trustee of the Plan on January 11, 2004, he had a duty to divest the Plan of the common stock within six to nine months after that date.

Kosanke argues that he cannot be liable for a breach of fiduciary duty, because it was not possible for *him* to liquidate the common stock. Kosanke argues that only Coenen made the investment decisions for the Plan, so only Coenen can be liable for a breach of fiduciary duty in retaining the common stock. For the reasons already explained in Part IV.C.3 of this Opinion, however, this defense is unavailing. For the time period when Kosanke was a Trustee of the Plan, the Plan granted him discretionary authority over the investments for the Plan. He therefore is directly liable for a breach of fiduciary duty under 29 U.S.C. § 1104(a)(1) and 29

---

[312] Pl.'s Post-Trial Br. (Docket # 539) at 12 ¶ 51 (citations omitted); *see also* Witz Expert Report (Pl.'s Trial Ex. 93) at 13-15.

[313] *See* Ex. U to Addendum to Frazee Expert Report (Pl's Trial Ex. 92).

U.S.C. § 1109(a), for any *imprudent* investment decisions, regardless of whether it was he or Coenen who made those decisions. (Section 1104(a)(1) states the prudent-person fiduciary duty, and § 1109(a) makes any fiduciary liable for any breach of his fiduciary duties).

In addition, Kosanke is liable under 29 U.S.C. § 1105(a), for Coenen's breach of fiduciary duty in imprudently causing the Plan to retain the Company's common stock. This is so because Kosanke's actions and inaction satisfy each of the conditions under § 1105(a), any one of which creates liability for Kosanke based on *Coenen's* breach of fiduciary duty. That is because: (1) Kosanke "participated knowingly in" Coenen's actions in imprudently retaining the common stock, "knowing such act or omission is a breach" (§ 1105(a)(1)); (2) Kosanke failed to comply with § 1104(a)(1) and "enabled [another] fiduciary to commit a breach" (§ 1105(a)(2)); and (3) Kosanke had "knowledge of a breach by such other fiduciary, [and did not] make[] reasonable efforts under the circumstances to remedy the breach." (§ 1105(a)(3)) As to this last point, the Court finds that Kosanke did not make *any* meaningful "efforts . . . to remedy the breach" by Coenen, let alone "reasonable efforts."

For all of these reasons, the Trustee has met his burden of proving that both Coenen and Kosanke breached their prudent person fiduciary duty to the Plan by retaining the common stock in the Plan.

### 10. The Plan Trustees' failure to liquidate the common stock of Trans-Industries, Inc. held by the Plan caused the Plan to suffer damages

The Trustee also met his burden of proving that the Plan suffered large losses because of Coenen's and Kosanke's retention of the common stock of Trans-Industries, Inc. The common stock of Trans-Industries, Inc. declined in value from $10.50 per share in 1997 to $.32 per share

118

in 2005.[314]

The Trustee relied on Frazee to establish the amount of damages the Plan suffered as a result of the retention of the common stock. Frazee testified that "[r]oughly . . . 330,000 shares [of common stock] were held during the relevant time period;" that "[s]ome of those [shares] were in fact sold in September . . . of 2005"; and that "there are no damages calculated for those shares that were actually sold."[315] According to Frazee, he did "a calculation that focused on the concept that those [common] shares [which were retained in the Plan] could have been sold earlier which would have resulted in the [P]lan receiving funds. And those funds would then have enhanced the [P]lan's asset values, or the asset balances at the end of 2006."[316] Frazee opined that the Plan's "concentrated position in [Trans-Industries, Inc.] equities (common and [Series A Preferred Stock shares]) during [the relevant] period would trigger the immediate need to begin the liquidation of the more marketable [Trans-Industries, Inc.] common shares. **This would support using liquidation dates that begin at or near the [statute of limitations d]ate [(December 14, 2001)].**"[317] In his report, Frazee performed calculations "for a range of assumed dates on which the . . . [Trans-Industries, Inc.] common stock divestiture should have begun. . . . The concluded damages range for $275 thousand to $1.137 million."[318] Frazee testified that in calculating damages based on the retention of the common stock, he assumed "that the shares . . .

---

[314] *See supra* note 303.

[315] Trial Tr. (Docket # 534) at 158 (testimony of Frazee); Addendum to Frazee Expert Report (Pl.'s Trial Ex. 92) at Ex. U n.2.

[316] Trial Tr. (Docket # 534) at 158 (testimony of Frazee).

[317] Addendum to Frazee Expert Report (Pl.'s Trial Ex. 92) at 4 ¶ 9)b.i. (emphasis in original).

[318] *Id.* at 4 ¶ 9)c; *see also* Ex. U to Addendum to Frazee Expert Report (Pl.'s Trial Ex. 92).

were sold and the cash was stuck in a bank account at the [Plan] and was therefore available to fund requests from . . . participants leaving the [P]lan."[319]  Frazee explained that this method of calculating damages "understates the damages because the reality of it is . . . that a fiduciary would have likely taken those proceeds from these common shares and re-invested them into something."[320]

According to Frazee, the calculation of damages based on the retention of the common stock in the Plan is "very straightforward" because it "is based on the freely traded published market price for those common shares."[321]  Frazee explained that "the common shares are valued on a daily basis by looking in the *Wall Street Journal* or [other] pricing service.  And you can determine the value of a share by looking at published sources."[322]  On Exhibit U of Frazee's addendum to his expert report contains a chart in which he calculated damages based on alternative time periods when the process of selling the common stock could have or should have begun, and when it would have or should have ended, with each row in the chart representing a different and alternative time period.  The damage calculations show the difference between what the Plan would have received during the alternative time periods (amounts ranging from $275,240 on the low end to $1,137,451 on the high end) minus what the Plan actually received

---

[319]  Trial Tr. (Docket # 534) at 180 (testimony of Frazee).

[320]  *Id.* at 180, 182 (explaining that the damages calculated in Ex. U of the Addendum to his expert report are "a conservative estimate of what the damages are because it doesn't reflect any assumption about how these monies could have been re-invested").

[321]  *Id.*

[322]  *Id.* at 179.

from the common stock, which was "$0."[323]

Given the need to liquidate the common shares as quickly as possible to avoid the risk associated with such a high concentration of company stock being held by the Plan, Frazee opined that the time period in which the process of selling the common shares should have begun is the time period the closest to the statute of limitations date, or "right at the beginning of 2002."[324]  That time period is represented by the first row of the chart on Exhibit U to the Addendum of Frazee's expert report.

The first row of Exhibit U assumes that the process of selling the shares of the common stock would start in the beginning of the first quarter of 2002 and would end at the end of the third quarter of 2002.  Under this scenario, Frazee opined that the common stock could have been sold gradually over a six to nine-month period.[325]  For determining the appropriate period over which the common stock could be sold, "one of the things [Frazee] looked at was the actual volume of shares that were being traded on the . . . public markets. [He] looked at the fact . . . for example[,that] a transaction was executed for 50,000 shares in a lump sum out in 2004."[326] Frazee explained that is necessary "to consider essentially the size of the block you're trying to liquidate and the number of shares being regularly traded on the markets . . . to estimate the time

---

[323]  Ex. U to Addendum to Frazee Expert Report (Pl.'s Trial Ex. 92); Trial Tr. (Docket # 534) at 181-82 (testimony of Frazee).

[324]  Trial Tr. (Docket # 534) at 183.

[325]  Kosanke agreed that the shares of common stock held by the Plan could have been, and should have been, sold after December 14, 2001 and that this process of selling the common stock could have been accomplished in a six-month time frame.

[326]  *Id.* at 184.

frame over which you could trickle [the shares into the market]."[327]

During the period indicated in the first row of Exhibit U, — *i.e.*, the first 3 quarters of 2002 — the average price per share for the common stock was $3.14 and the estimated number of the shares of common stock the Plan held was 259,738 shares.[328] Based on these figures, Frazee estimated that the Plan would have received $815,577, if it sold the common stock gradually over this nine-month period. The calculated damages the Plan suffered as a result of retaining, rather than selling, the common shares equals $815,577 (the amount the Plan would have received for the common shares during this time period) minus $0.00 (the amount the Plan actually received for the commons shares).[329]

In another row of the chart on Exhibit U, Frazee calculated damages based on the process of selling the shares of the common stock held by the Plan starting at the beginning of the first quarter of 2004 and ending at the end of the second quarter of 2004 — a six-month time frame. During this time frame, the average price per share for the common stock was $2.66 and the estimated number of the shares of common stock the Plan held was 286,708 shares. Based on these figures, Frazee estimated that the Plan would have received $762,643 if it sold the common stock gradually over this six-month period. The calculated damages the Plan suffered as a result of retaining, rather than selling, the common shares therefore equal $762,643 (the amount the Plan would have received for the common shares during this time period) minus $0.00 (the

---

[327] *Id*. at 185.

[328] Frazee explained why it was necessary for him to estimate and how he estimated the number of shares the Plan held during this period: "Disclosed holdings of common stock were 315,483 shares at the end of 2002 and 313,738 at the end of 2001; no monthly/quarterly records were available for this time period." Ex. U to Addendum to Frazee Expert Report at note B.

[329] Ex. U to Addendum to Frazee Expert Report (Pl.'s Trial Ex. 92)

amount the Plan actually received for the commons shares).[330]

The Court finds, based on the testimony and the expert report of Frazee, that the Plan suffered damages in the amounts calculated by Frazee on his chart on Exhibit U, discussed above.

Only Coenen was a Trustee for the first period of time discussed above, while both Coenen and Kosanke were Trustees for the alternative time frame discussed above. Therefore, both Coenen and Kosanke are jointly and severally liable for $762,643 of damages the Plan suffered based on their failure to divest the Plan of the shares it held of the common stock beginning in the first quarter of 2004 and ending at the end of the second quarter of 2004. Coenen alone is liable for another $52,934 of damages ($815,577 - $762,643), based on his failure to start the process of selling the shares of common stock held by the Plan in the first quarter of 2002.

### F. The Trustee's Distribution Claim

#### 1. The duty, breach, and harm elements of the Trustee's breach of fiduciary duty claim against Coenen and Kosanke based on the distributions to Coenen and Fields in June 2005

The duty, breach, and harm elements of the Trustee's Distribution Claim against Coenen were established by the default judgment against Coenen.[331] In the Court's summary judgment opinion, the Court, in essence, decided that, at least with regard to the Distribution Claim, the Trustee had established that both Coenen and Kosanke owed fiduciary duties to the Plan based on their exercise of discretion, on behalf of the Plan, regarding the June 2005 distributions to

---

[330] Ex. U to Addendum to Frazee Expert Report (Pl.'s Trial Ex. 92)

[331] *See supra* notes 14-15 and accompanying text.

Coenen and Fields. Now, after trial, the Court reiterates that finding, and finds that Coenen and Kosanke breached those fiduciary duties, by their actions and inactions in causing and allowing the Plan to make the June 2005 distributions to Coenen and Fields.[332] The Court finds that the distributions to Coenen and Fields improperly harmed the Plan and the Plan's other participants,[333] and will now discuss the amount of damages the Plan suffered.

### 2. The damages to the Plan for the Distribution Claim

The Trustee relied on Frazee to establish the amount of damages caused to the Plan by the distributions to Coenen and Fields in June 2005. Frazee opined, and the Court finds, that the Plan was harmed by Fields and Coenen receiving distributions, *in excess of what they were entitled to receive*. The calculations of those damages are in Exhibit G to the addendum to Frazee's expert report.[334]

Frazee opined that there were excess distributions to Fields and Coenen as a result of overvaluing the Series A Preferred Stock. The stated value of all of the Plan assets as of May 31, 2005 was $3,913,896.[335] This was the value used for determining the amount to be distributed to Fields and Coenen based on their respective vested interests in the Plan (40.63% for Fields, and 25.52% for Coenen) in June 2005.[336] According to Frazee, included in that total value of all of the Plan assets was an inflated value for the Series A Preferred Stock.

---

[332] *See* Part IV.D of this Opinion.

[333] *See supra* Part II.K.3 of this opinion.

[334] Exhibit G to Addendum to Pl's Trial Ex. 92.

[335] *Id.*. at Line 1.

[336] *Id.* at Line 2.

124

According to Frazee, the stated value of the Series A Preferred Stock, excluding accrued dividends, was $1.9 million as of May 31, 2005.[337] The stated value of accrued dividends was $730,000.[338] The stated total value of the Series A Preferred Stock plus the accrued dividends therefore was $2,630,000. This amount was included in the $3,913,896 stated value of all of the Plan assets, as noted on Line 1 of Exhibit G to the addendum of Frazee's expert report. But according to Frazee, the Series A Preferred Stock was overvalued at this time, so Frazee discounted the $2,630,000 stated value by 30%, or $789,000, to reflect what he believed was a more accurate value to ascribe to the Series A Preferred Stock at that time.[339] Based on this reduced value of the Series A Stock, the stated value of all of the assets of the Plan should have been adjusted downward from $3,913,896 to $3,124,896.[340] According to Frazee, this reduced value of the Plan assets is what the distributions to Fields and Coenen should have been based on.

Frazee explained the basis for his calculation of damages in Exhibit G this way: "Exhibit G basically does a calculation that focuses on the benefits that were received by Mr. Fields and

---

[337] *Id.* at note C.

[338] *Id.*

[339] When questioned why he valued the Series A Preferred Stock differently for purposes of his damage analysis related to the retention of the Series A Preferred Stock (the value of the Series A Preferred Stock attributed to it in the Amherst Appraisal: Valuation Date 12/31/2002 or 80% of that value) than for purposes of his damages analysis related to the distributions to Coenen and Fields (30% of the Amherst Appraisal: Valuation Date 12/31/2002), Frazee indicated that Trans-Industries, Inc. "was a different animal" in January 2003 than it was in June 2005, and that the Amherst Appraisal was outdated by June 2005. (Trial Tr. (Docket # 534) at 191.) In Frazee's view, there had been "a steady march away from the world that existed on January 1st, 2003 to the world that existed in June 2005" which made valuing the Series A Preferred Stock more challenging. (*Id.* at 194.)

[340] *See* Ex. G to Addendum to Pl.'s Trial Ex. 92 at Line 8 ("Adjusted PSP Value"). Frazee lists the value as $1,115,896 based on his mistake in calculating the 30% discount.

Mr. Coenen and compares the actual benefits received to what I believe they should have received if the preferred stock had been properly valued at the point in time."[341]  The calculation shows that Fields received $305,456.76 more than he should have, and that Coenen received $201,671.30 more than he should have.  The total of these excessive distribution amounts made by the Plan, therefore, was $506,671.30.

Rows 11 through 15 of Exhibit G contain Frazee's calculations of the value of the benefits that Coenen and Fields actually received on account of their vested interests in the Plan.  Row 16 of Exhibit G contains Frazee's calculations of what Coenen and Fields *should have* received, if the Series A Preferred Stock had been properly valued.  Row 17 of Exhibit G shows the excess amount that Coenen and Fields received.  The information indicated in rows 11-17 of Exhibit G are as follows:

| Line | Benefit Received | Fields | Coenen |
|------|------------------|--------|--------|
| 11 | Value of common stock received | $ 400,000.00 | $910,764.00 |
| 12 | Stock Restriction Agreement (10% discount) | $          0.00 | ($   91,076.00) |
| 13 | Cash Received | $1,175,102.00 | $    59,000.00 |
| 14 | Severance Received | $          0.00 | $   120,000.00 |
| 15 | Total Consideration Received | $1,575,102.00 | $998,688.00 |
| 16 | Less Consideration if Assets Properly Valued | ($1,265,898.00) | ($795,034.00) |
| **17** | **Gain to Participant (Lines 15-16)** | **$    309,204.00** | **$203,654.00** |

Frazee made a typographical error in calculating the 30% discount on the Series A Preferred

---

[341]  Trial Tr. (Docket # 534) at 190.

Stock, however, such that Row 16 should have been slightly higher – $1,269,645.24 for Fields, and $797,473.46 for Coenen.  Line 17 for Fields should have been **$305,456.76** ($1,575,102 - $1,269.645.24 = $305,456.76) and for Coenen should have been **$201,214.54** ($998,688 - $797,473.46 = 201,214.54), for a total of **$506,671.30**.

Thus, Frazee calculates that the Plan suffered damages totaling $506,671.30 for the Distribution Claim.  However, because the Court has found that after December 14, 2001, the Series A Preferred Stock had ***no*** value,[342] then also as of May 31, 2005, the Series A Preferred Stock had no value. This is so even though Trans-Industries, Inc. redeemed half of the Series A Preferred Stock from the Plan by paying the face amount of the stock, plus the accrued dividends. Trans-Industries, Inc.'s redemption of the Series A Preferred Stock from the Plan does not mean that stock had value, because such redemption was not done as part of an arms length transaction. Rather, the redemption was done as part of a series of transactions between interested parties, and did not ultimately increase the value of the Plan assets.

Because the Series A Preferred Stock had no value as of May 31, 2005, the calculations performed by Frazee must be adjusted to reflect this finding.  First, the stated value of the total Plan assets must be adjusted downward from the stated value of $3,913,896, to $1,283,896, to eliminate the $2,630,000 stated value of the Series A Preferred Stock ($3,913,896 - $2,630,000 = $1,283,896).  Then, the percentages of Fields's and Coenen's respective vested interests must be applied to the adjusted value of the total assets of the Plan.  Applying those percentages results in a finding that Fields should have received $521,646.94 (40.63% of $1,283,896) and Coenen should have received $327,650.26 (25.52% of $1,283,896).  Based on these numbers, the excess

[342]  *See supra* Part IV.E.1.c.i.a of this Opinion.

benefit distributed to Fields was $1,053,455.06, and the excess benefit distributed to Coenen was

$671,037.74, for a total of **$1,724,492.80 in damages** to the Plan due to the excess benefits paid

to Coenen and Fields.  These calculations are shown in the following table (with the Court's

revised numbers reflected in bold and italics):

| Line | Benefit Received | Fields | Coenen |
|------|------------------|--------|--------|
| 11 | Value of common stock received | $ 400,000.00 | $910,764.00 |
| 12 | Stock Restriction Agreement (10% discount) | $        0.00 | ($   91,076.00) |
| 13 | Cash Received | $1,175,102.00 | $   59,000.00 |
| 14 | Severance Received | $        0.00 | $   120,000.00 |
| 15 | Total Consideration Received | $1,575,102.00 | $998,688.00 |
| *16* | *Less Consideration if Assets Properly Valued* | *($521,646.94)* | *($327,650.26)* |
| *17* | *Gain to Participant (Lines 15-16)* | *$1,053,455.06* | *$671,037.74* |

These damages, totaling $1,724,492.80, were directly and proximately caused by the

exercise of Coenen's and Kosanke's discretion, on behalf of the Plan, to enter into the series of

transactions and agreements that resulted in the excess distributions to Coenen and Fields, in

violation of ERISA.  The alternative courses of action, not taken by Coenen and Kosanke, which

would have been consistent with their fiduciary duties under ERISA, include making

distributions in the lower, more appropriate amounts described above, or taking steps to

terminate the Plan and make fair, pro rata distributions to all Plan participants.  Coenen, as a

named discretionary Trustee under the Plan, and Kosanke, as both a named discretionary Trustee

under the Plan and a functional, unnamed Plan Administrator, are both liable for breach of

fiduciary duty. Coenen and Kosanke are therefore jointly and severally liable for the damages just described.

## G. Prejudgment interest

In his post-trial brief, the Trustee asked the Court to award prejudgment interest, from "the date the claims became ripe, December 14, 2001," until the date of judgment, using the federal postjudgment rate that is provided under 28 U.S.C. § 1961.[343]

### 1. Applicable law

> "Though ERISA does not address the propriety of awarding prejudgment interest, prejudgment interest may be awarded in the discretion of the district court. Awards of prejudgment interest are compensatory, not punitive, and a finding of wrongdoing by the defendant is not a prerequisite to such an award." *Tiemeyer v. Cmty. Mut. Ins. Co.*, 8 F.3d 1094, 1103 (6th Cir.1993), *cert. denied*, 511 U.S. 1005, 114 S.Ct. 1371, 128 L.Ed.2d 48 (1993) (internal quotations and citations omitted); *see also Wells v. U.S. Steel*, 76 F.3d 731, 737 (6th Cir.1996) (holding that district court did not abuse its discretion in awarding prejudgment interest when pension fund wrongfully withwhheld benefits).

> Prejudgment interest cannot be awarded, however, at a rate so high that the award amounts to punitive damages:

> > Although prejudgment interest is typically not punitive, an excessive prejudgment interest rate would overcompensate an ERISA plaintiff, thereby transforming the award of prejudgment interest from a compensatory damage award to a punitive one in contravention of ERISA's remedial goal of simply placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing.

> *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir.1998). An interest award should "simply compensate a beneficiary for the lost

---

[343] Pl.'s Second Post-Trial Br. (Docket # 547) at 7 ¶¶ 32-34. The Court notes that this request is inconsistent with the request for prejudgment interest the Trustee made earlier during trial. During closing arguments at trial, the Trustee asked for an award of prejudgment interest "from the date of the filing of the complaint." (*See* Trial Tr. (Docket # 553) at 33, 35.)

> interest value of money wrongfully withheld from him or her." *Rybarczyk v. TRW, Inc.*, 235 F.3d 975, 985 (6th Cir.2000) (quoting *Ford*, 154 F.3d at 618). An excessive prejudgment interest rate would "contravene ERISA's remedial goal of simply placing the plaintiff in the position he or she would have occupied but for the defendant's wrongdoing." *Schumacher v. AK Steel Corp. Retirement Accumulation Pension Plan*, 711 F.3d 675, 686 (6th Cir.2013). Conversely, an exceedingly low award would fail to make the plaintiff whole. *Id.*

*Rochow v. Life Ins. Co. of N. Am.*, 780 F.3d 364, 376 (6th Cir. 2015), *cert. denied*, 136 S. Ct. 480 (2015). The Sixth Circuit Court of Appeals has held that "'the statutory postjudgment framework set forth in 28 U.S.C. § 1961 is a reasonable method for calculating prejudgment interest awards.'" *Meoli v. The Huntington Nat'l Bank*, 848 F.3d 716, 735 (6th Cir. 2017) (quoting *Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 619 (6th Cir. 1998)). However, in *Meoli*, the court noted that in *Schumacher v. AK Steel Corp.*, 711 F.3d 675, 685–86 (6th Cir. 2013), the Sixth Circuit "also held that a 'mechanical application' of that rate was an abuse of discretion, in a case addressing highly specific facts." *Id.*

The *Schumacher* case is related to the case of *West v. AK Steep Corp. Ret. Accumulation Plan*, 484 F.3d 395 (6th Cir. 2007) (the "*West* litigation"). *Schumacher*, 711 F.3d at 679. The *Schumacher* case concerned two "identical plaintiffs." *Id.* at 686. The *Schumacher* plaintiffs were originally part of the *West* litigation but were "excluded from the *West* litigation due to the class members' execution of a severance agreement and release that each of them signed during the *West* litigation" after receiving notices in the middle of the *West* litigation that their employment was being terminated. *Id.* at 679. "Both sets of plaintiffs worked for the same company, brought the same whipsaw calculation claims [under ERISA], during the same period, and were awarded damages under the same calculation." *Id.* Both the *West* plaintiffs and the

*Schumacher* plaintiffs also received awards of prejudgment interest at the applicable rate under 28 U.S.C. § 1961(a). *Id.* at 681. However, the *West* plaintiffs received prejudgment interest at an annual rate of 4.7%, while the *Schumacher* plaintiffs received prejudgment interest at an annual rate 0.12%. *Id.* at 681, 686. Under 28 U.S.C. § 1961, "interest [is] calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(a). "At the time the *West* judgment was awarded, the rate was 4.7%. At the time of the district court's judgment in the [*Schumacher*] case, the rate was at an all-time low of 0.12%." *Schumacher*, 711 F.3d at 686.

The *Schumacher* court held that "[a] proper determination of pre-judgment interest involves a consideration of various case-specific factors and competing interests to achieve a just result." *Id.* at 686. The *Schumacher* court explained further that

> [w]hile district courts may fashion an award in their sound discretion, such an award must consider the case-specific factors such as, but not limited to: the remedial goal to place the plaintiff in the position that he or she would have occupied prior to the wrongdoing; the prevention of unjust enrichment on behalf of the wrongdoer; the lost interest value of money wrongly withheld; and the rate of inflation.

*Id.* at 687.

The *Schumacher* court looked at factors specific to the case before it, including the disparity of the awards between identical plaintiffs, which it found "an absurd result"; the fact that "the rate on return (6.55%)" and the borrowing costs of the company (7.75%) "were much higher than the 0.12% it had been ordered to pay" which "disparity would result in an unfair economic benefit" to the company; and the fact that the prejudgment interest award compensated

131

the plaintiffs for the rate of inflation, but "failed to adequately compensate them for the lost use

of their money." *Id.* at 686-87. Under the circumstances of the case, the *Schumacher* court held

that "the district court abused its discretion by awarding prejudgment interest at the statutory rate

under 28 U.S.C. § 1961(a)." *Id.* at 685, 687.

In *Meoli*, the court distinguished the facts before it from the facts in *Schumacher*, and

held that "[i]t was not an abuse of discretion for the bankruptcy court to award prejudgment

interest according to the rate specified in 28 U.S.C. § 1961, instead of the market interest rate,

because the bankruptcy court considered case-specific factors before applying that statutory rate."

848 F.3d at 735. In explaining its holding, the *Meoli* court stated that the case before it did not

have the idiosyncrasies of the *Schumacher* case. *Id.* (footnote omitted). The *Meoli* court

reasoned:

> [A]s the bankruptcy court noted, the Trustee alone is suing [a bank] to
> make sure that . . . creditors [of the debtor] get their fair share of the
> bankrupt estate under the Bankruptcy Code. The Trustee is a fiduciary
> with the duty to invest conservatively. "[W]hile interest rates on treasury
> bills are disappointingly low at that time, these low rates nonetheless
> represent the safe type of investment that is expected of a fiduciary." The
> bankruptcy court applied the statutory rate after considering case-specific
> factors and therefore did not abuse its discretion.
>
> While the bankruptcy court did not specifically address the rate of
> inflation in relation to the treasury bill rate, it was not required to do so.
> When this court in *Schumacher* required the lower court to consider
> case-specific factors before applying the statutory rate, we also provided
> an illustrative list of case-specific factors, which included the rate of
> inflation. *Schumacher*, 711 F.3d at 687. But the case-specific factors that
> we listed as examples in *Schumacher* did not require that each example be
> addressed in every case. The bankruptcy court satisfied its duty to consider
> case-specific factors when it considered whether the statutory rate was fair
> in light of the type of conservative investment that a fiduciary like the
> Trustee would have pursued.

*Id.* at 736.

### 2. Whether the Court should award prejudgment interest at the federal postjudgment rate as provided under 28 U.S.C. § 1961

The Trustee has asked for the Court to award prejudgment interest at the federal postjudgment rate as provided under 28 U.S.C. § 1961, but has not briefed what case-specific factors support an award of prejudgment interest at this rate. Nevertheless, for the following reasons, the Court will award prejudgment interest at this rate.

First, the Court notes that Kosanke has not objected to awarding prejudgment interest at the postjudgment interest rate under 28 U.S.C. § 1961. He therefore has waived any argument disputing the application of this interest rate. *See McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir. 1997).

Second, the Court finds that an award of prejudgment interest is necessary to make the Plan whole. This adversary proceeding has been pending for a long time and is based on breaches of fiduciary duties by the Trustees of the Plan, which occurred even much earlier than the commencement of this adversary proceeding, and which deprived the Plan of assets that it could have invested over the years to increase the assets of the Plan. Under these circumstances, the Plan should be compensated for the lost use of the money. The Court finds that an award of prejudgment interest at the postjudgment interest rate under 28 U.S.C. § 1961 is just. The Court finds, like the court in *Meoli*, that there are no idiosyncratic facts in this case akin to those in *Schumacher*, which would make an award of prejudgment interest at the 1961 rate unjust. The Court also finds that the interest rate under 28 U.S.C. § 1961 will compensate the Trustee for the lost use of its money, but is low enough to not be punitive in light of the fact that the Court is

133

also awarding the Trustee attorney fees. Based on all of these considerations, the Court will award the Trustee prejudgment interest at the applicable rate under 28 U.S.C. § 1961. That rate is discussed in the next section of this Opinion, below.

### 3. Whether the Court should award prejudgment interest, from the date the claims became ripe, December 14, 2001 or the date the adversary complaint was filed

The Trustee relies on *Sweet v. Consol. Aluminum Corp.*, 913 F.2d 268 (6th Cir. 1990), in asking the Court to award prejudgment interest, from "the date the claims became ripe, December 14, 2001." But *Sweet* does not support the Trustee's request.

In *Sweet*, the district court awarded the plaintiff, who was seeking pension benefits owed to his missing father, "prejudgment interest, calculated pursuant to 28 U.S.C. § 1961(a), from the date the complaint was filed [(May 14, 1984)] until the settlement money was paid." *Id.* at 270. The plaintiff appealed, arguing that the district court erred by not awarding prejudgment interest from the date he was appointed as Special Administrator for the Estate of plaintiff's father under a probate court order (November 10, 1975). *Id.* That order stated, in relevant part, that the Special Administrator "'[s]hall collect and take charge of the estate of [Plaintiff's father] until the fact of death or survival of [Plaintiff's father] can be satisfactorily established.'" *Id.* at 270. In *Sweet*, the Sixth Circuit noted that in *Gavie v. Stroh Brewery Co.*, 668 F. Supp. 608, 614 (E.D. Mich. 1987), the court "found an entitlement to pre-judgment interest was due the plaintiffs 'only if they had an unqualified right to immediate receipt of the funds.'" *Id.* The court of appeals also noted that "[a]nother case cited as authority by the plaintiff-appellant, *Short v. Central States, Southeast and Southwest Areas Pension Fund*, 729 F.2d 567 (8th Cir. 1984), holds that interest is due from the date on which the beneficiary is 'entitled' to the funds." *Id.* The court of appeals

134

held that the plaintiff-appellant was entitled to an award of prejudgment interest from the date he was appointed as Special Administrator, because the probate court order appointing him gave him "an unqualified right to the receipt of Edward Joseph Sweet's monthly pension payments beginning from the day the . . . [p]robate [c]ourt" order was entered. *Id.*

In this case, the Trustee, unlike the plaintiff-appellant in *Sweet*, did not have an unqualified right to immediate receipt of the damages that are being awarded in this case on December 14, 2001. It was necessary for the Trustee to file a complaint and obtain a judgment. Therefore, *Sweet* does not support the Trustee's position on the date from which prejudgment interest should be awarded. Rather, the Trustee is in a position more similar to that of Chapter 11 trustee in the case of *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 291 B.R. 111 (Bankr. N.D. Ill. 2003).

In *Daley*, the Chapter 11 trustee filed an adversary proceeding against the debtor's two officers and sole shareholders, alleging that they breached their fiduciary duties to the debtor's creditors by, among other acts, "selling [one of the two shareholder's] 50% stock in trust for $2.1 million, leaving the company insolvent." *Id.* at 113. The complaint also alleged there were fraudulent transfers and the misappropriation of assets. In *Daley*, the trustee sought the award of prejudgment interest "from the date of the transaction imposing liability which occurred on December 22, 1995, to the date of judgment." *Id.* at 114. The court denied that request, and instead awarded prejudgment interest to the trustee from the date of the filing of the adversary complaint on December 2, 1998. *Id.* The court reasoned:

> When the damages arise from a breach of the defendant's fiduciary duty, the appropriate date could well be the date of the breach or the conduct giving rise to the damages. *See Stanton* [*v. Republic of S. Chicago*, 581

135

N.E.2d 678, 682 (Ill. 1991)]. . . . Therefore, prejudgment interest could be considered for award here at the rate equal to the average "prime rates" for the period from December 22, 1995 until the date of the judgment.

Had an action asserting the wrongs proved by the trustee been brought by some interested party during the years following the transaction in issue, prejudgment interest running from the transaction date would certainly have been considered. But under circumstances here where the action was brought by the Trustee several years later, the [defendants] should not be required to pay interest before the date that they were presented with a suit contesting their conduct. However, as of the latter date, they were able to know the issues and could have decided to resolve the case at that point instead of putting [p]laintiff to his proofs. Therefore, discretion will be exercised to award prejudgment interest running from the date this suit was filed to the date of the judgments entered.

*Id.* at 120–21. The *Daley* court also noted that "[i]n [*Helms v. Roti* (]*In re Roti*, 271 B.R. 281 (Bankr. N.D. Ill. 2002)[, *aff'd sub nom. Nelmark v. Helms*, No. 02 C 0925, 2003 WL 1089363 (N.D. Ill. Mar. 11, 2003)], [the court] imposed prejudgment interest from the date an adversary proceeding was filed on the trustee's fraudulent transfer claim." *Id.* at 116.

In *Roti*, the court stated: "Prejudgment interest has been awarded pursuant to the rate set forth in 28 U.S.C. § 1961 from the date the adversary proceeding was filed." 271 B.R. at 293 (citing *Floyd v. Dunson* (*In re Rodriguez*), 209 B.R. 424, 434 (Bankr. S.D. Tex. 1997) and *Carmel v. River Bank America* (*In re FBN Food Servs., Inc.*), 175 B.R. 671, 690 (Bankr. N.D. Ill. 1994), *aff'd*, 185 B.R. 265 (N.D. Ill. 1995), *aff'd in part, remanded in part on other grounds*, 82 F.3d 1387 (7th Cir. 1996)).

The Court finds persuasive the reasoning in *Daley*. Based on the rationale in *Daley*, the Court will award the Trustee prejudgment interest, from the date of the filing of the adversary complaint, at the rate that was applicable under 28 U.S.C. § 1961 as of that date, which was 3.2

136

per cent per annum.[344]

## H. Attorney fees and expenses

### 1. Whether an award of attorney fees and expenses is appropriate

The Trustee also requests attorney fees and costs. Section 1132(g)(1) of ERISA states:

> (g) Attorney's fees and costs; awards in actions involving delinquent contributions

> **(1)** In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

29 U.S.C. § 1132(g)(1). Under § 1132(g)(1), the Court has broad discretion to "award fees and costs 'to either party' as long as the fee claimant has achieved 'some degree of success on the merits.'" *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010) (citation omitted). Here, the Court has found in favor of the Trustee and against Coenen and Kosanke on the Trustee's breach of fiduciary duty claims, based on the retention of the common stock and the distributions to Coenen and Fields, and has awarded the Trustee damages and prejudgment interest based on these claims. Therefore, the Trustee has satisfied the "some degree of success on the merits" threshold requirement for eligibility to receive an award of attorney fees and costs.

Once the Court has determined this, the Court must then determine whether an award of attorney fees is appropriate under the facts and circumstances of the case.

> A five-factor test articulated in *Secretary of Labor v. King*, 775 F.2d 666 (6th Cir.1985), has become a practical benchmark for whether to award

---

[344] *See* https://www.federalreserve.gov/releases/h15/h15_technical_qa.htm (for general information regarding interest rates); https://www.federalreserve.gov/releases/h15/ (for current release of selected interest rates - H.15); https://www.federalreserve.gov/datadownload/Format.aspx?rel=H15 (for data download of historical select interest rates).

fees. These factors include:

> (1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions.
>
> *King*, 775 F.2d at 669. "[W]hile the five-factor *King* test is not required [after the Supreme Court's decision in *Hardt*], it still has validity in helping courts determine whether or not to award fees to a party that achieves some degree of success on the merits." *Ciaramitaro v. Unum Life Ins. Co. of Am.*, 521 Fed.Appx. 430, 437 (6th Cir.2013); *see also Hardt*, 560 U.S. at 255 n. 8, 130 S.Ct. 2149 (observing that after a court has determined that a claimant has achieved some success on the merits, a court "may" consider the five-factor test). "The *King* factors are not statutory, and so should be looked at holistically, with no one factor 'necessarily dispositive.'" *Warner v. DSM Pharma Chems. N. Am., Inc.*, 452 Fed.Appx. 677, 681 (6th Cir.2011) (quoting *Foltice* [*Guardsman Products, Inc.*, 98 F.3d 933, 937 (6th Cir. 1996)]).

*Huizinga v. Genzink Steel Supply & Welding Co.*, 984 F. Supp. 2d 741, 745 (W.D. Mich. 2013).

The Court will consider the *King* factors.

### 1. Culpability or Bad Faith of the Opposing Party

The first factor is the culpability or bad faith of the opposing party. A party "may be culpable without evincing bad faith. 'Culpable' means 'guilty' or 'blameworthy' or '[i]nvolving the breach of a duty.'" *Id.* at 749 (citing Black's Law Dictionary 407 (8th ed. 2004)). In this case, there was evidence of fiduciaries treating funds in the Plan as a source for infusing capital into a failing company; favoring the interests of a failing corporation and of two highly compensated officers who were participants of the Plan over the interests of the participants of the Plan as a whole; and a substantial failure to prudently manage and monitor the investments in

138

the Plan solely for the interests of the participants of the Plan. These actions were taken in the face of legal advice which accurately detailed the applicable law and warned that taking such actions would constitute breaches of fiduciary duties. The Court has determined that both Coenen and Kosanke breached their fiduciary duties to the Plan, and therefore, they are, by definition, both culpable.

"By contrast, the Sixth Circuit has defined 'bad faith' as 'arbitrary, reckless, indifferent, or intentional disregard of the interest of the person owed a duty.'" *Id.* Under this definition, the Court finds that Coenen and Kosanke acted in bad faith in causing an/or allowing the Plan to retain the common stock and make the distributions to Coenen and Fields. Particularly given their positions as officers and Trustees of the Plan, their superior knowledge of the financial condition of Trans-Industries, Inc., and the detailed legal advice they received, their actions at a minimum were reckless, and showed that they were indifferent to the interests of all of the remaining participants in the Plan. This factor therefore weighs in favor of awarding the Trustee attorney fees and costs.

### 2. Opposing Party's Ability to Satisfy an Award

The second factor is the opposing party's ability to satisfy an award. There was no meaningful evidence presented on this issue. This factor does not weigh for or against an award of attorney fees.

### 3. Deterrent Effect of an Award on Other Persons

The third factor is the deterrent effect of an award of attorney fees and costs on other persons. The acts and omissions that occurred in this case were egregious and resulted in the loss of all, except for a *de minimis* amount, of the retirement savings of 175 participants in the Plan.

The types of acts and omissions that occurred in this case must be deterred in order to prevent similar losses to other retirement plan participants in other companies. This factor weighs in favor of awarding attorney fees and costs.

### 4. *Common Benefit or Significant Legal Question*

The fourth factor requires the Court to consider whether the Trustee "sought to confer a common benefit on other participants in the Plan or resolve a significant legal question under ERISA." *See id.* Here, the Trustee is seeking to confer a benefit on all of the Plan participants, whose retirement savings were wrongly managed and wrongly distributed to Coenen and Fields. This factor weighs in favor of awarding the Trustee attorney fees and costs.

### 5. *Relative Merits of the Parties' Positions*

The fifth factor is the relevant merits of the parties positions. The Trustee's position was strong. The legal advice that Kosanke and Coenen had received from their own counsel as well as the advice of other experts they hired over the years to advise them on the liquidity problem with the Plan, supported the Trustee's position. Kosanke himself admitted that the Plan's investments in the stock in Trans-Industries, Inc. were not done for the exclusive benefit of the Plan participants and were risky investments, and that it would have been possible to sell the common stock instead of retaining it. Although Kosanke's and Coenen's positions were weaker than the Trustee's position, Kosanke and Coenen did have a winning defense regarding the retention of the Series A Preferred Stock. On balance, however, this factor favors an award of attorney fees and costs to the Trustee.

Because four of the five factors favor an award of attorney fees and expenses and the remaining factor is neutral, the Court will award the Trustee his reasonable attorney fees and

costs.

### 2. The process for determining the amount of reasonable attorney fees

The Trustee has not specified the amount of attorney fees and costs he is seeking.  Fed. R.

Civ. P. 54(d), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7054(b)(2)

requires claims for attorney fees to be made by motion.  It provides:

> (d) Costs; Attorney's Fees.
>
> . . . .
>
> (2) Attorney's Fees.
>
> (A) Claim to Be by Motion. A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.
>
> (B) Timing and Contents of the Motion. Unless a statute or a court order provides otherwise, the motion must:
>
> (I) be filed no later than 14 days after the entry of judgment;
>
> (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award;
>
> (iii) state the amount sought or provide a fair estimate of it; and
>
> (iv) disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

Fed. R. Civ. P. 54(d)(2).

As permitted by Fed.R.Bankr.P. 7054(b)(2), this Court has adopted a local rule, L.B.R.

7054-1 (E.D. Mich.), and the procedures under that local rule will apply here.  That local rule

provides:

> **Rule 7054-1 Procedure to Obtain Fees and Costs Under F.R.Bankr.P. 7054**

**(a)** Unless the court orders otherwise, a party who has been awarded attorney fees and related nontaxable costs under F.R.Bankr.P. 7054(b) must, within 14 days after the award, file an application for allowance of the fees and costs with the following information stated separately:

    **(1)** the total amount of fees sought to be awarded;

    **(2)** the amount of expenses to be awarded;

    **(3)** the time period during which the services for which the award is sought were rendered;

    **(4)** a summary statement of the number of hours of service rendered by each professional and paraprofessional and the hourly rates of each;

    **(5)** an itemized time record in chronological order of each specific service for which an award is sought. This itemized time record must:

        **(I)** state the date each service was rendered;
        **(ii)** identify the professional or paraprofessional who performed the service; and
        **(iii)** describe with particularity the services rendered; and

    **(6)** an itemized statement of expenses for which reimbursement is sought.

In addition, the application must include a proposed order awarding and ordering payment of the fees and costs, and a certificate of service.

**(b)** Any party opposing the allowance or payment of the fees and costs will have 14 days from service of the application to object.

**(c)** If no objection is timely filed, the court may grant the application without a hearing.

**(d)** Any objection must specify in detail the nature and basis of the objection and the amount, if any, that is not disputed. Pending resolution of the objection, the court may enter an order awarding and ordering the payment of any undisputed fees and costs.

**(e)** The initial hearing on the application will not be an evidentiary hearing. If the court determines that an evidentiary hearing is needed, the court will schedule a separate evidentiary hearing.

Fed. R. Civ. P. 58(e), made applicable to this adversary proceeding by Fed. R. Bankr. P. 7058, states:

> (e) Cost or Fee Awards. Ordinarily, the entry of judgment may not be delayed, nor the time for appeal extended, in order to tax costs or award fees. But if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under Federal Rule of Appellate Procedure 4(a)(4) as a timely motion under Rule 59.

These rules will apply to the Court's determination of the amount of attorney fees and costs to be awarded to the Trustee in this case. Specifically, if the Trustee wants his relief in this case to include attorney fees and costs (in addition to normal taxable costs), he must file a motion under Civil Rule 54(d)(2), which satisfies all the requirements of L.B.R. 7054-1(a). If the Trustee does so, the procedures of L.B.R. 7054-1(b) through (e) will apply.

## V. Conclusion

For the reasons stated in this Opinion, regarding the Retention Claims, the Court finds Defendants Coenen and Kosanke jointly and severally liable to Plaintiff Trustee for $762,643 in damages the Plan suffered based on Defendants' failure to divest the Plan of the shares it held of the common stock during the period beginning in the first quarter of 2004 and ending at the end of the second quarter of 2004. The Court finds that Defendant Coenen alone is liable for another $52,934 of damages, based on his failure to start cause the Plan to divest itself of the shares of common stock beginning in the first quarter of 2002. Regarding the Distribution Claim, the Court finds that Defendants Coenen and Kosanke are jointly and severally liable to the Plaintiff Trustee for $1,724,492.80 in damages.

The Court will award prejudgment interest to the Trustee from the date on which the

143

Trustee filed this adversary proceeding forward, at the federal statutory rate under 28 U.S.C. § 1961 that was in effect when this adversary proceeding was filed. Post-judgment interest will accrue on the judgment at the federal statutory rate in effect as of the date of entry of the judgment. 28 U.S.C. § 1961(a).

The Trustee also is entitled to reasonable attorney fees and costs, in an amount to be determined under the procedures described above, plus normal taxable costs under Fed. R. Bankr. P. 7054(b)(1).

The Court will enter a judgment consistent with this Opinion.

**Signed on October 18, 2019**

/s/ **Thomas J. Tucker**

**Thomas J. Tucker**
**United States Bankruptcy Judge**